**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

        Plaintiff,

    v.

JETSTREAM GROUND SERVICES, INC.

        Defendant.

**COMPLAINT AND JURY TRIAL DEMAND**

**NATURE OF THE ACTION**

This is an action under Title VII of the Civil Rights Act of 1964, as amended, and Title I of the Civil Rights Act of 1991 against Defendant JetStream Grounds Services, Inc., to correct unlawful employment practices on the basis of religion and in retaliation for engaging in protected activities, and to provide appropriate relief to Safia Abdulle Ali, Sahra Bashi Abdirahman, Hana Bokku, Sadiyo Hassan Jama, Amino Warsame and other female Muslim applicants and employees at the Denver International Airport who were adversely affected by such practices. The Equal Employment Opportunity Commission alleges that Defendant discriminated against female Muslim applicants and employees when it refused to hire, discharged, reduced hours, and took other adverse measures against religiously observant female Muslim employees and failed to accommodate their religious practices and beliefs. The EEOC further alleges that

Defendant retaliated against female Muslim employees and applicants who engaged in protected activity including seeking accommodation and/or complaining about discrimination.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(1) and (3) ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

## PARTIES

3. Plaintiff Equal Employment Opportunity Commission ("EEOC" or "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII, and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

4. Defendant JetStream Ground Services, Inc., ("JetStream"), is a Florida corporation.

5. At all relevant times, Defendant has continuously been doing business in the State of Colorado, and has continuously had at least 15 employees.

6. At all relevant times, Defendant has continuously been an employer engaged in

an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## **STATEMENT OF CLAIMS**

### *Conditions Precedent*

7. More than thirty days prior to the institution of this lawsuit, Safia Abdulle Ali, Sahra Bashi Abdirahman, Hana Bokku, Sadiyo Hassan Jama, and Amino Warsame ("Charging Parties"), filed charges with the Commission alleging that Defendant had discriminated against them in violation of Title VII

8. The Colorado Civil Rights Division ("CCRD") and EEOC each provided Defendant with notice of the charges of discrimination.

9. CCRD and EEOC each investigated the charges of discrimination.

10. Based on evidence adduced during the agencies' two investigations, EEOC issued a determination finding reasonable cause to believe that Defendant had engaged in certain unlawful employment practices identified in the determination.

11. The Commission's determination included an invitation for Defendant to join the Commission in informal methods of conference, conciliation, and persuasion in an attempt to eliminate and remedy the alleged unlawful employment practices.

12. Defendant agreed to participate with EEOC in this informal conciliation process.

13. The Commission and Defendant were unable to reach an agreement through the conciliation process.

14. The Commission sent notice to the Defendant that conciliation had failed.

15. All conditions precedent to the institution of this lawsuit have been fulfilled.

### *General Allegations*

16. Since at least October of 2008, Defendant Employer has engaged in unlawful employment practices at the Denver International Airport, in violation of Sections 703(a) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a).

17. Defendant is a nation-wide corporation that offers ground services to airlines, including cargo, freight, and mail handling, air craft maintenance, and cabin-cleaning services.

18. In September of 2008, Defendant registered with the Colorado Secretary of State.

19. In October of 2008, Defendant first assumed the contract for ground-services of United Airlines at Denver International Airport ("DIA").

20. Prior to October of 2008, Air Serv Corporation ("AirServ") provided the ground services for the United Airlines fleet at DIA.

21. Charging Parties were all employed as cabin-cleaners for AirServ before Defendant assumed the United Airlines contract at DIA.

22. The Charging Parties are all female employees who are immigrants from Ethiopia and Somalia.

23. The Charging Parties all practice the Muslim faith.

24. Tenets of the Muslim faith require Muslim women to wear a head covering.

25. Depending on an individual's beliefs, the Muslim faith might also require Muslim women to wear long skirts.

26. AirServe policies included a uniform policy.

27. The Charging Parties and other female Muslim employees were provided a religious dress code accommodation by AirServ so that they were allowed to work wearing head coverings and full-length skirts.

28. During the tenure of their employment with AirServ, the Charging Parties and other female Muslim employees, who were provided a religious accommodation for their clothing, worked without incident or injury.

29. On or about the end of October, 2008, Defendant began to interview AirServ employees for positions with JetStream.

30. In October 2008, David Norris was Defendant's vice-president.

31. In October 2008, Defendant had and continues to have a uniform policy for cabin cleaners.

32. Defendant's uniform policy requires cabin-cleaners to wear company-issued uniforms, which included, *inter alia*, pants and a cap with a company logo on it.

33. All of the Charging Parties wore head coverings at their interviews for employment with Defendant.

34. Charging Parties Ali, Jama, and Warsame also wore full-length skirts at their interviews with Defendant.

### *Charging Party Amino Warsame*

35. Charging Party Amino Warsame worked for AirServ for almost a year and a half before she interviewed for employment with JetStream.

36. In October 2008, Warsame was interviewed by Norris for a position with

5

Defendant.

37. During Warsame's interview, Norris questioned her about her religious clothing.

38. Norris asked Warsame if she dressed the same way during her employment with AirServ as she was dressed at the interview.

39. Warsame told Norris that she had worn the same kinds of clothing while working at AirServ as she was wearing in the interview.

40. Warsame explained to Norris during her interview that she was required to cover her hair and wear a long skirt in accordance with her religious principles.

41. Norris told Warsame that she could not dress the way she was dressed at the interview and work for JetStream.

42. Norris told Warsame that if she did not uncover and reveal her hair, she would not be hired to work at JetStream.

43. Because she needed the work, Warsame agreed to wear pants, but told Norris that she could not uncover her hair.

44. Warsame complained to Norris that she felt she was being discriminated against.

45. Norris refused to hire Warsame and dismissed her from his office.

46. Several days after her interview, Warsame returned to speak with Norris.

47. When she met with Norris, she provided him a note from Denver Islamic Society President, Ferjani Hafedh.

48. The note was one Warsame had previously provided to AirServ to prove she needed a religious dress code accommodation in the form of covering her hair and wearing a long skirt.

49. The letter states that "according to Islamic rules girl is not allowed to wear pens [*sic*] showing her body so it advised to put dress, and she has to cover her hair. This is written based on Amino Warsame request for her job."

50. Upon providing Norris the note from Hafedh, Warsame asked to be allowed to work.

51. Norris refused to employ Warsame unless she removed her religious head covering.

52. Norris did not provide Warsame a religious accommodation.

53. Norris did not discuss with Warsame any potential religious accommodation.

54. Norris did not propose or offer Warsame any potential religious accommodation.

55. Warsame was not hired by JetStream.

### *Charging Party Hana Bokku*

56. Charging Party Hana Bokku worked for AirServ for approximately two and a half years before she interviewed for employment with JetStream.

57. When Bokku sought work with JetStream, she was also interviewed by Norris.

58. During her interview, Norris asked Bokku whether AirServe had allowed her keep her hair covered at work.

59. Bokku explained that she was required to cover her hair because of her faith, and that AirServe had indeed allowed her to do so while she had been employed by them.

60. Norris told Bokku that JetStream would not hire her because the company's rules prohibited her from covering her hair.

61. Norris did not provide Bokku a religious accommodation.

62. Norris did not discuss with Bokku any potential religious accommodation.

63. Norris did not propose or offer Bokku any potential religious accommodation.

64. Bokku was not hired by JetStream.

### *Charging Parties Safia Abdulle Ali and Sadiyo Hassan Jama*

65. Charging Parties Jama and Ali worked for AirServ for approximately two years before they interviewed for employment with JetStream.

66. Norris interviewed Jama and Ali together.

67. During the interview, Norris asked both Jama and Ali if AirServ had allowed them to keep their hair covered at work.

68. Jama and Ali both answered that AirServe had allowed them to keep their hair covered.

69. Norris also asked Jama if AirServ had allowed her to wear a skirt at work.

70. Jama confirmed that she was allowed to work in a skirt when she worked for AirServ.

71. Norris stated that in Florida, where Defendant is headquartered, he was not faced with similar problems, and that none of the employees attempted to dress like Ali and Jama were dressed during the interview.

72. Norris told Jama and Ali that the company would not allow any deviations from the uniform.

73. Jama agreed to wear pants in order to keep her job.

74. Jama and Ali both maintained that they needed to be able to cover their hair.

75. Norris did not provide Jama or Ali a religious accommodation.

76. Norris did not discuss with Jama or Ali any potential religious accommodation.

77. Norris did not propose or offer Jama or Ali any potential religious accommodation.

78. Neither Jama nor Ali was hired by Jetstream.

### *Charging Party Sahra Bashi Abdirahman*

79. Charging Party Sahra Bashi Abdirahman worked with AirServ for approximately 18 months before she interviewed with JetStream.

80. Abdirahman was the only Charging Party who was not interviewed by Norris.

81. Norris, however, saw Abdirahman on the day of the interviews and asked an AirServ manager named "Gary" if Abdirahman covered her hair at work for AirServ.

82. Gary told Norris that Abdirahman covered her hair, but that it was not a problem.

83. Gary told Norris that Abdirahman was a good worker.

84. After being interviewed, Abdirahman was placed on a list of employees JetStream intended to hire.

85. The first day Abdirahman came to work for JetStream, Norris told her that JetStream would not employ her unless she was willing to wear pants and uncover her hair.

86. Abdirahman agreed to wear pants, because she needed the work.

87. Abdirahman explained to Norris that according to her religion, she could not uncover her hair in public.

88. Abdirahman demonstrated to Norris how she could tie her headscarf tight around her head so that it was almost entirely concealed underneath the mandatory company hat.

89. Norris refused to let Abdirahman work, telling her that even if she secured her head scarf close to her head, JetStream would not hire her.

90. Norris did not provide Abdirahman a religious accommodation.

91. Norris did not discuss with Abdirahman any potential religious accommodation.

92. Norris did not propose or offer Abdirahman any potential religious accommodation.

93. Norris then terminated Abdirahman.

### *Defendant Denied Equal Employment Opportunities To and Retaliated Against Other Muslim Women Who Requested a Religion Accommodation*

94. Defendant has also refused to employ other Muslim women because of their religious practices of covering their hair and/or wearing full-length skirts.

95. Defendant has refused to accommodate the religious practices of the Charging Parties and other Muslim women who wear head coverings and/or full-length skirts.

96. During the time of the October 2008 interviews, several Muslim women complained to Norris about being discriminated against because of their religion, and/or for requesting a religious accommodation.

97. Defendant denied employment opportunities to Charging Parties and other Muslim women because of their religious beliefs and practices.

98. Defendant retaliated against Charging Parties and other Muslim women who requested accommodation for their religious beliefs and/or who complained about discrimination when they were denied an accommodation.

## FIRST CLAIM FOR RELIEF: RELIGIOUS DISPARATE TREATMENT
[Religious Discrimination -- 42 U.S.C. § 2000e-2(a)]

99. The allegations contained in the forgoing are hereby incorporated by reference.

100. Since at least September, 2008, Defendant has engaged in unlawful employment practices at Denver International Airport, Colorado, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by denying equal employment opportunities to female Muslim employees and applicants because of their *bona fide* religious beliefs regarding dress requirements.

101. Charging Parties and other women who are observant Muslims and dress in conformance with their religious mandate were subject to degrading comments about their appearances and dress.

102. Non-Muslim female employees and applicants were not subject to similar comments about their appearance or dress.

103. Defendant denied employment to the Charging Parties and other female Muslim employees and applicants because of their religious practices of covering their hair and/or wearing full-length skirts.

104. The effect of the practices complained of above has been to deprive Charging Parties and other aggrieved individuals of equal employment opportunities and otherwise adversely affect their employment status because of their religious

beliefs.

105. The unlawful employment practices complained of above were and are intentional.

106. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Charging Parties and other aggrieved female Muslim applicants and employees.

## SECOND CLAIM FOR RELIEF: RELIGIOUS ACCOMMODATION

[Failure to Accommodate -- 42 U.S.C. § 2000e-2(a)]

107. The allegations contained in the forgoing are hereby incorporated by reference.

108. Since at least September, 2008, Defendant has engaged in unlawful employment practices at Denver International Airport in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by failing to reasonably accommodate the religious beliefs and/ or practices of female Muslim employees and applicants.

109. Defendant's uniform policy for cabin cleaners required employees who are cabin cleaners to wear pants and a logoed cap.

110. Defendant's uniform policy for cabin cleaners conflicts with the religious practice of Charging Parties and other Muslim women who wear head coverings and/or full-length skirts.

111. Defendant refused to provide any religious accommodation to eliminate the conflict between Defendant's uniform policy for cabin cleaners and the religious practices of Charging Parties and other Muslim women who wore head coverings

12

and/or full-length skirts.

112. Defendant refused to allow female Muslim applicants and employees to wear head coverings as a religious accommodation.

113. Defendant refused to allow female Muslim applicants and employees to wear full-length skirts as a religious accommodation.

114. The effect of the practices complained of above has been to deprive Charging Parties and other aggrieved individuals of equal employment opportunities and otherwise adversely affect their employment status because of *bona fide* religious beliefs and practices.

115. The unlawful employment practices complained of above were and are intentional.

116. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Charging Parties and other aggrieved female Muslim applicants and employees.

## THIRD CLAIM:  RETALIATION

[Retaliation -- 42 U.S.C. § 2000e-3]

117. The allegations contained in the forgoing are hereby incorporated by reference.

118. Since at least September, 2008, Defendant has engaged in unlawful employment practices at Denver International Airport in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3 by retaliating against female Muslim employees and applicants who engaged in the protected activity.

119. Charging Parties and other Muslim women engaged in protected activity by requesting religious accommodation and/or complaining about religious discrimination.

120. After Charging Parties and other Muslim women requested religious accommodation and/or complained about religious discrimination, they were subjected to actions that would dissuade a reasonable person from engaging in protected conduct.

121. In particular, Defendant reduced work hours, changed schedules, discharged, and/or refused to hire Charging Parties and other Muslim women who requested religious accommodation and/or complained about religious discrimination.

122. The effect of the practices complained of above has been to deprive Charging Parties and other aggrieved female Muslim applicants and employee of equal employment opportunities and otherwise adversely affect their employment status because they engaged in protected activity.

123. The unlawful employment practices complained of above were and are intentional.

124. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Charging Parties and other aggrieved female Muslim applicants and employees.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of religion or retaliates against employees for complaining about discrimination or requesting religious accommodation, in violation of Title VII.

B. Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for women, Muslims, and employees who engage in protected activity, and which eradicate the effects of its past and present unlawful employment practices.

C. Order Defendant to make whole Safia Abdulle Ali, Sahra Bashi Abdirahman, Hana Bokku, Sadiyo Hassan Jama, Amino Warsame and other aggrieved Muslim women by providing appropriate back-pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief, including but not limited to reinstatement with all attendant rights and benefits, or front-pay in lieu thereof.

D. Order Defendant to make whole Safia Abdulle Ali, Sahra Bashi Abdirahman, Hana Bokku, Sadiyo Hassan Jama, Amino Warsame and other aggrieved Muslim women by providing compensation for past and future compensatory losses resulting from the unlawful practices complained of in the paragraphs above, including emotional pain, suffering, inconvenience, mental anguish, loss

of enjoyment of life and humiliation, in amounts to be determined at trial.

E. Order Defendant to make whole Safia Abdulle Ali, Sahra Bashi Abdirahman, Hana Bokku, Sadiyo Hassan Jama, Amino Warsame and other aggrieved Muslim women by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above.

F. Order Defendant to pay punitive damages for its unlawful employment practices done with malicious or reckless disregard for the federally protected rights of Charging Parties and other aggrieved Muslim women, in amounts to be determined at trial.

G. Grant such further relief as the Court deems necessary and proper in the public interest.

H. Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its complaint.

Dated:  August 30, 2013.

    Respectfully submitted,

    P. David Lopez
    General Counsel

    U.S. EQUAL EMPLOYMENT
    OPPORTUNITY COMMISSION
    1801 L Street, N.W.
    Washington, D.C.  20507

        MARY JO O'NEILL
        Regional Attorney
        Phoenix District Office

        RITA BYRNES KITTLE
        Supervisory Trial Attorney
        Denver Field Office

        */s/ Iris Halpern*
        IRIS HALPERN
        Trial Attorney
        EEOC Denver Field Office
        303 E. 17th Ave., Suite 510
        Denver, CO  80203
        Telephone:  303-866-1347
        Fax:  303-866-1374
        Email:  iris.halpern@eeoc.gov

        Attorneys for Plaintiff
        EQUAL EMPLOYMENT
        OPPORTUNITY COMMISSION

**PLEASE NOTE:**
**For the purposes of service upon the EEOC, it is sufficient that pleadings, notices, and  court documents be served upon the Trial Attorneys.**