**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-02340-CMA-KMT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

     Plaintiff,

SAFIA ABDULLE ALI,
SAHRA BASHI ABDIRAHMAN,
HANA BOKKU,
SADIYO HASSAN JAMA, and
SAIDA WARSAME, a/k/a AMINO WARSAME,

     Applicants for Intervention,

v.

JETSTREAM GROUND SERVICES, INC.,

     Defendant.

---

**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING IN PART PLAINTIFF'S PARTIAL MOTION FOR SUMMARY
JUDGMENT <u>AND</u> DENYING THE EEOC's MOTION TO STRIKE**

---

In this religious discrimination and retaliation case, Plaintiff-Intervenors – five

female Muslim cabin cleaners who worked for a United Airlines contractor – allege that

Defendant JetStream Ground Services, Inc. (JetStream), failed to hire them after they

requested to cover their heads and wear long skirts for religious purposes.  The Equal

Employment Opportunity Commission (EEOC) also alleges that two so-called

"aggrieved individuals" (also Muslim employees of JetStream) were laid off or selected

for part-time work for the same discriminatory reasons.

This matter is before the Court on JetStream's Motion for Summary Judgment (Doc. # 83) and the Plaintiffs' Cross-Motion for Partial Summary Judgment (Doc. # 84.) Defendant's Motion argues that summary judgment should be entered in its favor on all of the claims due to the EEOC's failure to satisfy its conciliation requirements.  (Doc. # 83 at 1.)  It also seeks summary judgment on the two aggrieved individual's religious accommodation, disparate treatment, and retaliation claims.  (*Id.*)  Lastly, it contends that summary judgment should be entered on some of the Intervenors' damages, because the job offers made to the Intervenors limit their recovery of both back and front pay.  (*Id.* at 1-2.)

Plaintiffs' Cross-Motion for Partial Summary Judgment argues that the Court should enter summary judgment in their favor on several of Jetstream's defenses, including (1) the exhaustion of remedies and administrative prerequisites; (2) the viability of Plaintiffs' claims based on statute of limitations, waiver, estoppel, and laches; and (3) defenses alleging that the religious accommodations at issue are an undue burden.  (Doc. # 84.)

## I.   **BACKGROUND**[1]

## A.   **GENERAL BACKGROUND**

JetStream provides a variety of support services for airlines – including cargo, freight, and mail handling services; aircraft maintenance services; and cabin cleaning services – at airports throughout the United States, including Denver International

---

[1] Unless otherwise noted, these facts are deemed undisputed.  Additionally, the Court sets forth facts only as necessary to address the arguments presented in the parties' respective Motions for Summary Judgment.

Airport (DIA).  (Doc. # 83, ¶ 1.)  In early October of 2008, Jetstream was awarded a

contract with United Airlines (United) to provide cabin-cleaning services at DIA.  (*Id.*, ¶

2.)  In December of 2008, Jetstream also assumed United's overnight and daytime

cleaning operations from AirServ Corporation ("AirServ"),[2] United's prior cabin cleaning

service provider at DIA.  (*Id.*, ¶ 3.)  JetStream announced that it would interview

AirServ's prior employees for its new operations, and conducted these interviews on

October 21-23, 2008.  (Doc. # 84-57 at 2.)

On February 5, 2009, five of AirServ's female cabin-cleaning employees – Safia

Abdulle Ali, Sahra Abdirahman, Hana Bokku, Sadiyo Jama, and Amino Warsame

("Intervenors") – all of whom are Muslim Ethiopian and Somali immigrants, filed

Charges of Discrimination (Charges) against JetStream, alleging discrimination on the

basis of sex and religion.  (*Id.*, ¶ 4.)  Specifically, the Intervenors allege that they were

not hired during the transition between the AirServ and the JetStream contract because

their religious beliefs require them to cover their hair, ears, and neck with a hijab[3]

whenever they are in public.  (Doc. # 84, ¶ 1.)  The women also believe that they must

dress is a way that is not revealing of their form or body, such that they must wear full-

length skirts in public.  (*Id.*)  JetStream's (current and past) uniform policy requires that

cabin cleaners to wear pants while working, even if they request to wear skirts for

---

[2] "AirServ" is also occasionally referred to by employees and others as "AirServices."  (*See, e.g.*, Doc. # 117-6, ¶ 1.)

[3] "A leading scholar of Islam . . . has defined a 'hijab' as the 'veil or head covering worn by Muslim women in public.'"  *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1111, n.1 (10th Cir. 2013) *rev'd and remanded*, 135 S. Ct. 2028 (2015) (citing John L. Esposito, <u>Islam: The Straight Path</u> 310 (4th ed. 2011)).  In their briefs, the parties use the term "hijab" interchangeably with "headscarf" or "head covering"; the Court will adopt this convention as well.

religious reasons.  (Doc. # 117, ¶ 52.)  The parties dispute whether, prior to a change in 2011, Jetstream permitted its cabin cleaners to wear hijabs or headscarves – either as a matter of formal policy or actual practice.  (*Compare* Doc. # 117, ¶¶ 50-52 to Doc. # 130, ¶¶ 50-52).[4]

In her Charge, each Intervenor alleged that she worked for AirServ for some years prior to Jetstream's assumption of the United contract; that AirServ had provided her with a religious accommodation to its uniform policy, such that she was allowed to work while wearing a hijab and a full-length skirt; and that she had worked wearing both

---

[4] The EEOC submitted a declaration from Mary Berish, another cabin cleaner who worked for AirServ and later for JetStream.  (Doc. # 117-6.)  In her Declaration, Ms. Berish states that after the interviews were conducted with JetStream, Ms. Abdirahman and another employee (possibly Ms. Ali) told her that they were worried that they would not be hired because of their headscarves and skirts.  (*Id.*, ¶ 20.)  She further states that she spoke with station Manager Earl Alexander and he told her that he "didn't know if JetStream would allow the women to wear skirts or the 'tops over their head'", and also that "he didn't know if JetStream would allow them to wear the 'garments for their religion."  (*Id.*, ¶ 21.)  The EEOC also submitted a declaration from Diana Martinez, the Administrative Manager for JetStream, explaining how she was approached by some female employees who complained about needing to wear headscarves for religious purposes.  She and station manager Earl Alexander worked with JetStream's uniform supplier in an effort to supply headscarves for the women, but "[n]o one from JetStream in Jupiter, Florida had anything to do with Earl and I providing the female cabin-cleaners with headscarves.  In fact, the managers from Florida initially told us that there were absolutely no exceptions to the uniform policy for any reason.  It was only after some Muslim female applicants complained to the government and a legal investigation started that Earl and I finally heard back from JetStream with permission to start providing employees at DIA with the option of ordering headscarves through our uniform provider.  We had tried to raise the matter of headscarves up to Florida's attention before the government investigation, but they just ignored us and we never heard back. . . . no one from JetStream ever told Earl or I that we needed to work with or accommodate employees' religious practices if it was possible.  We were just told that there was no deviation from the uniform policy."  (*Doc. # 117-34*, ¶¶ 17-18.)  Defendant responds that "The EEOC's cited declarations do not establish that JetStream prohibited headscarves in 2008 and early 2009.  According to Berish, she spoke to Alexander about headscarves before JetStream took over at DIA, and he only said that he did not know if they were permitted.  Martinez states that, in 2008 or early 2009, she worked with Alexander to accommodate women who asked to wear headscarves, and none of JetStream's corporate managers spoke to them about it.  Further, [another Muslim employee] wore a headscarf at JetStream after it took over the United contract."  (Doc. # 130, ¶¶ 50-52).

items of clothing without incident or injury.  (*See, e.g.*, Doc. # 84-9 at 2.)  Each

Intervenor also alleged that in October of 2008, during the transition between the

AirServ and the Jetstream contracts, Jetstream's Vice President, David Norris, began

interviewing AirServ's employees to determine if they should be "re-hired" at JetStream.

(*Id.*)

The EEOC has submitted evidence regarding Mr. Norris' allegedly open

animosity toward Muslim women wearing hijabs.  Specifically, Michael Maina, who was

employed by both AirServ and JetStream as a Duty Manager, provided a declaration

describing the following comments allegedly made by Mr. Norris:

> On or about two weeks after JetStream took over at DIA, I recall David
> Norris making a comment about a female Muslim employee who was
> wearing a headscarf.  He stated that "United Airlines passengers would
> think they were terrorists," and that "JetStream should fire them" referring
> to female employees who wore headscarves.  He made this comment in
> the break room to me and several other managers.  On another occasion,
> maybe two or three weeks after JetStream took over the contract from
> AirServices, David Norris personally spoke with me and told me that the
> Muslim women who were working for JetStream should be fired because
> they looked like "terrorists."  I told him that he could not do that – that he
> could not fire employees because of their religious beliefs once they were
> already hired.  He just replied that it was his company and he could do
> whatever he wanted.

(Doc. # 117-14, ¶¶ 1-2, 10-11.)  Plaintiffs also submitted a declaration from Brenda

Holan, who worked as an Administrative Manager for JetStream and helped interview

applicants during the United transition.  (Doc. # 117-15, ¶¶ 1, 5.)  She described the

following interactions with Mr. Norris:

> I recall that a number of times during the days we were conducting
> interviews and throughout the transition period David Norris stating [sic]
> that female employees "can't wear headscarves" and that he expected
> them to wear uniforms.  I recall that he stated that he did not care if the

reason was "religion" or not.  Female cabin-cleaners would not be allowed to wear headscarves, "no ifs, ands, or buts."  He also said that he wanted "none of this headscarf garbage. We're not putting up with any of that." . . . During the interviews, David Norris made many references to "these people" which I thought were derogatory and insulting to the applicants.  I also recall David Norris stating once at one of the daily managers meeting that we should not hire any female Muslim employees and that the ones we had hired we should fire because when they wore headscarves "United passengers would think they were terrorists." I cautioned him that he couldn't do that and it was wrong.  I was appalled.

(*Id.*, ¶¶ 16-17, 19.)

During his interviews, Mr. Norris asked Ms. Ali, Ms. Jama, and Ms. Warsame about whether AirServ had permitted them to wear skirts and hijabs at work.  (Doc. ## 83, ¶ 5; 117, ¶ 1.)  The women confirmed that, indeed, AirServ had allowed them to work with skirts and hijabs, and they told Norris that they needed to wear these garments for religious reasons.  (Doc. ## 83, ¶ 2; 117, ¶¶ 2-4; 117-57 at 17.)  Mr. Norris allegedly responded by telling Ms. Ali, Ms. Jama, and Ms. Warsame that he had an "issue" with the skirts; after hearing this, all three agreed to wear pants (because they thought they needed to do so to be hired), but Norris allegedly told them that JetStream still would not hire them because they could not agree to work without hijabs.  (Doc. # 117-57 at 7, Doc. 13, ¶ 41).  Ms. Warsame also alleges that she offered to provide Mr. Norris with a note from the Denver Islamic Society, explaining that Islamic tenets provide that a woman is not allowed to wear pants and that she is also supposed to cover her hair, but that he refused to accept it.  (Doc. # 84-12.)  After the interviews, the women were allegedly told that they would receive a follow-up phone call; ultimately,

however, the five women were not "re-hired" as employees by Jetstream.[5]  (Doc. ## 84,

¶ 7, 84-8 to -12.)  In July of 2009, each Intervenor filed an Amended Charge, adding an

allegation of retaliation.  (Doc. # 83, ¶ 7.)

Between April 13, 2010 and August 29, 2012, the EEOC investigated the

Intervenors' charges and also expanded the investigation to encompass all of

JetStream's national operations.  (Doc. # 84, ¶ 13.)  The expanded investigation

included multiple requests for additional information sent to both JetStream and AirServ,

an on-site visit to DIA, and interviews of current JetStream employees.  (*Id.*)

In February and March of 2011, based on "legal issues regarding the

burka headgear," JetStream amended its uniform policy.  (Doc. ## 84-33 at 1.)

The policy provides that

> Scarves used as a headdress are permitted in solid navy blue, black or
> JGS [JetStream Ground Services] approved only.  In compliance with
> safety requirements, the scarf/head dress must be short as not to obscure
> the face (36" x 36" maximum dimensions) and must be attached securely
> to the employee's head.  The scarf/head dress must not hang below the
> shoulders or loose fitting to prevent injury.

(Doc. ## 84-33 at 1, 7; 116-4 at 22, 37.)

In a letter dated August 8, 2012, Defendant provided the following explanation to

the EEOC investigator for its decision not to hire the Intervenors:[6]

> Air Services lost its contract with United because it was not meeting
> United's cleaning standards.  When JetStream began providing cabin
> cleaning services, it set out to overhaul and improve upon the level of

---

[5] In May of 2009, Ms. Abdirahman filed an Amended Charge alleging that JetStream initially
placed her name on a list of hired employees but, after talking to Norris regarding her religious
dress, never received a work schedule or began work for Jetstream.  (Doc. # 83, ¶ 6.)

[6] Internal citations to Defendant's prior position statements were omitted.

service previously provided to United.  Thus, although JetStream needed to fill approximately one hundred and ninety (190) full time and part time positions, it decided not to hire every cabin cleaner employed by Air Services; it decided, instead, to hire only about sixty (60) of the best applicants from Air Services and then to fill the remaining available positions through "outside" hires.

JetStream evaluated applicants based on how well they conducted themselves during their interviews, whether they had relevant cleaning experience, whether they could provide their own transportation to DIA, whether they expressed a willingness to change their work schedules and rate of pay, and whether they would accept JetStream's work standards, including its religiously neutral and gender neutral uniform requirements. Applicants were also required to pass a drug test and an airport security screening before being hired.

Like all of the applicants, the Charging Parties were evaluated based on these factors.  Sadiyo Jama and Hana Bokku were not hired because they had scheduling conflicts that JetStream could not accommodate, and they both showed little enthusiasm or interest in working for JetStream during their interview.  Amino Warsame was not hired because a dispute arose during her interview regarding the rate of pay that she would accept and whether she had adequate experience as a cabin cleaner.  Safia Ali was not hired because she refused to abide by JetStream's uniform policy. Sahra Abdirahman demanded during her interview that JetStream pay for her RTD bus pass, a benefit that JetStream was not prepared to provide, and she failed to complete a required drug test.

(Doc. # 84-6 at 2-3).  It also contended that it did not permit cabin cleaners to wear long skirts for safety reasons, explaining that "[p]ermitting cabin cleaners to wear long skirts would . . . increase the likelihood of a serious injury occurring on the jetway stairs, as employees would be more apt to trip over a long skirt or catch loose clothing on protuberances while moving up and down the stairway throwing them off balance." (*Id.* at 5.)  As for hijabs, JetStream noted that its policy "does permit employees to wear a head scarf so long as certain conditions are met" – namely, the head scarf must be blue or black in color, "secured to the employee's head, either by a hat or by some other means," as well as "short (i.e., not so long that it flows over the employee's shoulders,

chest, or back); this ensures that an employee's head scarf does not become caught on aircraft equipment, portions of the jetway (a.k.a. the passenger bridge), or the jetway stairs, resulting in injury."  (*Id.*)

On August 29, 2012, the EEOC issued a Letter of Determination as to each Intervenor's charge, notifying JetStream that the EEOC had found reasonable cause to believe that it had violated Title VII in refusing to provide the Intervenor herself as well as a "class" of other female Muslim employees or applicants "a reasonable accommodation based on [their] religion" and also in refusing "to hire her and others like her for the position of Aircraft Cleaner based on sex, religion, and in retaliation for engaging in protected activity."  (*Id.*, ¶ 15.)

## B.    THE PRE-SUIT ACTIVITIES

Four years, 6 months, and 23 days elapsed between the Intervenors' filing of their initial charges (on February 5, 2009) and the EEOC's filing the Complaint (on August 30, 2013).  (Doc. ## 1; 116-5 at 1-12).

### The Colorado Civil Rights Division's and the EEOC's Investigations

Because the Intervenors' charges were initially filed with the Colorado Civil Rights Division (CCRD), they were also initially investigated by that agency,[7] which

---

[7] The EEOC and the CCRD have a "Worksharing Agreement," which

> delegates authority to the CCRD to receive, investigate, and draft charges on behalf of the EEOC.  The agreement, however, also expressly limits the delegation of authority: "This delegation of authority to receive charges does not include the right of one Agency to determine the jurisdiction of the other Agency over a charge."  As to the investigation of the charges' merits, the agreement provides that the CCRD may "receiv[e] and draft[] charges," and, "once [the CCRD] begins an investigation, it resolves the charge."  [However], [t]he resolution of charges by the CCRD is not binding on the EEOC.  According to the

completed its investigation after approximately 11 months (on December 5, 2009). (Doc. # 116, ¶ 4.) On January 29, 2010, the CCRD filed a Complaint on all five Charges with Colorado's Office of Administrative Courts (OAC), which set a hearing for May 24, 2010. (Doc. # 116-5 at 25.) However, the EEOC filed a Motion to Withdraw the Complaint and Notice of Transfer, and on March 26, 2010, the OAC granted that motion and vacated the hearing. (Doc. # 84-14.)

The parties disagree about the date the case was effectively transferred to the EEOC (contending this occurred in either March of April of 2010),[8] but do not dispute that the EEOC sent its first Request for Information (RFI) to JetStream on September 1, 2010. (Doc. # 116-5 at 293-94.) This RFI sought, among other things, the identity of all employees working for JetStream and all cabin cleaning employees who had worked at DIA since 2008. (*Id.*) Approximately five months later, on March 9, 2011, indicating that "[t]he Commission has decided to broaden its investigation," the EEOC sent a second RFI. (Doc. # 84-18.) It sent its third and fourth RFIs to Jetstream May 24, 2012, and June 7, 2012, respectively. (Doc. ## 84-19; -20.) On June 8, 2012, it sent a Third Party

---

worksharing agreement and federal regulations, the EEOC is only required to give "substantial weight" to state agency final action and the EEOC is not bound by the state action. 29 C.F.R. § 1601.21(e). Thus, the EEOC's Notice of Charge of Discrimination informs parties that the state agency's final "findings and orders will be given weight by EEOC in making its own determination as to whether reasonable cause exists to believe that discrimination has occurred." The EEOC's substantial weight review occurs only after the state agency—here, the CCRD—completes its review and investigation.

*Rodriguez v. Wet Ink, LLC*, 603 F.3d 810, 813 (10th Cir. 2010) (internal citations omitted).

[8] Defendant contends that the Charges were transferred to the EEOC on March 10, 2010, whereas the EEOC states that this transfer occurred transferred on April 14, 2010. (Doc. ## 116, ¶ 5; 132, ¶ 5.)

RFI to AirServ, and it requested additional information from AirServ on June 15, 2012. (Doc. ## 84-21; -22.)  On July 10, 2012, it interviewed five employees at JetStream, including Ms. Haji.  (Doc. # 84-23.)  On August 29, 2012, it issued cause determinations.  (Doc. # 84-15.)

**The EEOC's Conciliation Efforts**

Between late August and October of 2012, the EEOC and JetStream exchanged written conciliation proposals five times, and met in person once.  (Doc. # 83-3 at 49-50.)

On September 18, 2012, the EEOC provided JetStream with a proposed, initial conciliation agreement.  (Doc. # 83, ¶ 8.)  In this proposed agreement, the EEOC identified two other Muslim women, Milko Haji and Amina Oba, who, it contended, had also been aggrieved by JetStream's uniform policies.  (*Id.*, ¶ 10.)  The EEOC initially proposed economic damages for the Intervenors in the sum total of $775,500,00 (all-inclusive of back pay, front pay, and emotional distress/compensatory damages plus interest), as well as the creation of a $436,500 settlement fund, which would be paid to other aggrieved individuals identified by the EEOC in the course of its investigation. (Doc. # 83-3 at 49.)  The EEOC's proposal also provided that JetStream would reinstate the Intervenors and other aggrieved individuals, as well as "develop a plan for providing religious accommodation to Muslim employees, including policies and procedures for accommodating deviations from the company's dress code."  (Doc. # 83-3 at 55.)

The parties met for an unsuccessful, in-person conciliation conference on October 25, 2012, at which time the Intervenors twice reduced their requested damages

offers (first to $705,500, and second to $670,500).  (*Id.* at 50.)  Jetstream requested

three to four days to respond with a counter-proposal, and the conference was

adjourned at JetStream's request.  (*Id.*)  Ultimately, however, JetStream terminated the

negotiations by making a last offer, and the EEOC concluded that conciliation was

unsuccessful.  (*Id.*)  JetStream's final offer was that it would pay $75,000 to cover the

Intervenor's back pay and compensatory damages, but it refused to compensate Haji

and Oba or to set aside additional funds for putative victims.  (*Id.*)

The EEOC filed its Complaint in this matter on August 30, 2013.  (Doc. # 1.)

**C.**     **THE REINSTATEMENT OFFERS**

On October 13, 2014, JetStream made offers of full-time employment to all five

Intervenors to work as cabin cleaners; these offers provided that the women "may wear

a headscarf at work that meets their religious requirements but does not present safety

risks," but required that they "wear pants at work, as they claim they are willing to do."

(Doc. # 83, ¶ 18, Doc. # 83-2 at 43.)  The Intervenors were also required to complete

employment applications and to take drug tests.  (Doc. # 83-4 at 21.)

**D.**     **THE "AGGRIEVED INDIVIDUAL'S" CLAIMS**

**Amina Oba**

Ms. Oba is a Muslim female from Ethiopia, whose religious beliefs require her to

cover her head and also to wear modest clothing that is not revealing of the shape of

her body.  (Doc. ## 83, ¶¶ 19, 30; Doc. # 83-2 at 47; 132-1 at 1; 132-11, ¶ 1.)  She

worked as a cabin cleaner at AirServ beginning in December of 2008, and regularly

wore a hijab and skirt on her way to work, but removed her hijab and skirt and changed

into pants when she arrived at the airport for work; she also donned and doffed her skirt and hijab during her breaks.  (Doc. ## 83, ¶¶ 19-20, 31; 83-2 at 50; 117, ¶ 31.)  During the United Contract transition, Ms. Oba was interviewed by a Jetstream employee, but not by Mr. Norris.  (Doc. # 83, ¶ 21.)  She was not asked about her clothing during her interview and also did not discuss her religion during her interview.  (Doc. #83, ¶ 23.)

Ms. Oba wore pants while working for JetSteam and did not request to wear a skirt while working; specifically, she testified that despite wishing to wear a skirt for religious reasons, she did not make such a request because she knew that JetStream had refused to hire other Muslim women who requested similar accommodations.  (Doc. # 83, ¶ 32; Doc. # 83-2 at 48, 49.)  She also did not cover her head while working for Jetstream.  (Doc. # 83-2 at 50.)  Ms. Oba continued, however, to don and doff her hijab and skirt when she arrived at work and during breaks (so she was properly outfitted for prayer) and before she went home for the day.  (Doc. # 117, ¶ 15.)  The EEOC submitted a declaration from Mary Berish, a fellow cabin-cleaning employee, about this practice:

> The Ethiopian women would wear skirts over pants and headscarves up until our shift would start – then they would take off the skirts and headscarves and put them in backpacks for the shift.  We had lockers with AirServices [sic] but those were taken away by JetStream.  So the Ethiopian women would take off their religious clothes and put them in backpacks in the corner.  Then they would put them on as soon as we got off the shift.  They didn't wait to get home.  You could tell they didn't want to be seen in public wearing pants and without their headscarves but they had to take these off for work.

(Doc. # 117-6, ¶ 23.)

On February 6, 2009 – approximately three and a half months after David Norris's interviews of the Intervenors – JetStream laid off approximately 25 employees (approximately 10% of its workforce), including Ms. Oba.  (Doc. # 83, ¶ 25.)  The parties disagree both about who selected Oba for a layoff and about why she was selected. JetStream contends that layoff itself was "precipitated by a dispute between Jetstream and United over compensation paid to JetStream for certain services.  As a result, JetStream was losing money at DIA and needed to reduce payroll costs."  (Doc. # 83, ¶ 26.)   JetStream submits evidence from the deposition of station manager Earl Alexander, who admitted that he had no firsthand knowledge of Ms. Oba's work performance, but testified that shift manager Tom Kinsella[9] told him that Oba "was a lesser performer.  She was maybe slower than others in doing her job, but [Mr. Kinsella] wanted to try to keep her, if possible" and also that "she was right on the cusp of being able to stay."  (Doc. # 83-1 at 16-17.)

The EEOC contends that Ms. Oba was selected for a layoff because she wished to wear a hijab and skirt for religious reasons.  In support of this argument, it points to the fact that Ms. Oba regularly and openly wore her hijab and skirt at work, donning and doffing them for work breaks, and that she was laid off along with another woman who also wore a hijab.  Additionally, it notes that Ms. Oba was not initially selected for a layoff; specifically, her name did not appear on a list of employees who were to be laid off which was sent via email by Frank Austin, JetStream's Director of Hub Operations and Planning, on February 5, 2009, to Mariela Feliciano (JetStream's Human

---

[9] Mr. Kinsella had not provided testimony in the case as of the date of the respective Summary Judgment Motions.  (Doc. # 117, ¶ 27.)

Resources Director), Norris, and co-owner Mark Desnoyers.  (Doc. # 117-8 at 2.)

However, on February 6, 2009, Mr. Austin sent these same individuals "a revised work

schedule with changes regarding those names **you** sent earlier today,"[10] which included

Ms. Oba's name as one selected for termination.  (Doc # 117-9) (emphasis added).

Moreover, despite purportedly being laid off because she was a "slow" worker, this

"slow" explanation did not appear in her personnel file (whereas JetStream documented

the reasons why at least some other employees were selected for layoff in those

employees' personnel files).[11]  Additionally, when Ms. Oba was notified that she was

laid off by Ms. Martinez, Ms. Martinez told her that she had done "nothing wrong"; she

had never been disciplined or written up for slow or poor performance at JetStream; and

Ms. Oba's lead, who worked with her daily, was not consulted about her work prior to

the layoff.  After being laid off, Ms. Oba was rehired in June of 2012 (and since being

rehired, has received a 3% increase in pay and received highest marks for competence

and performance).  (Doc. ## 83, ¶ 28; 116, ¶¶ 16-20, 22-26.)

After being rehired at JetStream, Ms. Oba has worn a hijab while on the clock.

(Doc. # 83-2 at 50.)

---

[10] It is not clear to whom this "you" refers; the original document to which Mr. Austin seems to be referring (*i.e.*, an email with the "names you sent earlier today") is not before the Court.

[11] JetStream notes that "only 2 of the 21 employees laid off in in February 2009 and listed in the EEOC's Exhibit No. 7 have a specific reason for their layoff listed on their termination forms. The termination forms for Oba and everyone else only state that the employee was 'laid off.'" (Doc. # 130 at 2.)  Although JetStream submitted these termination forms to the Court, it is unable to resolve this dispute because it does not have access to the employee's entire personnel files.

**Milko Haji**

Ms. Haji is a Muslim woman whose religious beliefs require her to wear modest clothing that does not reveal the shape of her body, including a skirt and hijab. (*Id.*, ¶ 37; Doc. # 117, ¶¶ 43, 44). Ms. Haji worked as a cabin cleaner at AirServ before being hired as a cabin cleaner by Jetstream. (Doc. # 83, ¶ 37.) During the United contract transition, Ms. Haji requested a full-time shift, but was assigned a part-time schedule during the first three shifts she worked with Jetstream, working five hours and 30 minutes (from 8:30 AM to 2:30 PM, inclusive of her 30-minute lunch break) on Monday, December 15, 2008 through Wednesday, December 17, 2008. (*Id.*, ¶ 38.) Beginning with her fourth shift, on December 21, 2008, Ms. Haji began working a full-time schedule, working eight hours (from 6:30 AM to 3:00 PM, inclusive of her 30-minute lunch break). (*Id.*, ¶ 39.)

The EEOC asserts that "According to Defendant's records, Haji's first day of work was November 13, 2008, but she was not allowed to work until December 15, and then was scheduled for and worked only part time hours on December 15-17," and cites to exhibit number 41, submitted in support of its Motion for Summary Judgment. (Doc. # 117, ¶ 39.) Exhibit number 41 appears to be a printout of a "Time Card" from a time-tracking program, indicating that Ms. Haji had 7.5 "worked hours" on November 13, 2008. (Doc. # 117-41) However, the "Time Card" contains no other time entries for the week of November 9, 2008. (*Id.*) (showing zero hours for November 9th through 12th and 14th through 22nd.) The EEOC also submitted an undated "New Hire Processing Form" with information about Ms. Haji, including her address, with several handwritten

notations at the very bottom of the page – some are illegible, but the legible words read "Events 401K & Med," a date (11/12/08), and what appear to be initials (MR).  (Doc. # 117-5.)

The Court has thoroughly reviewed all of the other evidence submitted by both sides, including the excerpts from Ms. Haji's and Mr. Austin's depositions.  It notes that there is no other evidence in the record indicating that Ms. Haji was, in fact, supposed to begin work in November of 2008, rather than the day she actually started in December; for example, Ms. Haji and Mr. Austin never discuss her start date in any respect in their deposition excerpts.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997).  In reviewing motions for summary judgment, a court may not resolve issues of credibility, and must view the evidence in the light most favorable to the non-moving party – including all reasonable inferences from that evidence.  *Id.; Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1251 (10th Cir. 2013) ("a judge may not make credibility determinations on summary judgment"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."). However, conclusory statements based merely on conjecture, speculation, or subjective beliefs do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S at 256. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### III.   ANALYSIS

**A.    DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**1.    THE EEOC'S CONCILIATION EFFORTS**

Title VII requires the EEOC to engage in conciliation efforts prior to filing suit. *See* 42 U.S.C. § 2000e-5(b) (emphasis added) ("If the Commission determines after [an] investigation that there is reasonable cause to believe that [a] charge is true, the Commission **shall endeavor** to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.")  Only if the EEOC "has been unable to secure from the respondent a conciliation agreement acceptable to the Commission," may it bring a suit against the employer.  42 U.S.C. § 2000e–5(f)(1).

Prior to the United States Supreme Court's recent decision in *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645 (2015), the Circuit Courts of Appeals disagreed about whether the EEOC's satisfaction of Title VII's conciliation requirement was even subject to judicial review – much less the standard that should be applied in determining whether the Commission had engaged in sufficient conciliation.  *See, e.g., EEOC v. Mach Mining, LLC*, 738 F.3d 171, 177 (7th Cir. 2013) (holding that Title VII's statutory directive to attempt conciliation was "not subject to judicial review"); *EEOC v. Zia Co.*, 582 F.2d 527, 533 (10th Cir. 1978) (holding that "good faith efforts" at conciliation were required, but "a court should not examine the details of the offers and counteroffers between the parties, nor impose its notions of what the agreement should provide.")

In *Mach Mining, LLC,* 135 S. Ct. at 1656, the United States Supreme Court provided considerable guidance on this issue, holding that, in the context of the EEOC's obligation to conciliate, the scope of judicial review is "narrow, reflecting the abundant discretion the law gives the EEOC to decide the kind and extent of discussions appropriate in a given case."   *See also id.* at 1653 (describing the scope of review as "limited" and "relatively barebones").   The Court explained that Title VII requires that "the EEOC afford the employer a chance to discuss and rectify a specified discriminatory practice – **but goes no further**."   *Id.* at 1653 (emphasis added). Specifically, in addition to informing the employer about the allegation ("as the Commission typically does in a letter announcing its determination of 'reasonable cause'"), the EEOC

> **must try to engage the employer in some form of discussion (whether written or oral), so as to give the employer an opportunity to remedy the allegedly discriminatory practice**.  **Judicial review of those requirements (and nothing else) ensures that the Commission complies with the statute.**  At the same time, that relatively barebones review allows the EEOC to exercise all the expansive discretion Title VII gives it to decide how to conduct conciliation efforts and when to end them.  And such review can occur consistent with the statute's non-disclosure provision, because a court looks only to whether the EEOC attempted to confer about a charge, and not to what happened (i.e., statements made or positions taken) during those discussions.

*Id.* at 1655-56 (emphasis added).

JetStream's Motion argues that the EEOC did conduct a "sincere and reasonable conciliation" because it initially proposed that JetStream create a settlement fund for "aggrieved individuals" who had not yet been identified, and because the EEOC "demanded that Jetstream reinstate all other aggrieved individuals that it could identify."

(Doc. # 83 at 18.)  JetStream further contends that the EEOC's negotiations on behalf of

the Intervenors evidenced its "bad faith because the EEOC did not negotiate in an

individualized manner.  Instead, the EEOC demanded an unsubstantiated lump sum of

$755,500 (without any calculations or disclosed bases), while rejecting Jetstream's

individualized offers."  (*Id*. at 19.)

It is clear that JetStream's objections to the EEOC's efforts all relate to the

**substantive terms of the bargaining between it and the EEOC** – not to the **process**

of conciliation or whether the EEOC "attempted" to conciliate.  *Mach Mining*, however,

specifically stays this Court's hand, and provides that it may determine whether the

EEOC has provided notice of the allegations and "engaged the employer in some form

of discussion (whether written or oral), so as to give the employer an opportunity to

remedy the allegedly discriminatory practice," but may not police the details of the offers

and counteroffers between JetStream and the Commission.  In other words, it may not

evaluate "what happened (i.e., statements made or positions taken) during [settlement]

discussions."  *See Mach Mining, LLC*, 135 S. Ct. at 1655-56; *see also Equal*

*Employment Opportunity Comm'n  v. Blinded Veterans Ass'n*, No. CV 14-2102, 2015

WL 5148737, at *8 (D.D.C. July 7, 2015) (examining conciliation the context of the Age

Discrimination in Employment Act and noting that a defendant's "invitation for the [c]ourt

to place itself in the shoes of the negotiating parties, . . . to question whether the EEOC

should have sought clarification, and to evaluate whether the EEOC ended the

conciliation process to abruptly vastly exceeds the type of review contemplated by *Mach*

*Mining*."); *Zia Co.*, 582 F.2d at 533 (noting that in determining the sufficiency of conciliation efforts, the Court may not "examine the details of the offers and counteroffers between the parties.")

That JetStream would have preferred individualized settlement counter-offers to match its own, or wished that the EEOC was not as aggressive as it was with respect to additional "aggrieved employees" who were affected by its uniform policy, is of no moment: the Commission is entitled to "expansive discretion . . . over the conciliation process." *Id.* at 1653. Specifically, it "need only 'endeavor' to conciliate a claim, without having to devote a set amount of time or resources to that project." *Id.* at 1654. Additionally, its efforts "need not involve any specific steps or measures," and it – not this Court – may "decide the kind and extent of discussions appropriate in a given case." *Id.* at 1654, 1656. It is also up to the EEOC to decide when conciliation has failed. *Id.* at 1654 (noting that the EEOC may decide "when to quit the effort" and the "pace and duration" of conciliation efforts).

It is undisputed that the EEOC did, in fact, engage in substantive conciliation efforts with Defendant. Specifically, in exchanging multiple settlement offers and in meeting in person with JetStream, the Commission tried "to engage [JetStream] in some form of discussion . . . so as to give [it] an opportunity to remedy the allegedly discriminatory practice." *See id.* at 1653, 1655-56. Applying the "limited" scope of review mandated by *Mach Mining*, Court finds that the Commission's settlement efforts

here were sufficient to fulfill Title VII's conciliation requirements.[12]

## 2.   MS. OBA'S CLAIMS

### (i)   Religious Discrimination and Disparate Treatment

Defendant contends that Ms. Oba's religious accommodation and disparate

treatment claims should be dismissed because she did not inform JetStream that she

desired a religious accommodation, wore pants and did not wear a headscarf while at

work, and "there is no evidence that Kinsella and Alexander [i.e., the individuals who it

claism made the layoff decisions] even knew Oba was Muslim."  (Doc. # 83 at 11, 13.)

The Tenth Circuit **did** require that an employee show that she had informed her

employer of her need for a religious accommodation, but this requirement was recently

abrogated by the United States Supreme Court.  *EEOC v. Abercrombie & Fitch Stores,*

*Inc.*, 731 F.3d 1106, 1122-23 (10th Cir. 2013), *rev'd*, 135 S. Ct. 2028, 2031 (2015).  In

*EEOC v. Abercrombie & Fitch Stores, Inc.*, the Supreme Court held that an employee

"need only show that his [or her] need for an accommodation was a **motivating factor**

in the employer's decision," because Title VII "prohibits certain motives, **regardless of**

**the state of the actor's knowledge**," and

> **Motive and knowledge are separate concepts**.  An employer who has
> actual knowledge of the need for an accommodation does not violate Title

---

[12] The Court notes that Defendant's Motion – which was filed prior to the *Mach Mining* decision – argued that the Intervenor's claims should be dismissed outright in the event the Court found that the EEOC had engaged in insufficient conciliation efforts (and, indeed, there was legal authority, albeit mixed, supporting this course of action).  However, in *Mach Mining*, the Supreme Court held that in the event an employer "provides credible evidence" indicating that the EEOC did not attempt to engage in a discussion about conciliating a claim, the proper remedy is not dismissal.  *Id.* at 1656.  Rather, a reviewing court "must conduct the factfinding necessary to decide" whether the EEOC met its obligations, and should the court find in favor of the employer, the appropriate remedy is to stay the case and "order the EEOC to undertake the mandated efforts to obtain voluntary compliance."  *Id.*

> VII by refusing to hire an applicant if avoiding that accommodation is not his motive.  Conversely, **an employer who acts with the motive of avoiding accommodation may violate Title VII even if he has no more than an unsubstantiated suspicion that accommodation would be needed**.
>
> Thus, the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward:  **An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions**.  For example, suppose that an employer thinks (though he does not know for certain) that a job applicant may be an orthodox Jew who will observe the Sabbath, and thus be unable to work on Saturdays.  **If the applicant actually requires an accommodation of that religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII.**

135 S. Ct. at 2032, 2033 (emphasis added).  Thus, although "[a] request for accommodation, or the employer's certainty that the [religious] practice [requiring accommodation] exists, **may make it easier to infer motive, [it] is not a necessary condition of liability**."  *Id.* at 2033 (emphasis added).

Because Defendants relied extensively on the Tenth Circuit's *Abercrombie & Fitch* decision in moving for summary judgment on this claim, and because that decision was abrogated by the Supreme Court after the parties had filed their Motions for summary judgment, the Court asked the parties to file supplemental briefing regarding the impact of the case.  (Doc. # 57.)  The parties did so, and the Court considers this briefing herein.[13]

Under the "failure to accommodate" burden-shifting analysis, the plaintiff employee bears the initial burden of production with respect to making out a *prima facie*

---

[13] Defendant's brief was the subject of a Motion to Strike by the EEOC.  (Doc. # 170.)  The Court discusses this Motion in greater detail and rules on it at the end of this Order.

case for failure to accommodate.  Although the United States Supreme Court did not explicitly rework the elements of the *prima facie* case in *Abercrombie & Fitch*, the decision makes it clear that a plaintiff may establish such a case by showing that (1) she had a *bona fide* religious belief that conflicted with an employment requirement; and (2) her need for an accommodation was a motivating factor in the employer's decision to take an adverse employment action against her.  *Compare Abercrombie & Fitch*, 798 F. Supp. 2d at 1282 (describing the *prima facie* case as a "showing that (1) she had a bona fide religious belief that conflicts with an employment requirement; (2) she informed the employer of this belief; and (3) she was not hired for failing to comply with the employment requirement") *to* 135 S. Ct. at 2032 ("Abercrombie's primary argument is that an applicant cannot show disparate treatment without first showing that an employer has 'actual knowledge' of the applicant's need for an accommodation.  We disagree.  Instead, an applicant need only show that his [or her] need for an accommodation was a motivating factor in the employer's decision.")   If the employee establishes a *prima facie* case, the burden shifts to the defendant employer to "(1) conclusively rebut one or more elements of the plaintiff's *prima facie* case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable to accommodate the employee's religious needs reasonably without undue hardship."  *Thomas v. National Ass'n of Letter Carriers*, 225 F.3d 1149, 1156 (10th Cir. 2000).

JetStream argues that Ms. Oba fails to proffer a *prima facie* claim for religious accommodation or for disparate treatment, even post-*Abercrombie & Fitch*, because there is "no evidence" that JetStream's desire to avoid a religious accommodation was a

"motivating factor" in its decision to lay her off.  (Doc. # 165 at 9.)  Specifically,

JetStream points to the fact that it is undisputed that Ms. Oba never requested an

accommodation, did not discuss her religion during her JetStream interview (which was

not with Mr. Norris), always wore pants and never wore a hijab (prior to her layoff) while

working for Jetstream, and also never spoke with David Norris.  (*Id.* at 6-9)

    The EEOC counters, and the Court agrees, that there is sufficient evidence to

create a disputed issue of fact as to whether JetStream's decisionmakers knew – or, at

the very least, suspected – that Ms. Oba desired an accommodation and laid her off to

avoid giving her one.  Significantly, far from being secretive about her religious clothing,

Ms. Oba consistently wore religious garments in the workplace during non-work hours,

donning and doffing them at the workplace several times each workday, including

during her work breaks and when she arrived and left for the day.  The Court also notes

that the circumstances surrounding Ms. Oba's layoff were otherwise indicative of

pretext.[14]  First, Ms. Oba's name was not included in a proposed layoff list sent on

February 5, 2009, by Frank Austin (JetStream's Director of Hub Operations and

Planning) to Mariela Feliciano (JetStream's Human Resources Director), Mr. Norris, and

co-owner Mark Desnoyers.  (Doc. # 117-8 at 2.)  However, her name **was** included in

an email Austin sent to these same individuals the following day, in which he explained

---

[14] The factfinder is entitled to infer from any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons for its action that the employer did not act pursuant to those reasons.  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *see also Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005) (evidence of pretext may include evidence regarding the employer's prior treatment of the employee, the employer's policy and practice , disturbing procedural irregularities, the use of subjective criteria, or the fact that an employer has changed its explanation under circumstances that suggest dishonesty or bad faith).

that he had attached a "revised work schedule with changes regarding those names **you** sent earlier today" (Doc. # 117-9 at 1-2) (emphasis added).  If jurors ultimately conclude that Mr. Norris was hostile toward women who wore headscarves and/or did not wish to provide them with an accommodation, they could also believe that some kind of communication occurred (for which there may or may not be documentation) in which Mr. Norris selected Ms. Oba for a layoff because he believed she might desire an accommodation.  Additionally, unlike at least some other employees, there was no explanation in Ms. Oba's personnel file for her selection for a layoff.  Moreover, despite being purportedly selected because she was a slow worker, Ms. Oba was told she had done "nothing wrong" by Ms. Martinez when she notified her of the layoff, no one ever spoke with her lead about the speed of her work prior to selecting her for a layoff, she had never been disciplined for being slow, she was rehired immediately upon re-application and has performed quite competently since, earning pay increases and positive evaluations.

In addition to this, there is, of course, the obvious fact that Ms. Oba might well have been associated in Norris's (or Austin's) minds with the Intervenors, who personally informed Mr. Norris that they identify as Muslims and that they desired a religious accommodation.  Defendant argues that merely because the Intervenors did so "does not establish that JetStream knew or suspected" that Ms. Oba "harbored the same religious beliefs as the Intervenors," and cites the Tenth Circuit's reasoning behind its (now-abrogated) requirement of actual knowledge of a need for a religious accommodation – namely, that "religious beliefs and practices are individualized and

idiosyncratic, and employees may engage in apparently religious practices for secular reasons and not need an accommodation, or may not view their religious practice as inflexible."  (Doc. # 165 at 8-9.)  However, not only has the EEOC proffered competent (albeit hotly disputed) evidence that Mr. Norris might not have been one to recognize the finer distinctions among Muslims, it is significant that Ms. Oba was one of a group of African women who immigrated from the same region of Africa as the Intervenors, spoke the same language as the Intervenors, and came to work wearing (and regularly donned and doffed) a headscarf and a skirt, including on JetStream's premises and in view of her fellow employees.  Moreover, Ms. Oba's layoff occurred under questionable circumstances, and within three and half months of the Intervenors' initial requests for accommodation.  This evidence – taken as a whole,[15] and viewed in the light most favorable to Ms. Oba, **including any reasonable inferences therefrom** – is certainly sufficient to create a disputed issue of material fact regarding whether JetStream's decisionmakers made Ms. Oba's "religious practice, **confirmed or otherwise**, a factor" in deciding to select her for a layoff, because they **at least suspected** that Ms. Oba (like the other Intervenors) desired a religious accommodation.  *See Abercrombie & Fitch*, 135 S. Ct. at 2033 (emphasis added).

In sum, although the EEOC has not been able to proffer a "smoking gun," it has pointed to sufficient evidence of smoke to require JetStream to convince a jury that

---

[15] "When assessing whether [a] plaintiff has made an appropriate showing of pretext, we must consider the evidence as a whole."  *Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.")).

"despite the smoke, there is no fire." *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1187 (2d Cir. 1992) (*citing Price Waterhouse*, 490 U.S. 228, 266 (1989) (O'Connor, J., concurring)). [16]  To put it slightly differently, there is sufficient evidence from which a jury could credit **either** JetStream's proffered, legitimate nondiscriminatory reason for Ms. Oba's layoff, **or** from which it could conclude that she was selected because she regularly wore religious garments.  Accordingly, summary judgment is precluded on this claim.  *See Brown v. Parker–Hannifin Corp.*, 746 F.2d 1407, 1411

---

[16] Defendant asserts that "[t]he notion that Norris ordered [Ms.] Oba's layoff is **pure speculation** and cannot demonstrate pretext" because "there is no evidence that Norris sent Oba's name as a person to be laid off.  Oba was one of four names added to the layoff list on Feburary 6 . . . the EEOC has provided no evidence as to which of the six names Austin was referring to, or that Norris sent him any of the names (or which names)."  (Doc. # 130 at 11-12) (emphasis added).  Although it is true that the EEOC cannot establish as a matter of **undisputed fact** that Ms. Oba's name was, in fact, added to the list for impermissible reasons, given the overall circumstances here – including, but not limited to, the fact that (1) Ms. Oba wore religious clothing in plain view while at the workplace, (2) David Norris, who allegedly made hostile comments about headscarves and undisputedly received a request for a religious accommodation from the Intervenors, was notified that Ms. Oba would not be included in the layoff list, and almost immediately after this notification, her name appeared on this list, and (3) the relative weakness of the purported reason for Ms. Oba's selection – there is far more than "pure speculation" to establish that Ms. Oba's name was impermissibly chosen.  As such, this case is plainly distinguishable from *Webb v. Level 3 Commc'ns, LLC*, 167 F. App'x 725 (10th Cir. 2006), cited by Defendant, in which the plaintiff submitted "**no** evidence to support his conspiracy theory."  *Id.* at 733 (emphasis added).  Indeed, the central inquiry presented by **most** employment discrimination cases is precisely the one that will be faced by jurors here: what was the employer's state of mind when it took an adverse action against the employee, and when the employer says that it did not act with discriminatory intent, is it credible, or are the circumstances such that the employer should not be believed?  In *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716-17 (1983), the Supreme Court explained that this question "is both sensitive and difficult.  The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy**.  There will seldom be 'eyewitness' testimony as to the employer's mental processes.**  But none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. . . . The law often obliges finders of fact to inquire into a person's state of mind."  *See also Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) (emphasis added) (noting that a plaintiff may prove illegal discrimination in employment at trial either directly by offering direct evidence of discrimination, or "**inferentially** by showing that the proffered reason is **a pretext for discrimination**.")

(10th Cir. 1984) ("where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment."); *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) ("So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial.  Judgments about intent are best left for trial and are within the province of the jury."); *Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1309 (10th Cir. 1980) (noting that questions of motive and intent are "particularly inappropriate for summary judgment disposition").[17]

**(ii)**   **Retaliation**

Title VII's anti-retaliation provision forbids an employer from discriminating against an individual because that individual "has opposed any practice made an unlawful employment practice" by Title VII.[18]   42 U.S.C. § 2000e–3(a).  Where the

---

[17] Defendant's Reply in support of its Motion for summary judgment asserts that "**as noted in JetStream's Motion**, Haji **and Oba suffered no adverse actions** for failing or refusing to comply with JetStream's uniform requirements, and thus the EEOC cannot establish the third element of its *prima facie* accommodation case.  The EEOC ignores this argument in its Response.  The argument should be deemed confessed and the accommodation claims dismissed."  (Doc. #130 at 10, n. 3) (emphasis added).  However, a close look at JetStream's Motion reveals that it made this argument with respect to Ms. Haji's claim (specifically, her retaliation claim); **not** Ms. Oba.  (Doc. # 83 at 15, n. 4.)  In any event, it is abundantly clear that Ms. Oba's layoff constituted an "adverse action."  *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1216 (10th Cir. 2003) ("It hardly requires stating that when an employer tells an employee that she no longer has a job, that employee's job status has been significantly and materially altered.")

[18] Title VII also prohibits discrimination against an employee because that individual "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pursuant to Title VII.  42 U.S.C. § 2000e–3(a).  The parties agree that this provision is inapplicable to either Ms. Oba's or Ms. Haji's retaliation claims.

plaintiff seeks to prove a Title VII retaliation claim through indirect or circumstantial evidence, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). To establish a *prima facie* case of retaliation under *McDonnell Douglas*, a plaintiff must demonstrate (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.  *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).[19]

JetStream contends that Ms. Oba's retaliation claim should be dismissed because she did not request a religious accommodation – i.e., she did not engage in any protected opposition – and, "as a result, the EEOC cannot establish the first element of its *prima facie* case," nor can it establish causation between any protected activity and her layoff.  (Doc. # 83 at 15.)  The EEOC argues that despite the fact Ms. Oba did not request an accommodation or otherwise complain about not being afforded one, she still engaged in protected activity insofar as she "opposed Defendant's

---

[19] In *Thomas v. National Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000). the Tenth Circuit explained that the burden shifting approach is different in ADA and religious discrimination cases than in other types of discrimination cases:

> In [an ADA or religious failure to accommodate] case, the Congress has already determined that a failure to offer a reasonable accommodation to an otherwise qualified disabled employee is unlawful discrimination.  Thus, we use the burden-shifting mechanism, not to probe the subjective intent of the employer, but rather simply to provide a useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered.

practices by continuing to wear her hijab openly at work during non-work times." (Doc.

# 117 at 23.)[20]  Accordingly, the Court needs to decide, as a matter of first impression,

whether Plaintiff engaged in protected activity merely by wearing her religious clothing

on the employers premises but during her breaks.

In *University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517

(2013), the Supreme Court explained the differences Title VII's antidiscrimination

provision (§ 2000e–2) and its anti-retaliation provision (§ 2000e–3(a)):

> Since the statute's passage in 1964, it has prohibited employers from
> discriminating against their employees on any of seven specified criteria.
> Five of them – race, color, religion, sex, and national origin – are personal
> characteristics and are set forth in § 2000e–2. . . .  And then there is a
> point of great import for this case: **The two remaining categories of
> wrongful employer conduct – the employee's opposition to
> employment discrimination**, and the employee's submission of or
> support for a complaint that alleges employment discrimination – **are not
> wrongs based on personal traits but rather types of protected
> employee conduct.**  These latter two categories are covered by a
> separate, subsequent section of Title VII, § 2000e–3(a).

*Id.* at 2525-26; *see also Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S.

53, 63 (2006) (emphasis added) ("The antidiscrimination provision seeks a workplace

where individuals are not discriminated against because of their racial, ethnic, religious,

or gender-based status.  The **anti-retaliation provision seeks to secure that primary

objective** by preventing an employer **from interfering (through retaliation) with an

employee's efforts to secure or advance enforcement of the Act's basic

guarantees.**  The substantive provision seeks to prevent injury to individuals based on

---

[20] The EEOC also contends that "temporal proximity alone – a discharge within six weeks after
she began openly wearing religious garb at work – establish[es] causation."  (Doc. # 117 at 23.)
This argument presupposes, however, that "openly wearing religious garb at work" (without
more) qualifies as "protected opposition."

who they are, i.e., their status.  The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct.")

Applying this distinction here, Ms. Oba's religious accommodation and disparate treatment claims allege that she was discriminated against **because of who she is** – that is, a Muslim woman who actually requires an accommodation for her religious practice.  The problem, however, is that because Ms. Oba never requested an accommodation and never complained (informally or otherwise), about JetStream's failure to provide her with an accommodation, at bottom, her retaliation claim is premised on precisely the same theory as her discrimination claim: namely, that JetStream retaliated against her **because of who she is** – that is, a Muslim woman who actually requires an accommodation for her religious practice.  To put it slightly differently, on the factual record before the Court, the alleged wrong still begins, and ends, with Ms. Oba's "personal trait."

However, something more than conduct that is perfectly consistent with one's protected status (that is, something more than wearing a headscarf on the job during breaks) must be alleged for a plaintiff to have engaged in "protected activity."  *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188-89 (10th Cir. 2002) ("The purpose of § 2000e-3(a) is to **let employees feel free to express condemnation of discrimination** that violates Title VII.  That purpose is hardly served by imposing sanctions upon employers who take action against employees who never communicate their concern about unlawful discrimination.")  At the very least, Ms. Oba was required to allege facts to indicate that she "conveyed" her "concern" to JetStream that its

religious accommodation practices were unlawful or otherwise problematic.  Indeed, the

Tenth Circuit has specifically held that "[a]lthough no magic words are required, **to**

**qualify as protected opposition the employee must convey to the employer his or**

**her concern that the employer has engaged in a practice made unlawful by the**

**[statute]**.[21] **General complaints** about company management and one's own negative

performance evaluation **will not suffice**."  *Hinds v. Sprint/United Mgt. Co.*, 523 F.3d

1187, 1202-03 (10th Cir. 2008) (emphasis added); *see also Dean v. Computer Scis.*

*Corp.*, 384 F. App'x 831, 839-40 (10th Cir. 2010) (unpublished) (to survive summary

judgment, an employee must allege facts to indicate that she "sufficiently conveyed a

concern that [her employer] was permitting a practice made unlawful by Title VII");

*Anderson v. Acad. Sch. Dist. 20*, 122 Fed. App'x. 912, 916 (10th Cir. 2004)

(unpublished) ("[A] vague reference to discrimination and harassment without any

indication that this misconduct was motivated by race (or another category protected by

Title VII) does not constitute protected activity and will not support a retaliation claim.")

The Court recognizes that there are a variety of ways to "convey a concern" to an

employer in order to "oppose" an unlawful practice.  *See Crawford v. Metro. Gov't of*

*Nashville & Davidson Cnty., Tenn.,* 555 U.S. 271, 277 (2009) ("Countless people were

known to 'oppose' slavery before Emancipation, or are said to 'oppose' capital

punishment today, without writing public letters, taking to the streets, or resisting the

government.  And we would call it 'opposition' if an employee took a stand against an

---

[21] *Hinds,* 523 F.3d at 1202, was discussing the anti-retaliation provision of the Age
Discrimination in Employment Act (ADEA); that provision, however, is identical to Title VII's.
*See* 29 U.S.C. § 623(d) (prohibiting discrimination against an employee who "has opposed any
practice made unlawful" by the statute.)

employer's discriminatory practices not by 'instigating' action, but by standing pat, say,

by refusing to follow a supervisor's order to fire a junior worker for discriminatory

reasons.")  Refusing to remove a hijab, for example, might – **depending on the totality**

**of the circumstances** – sufficiently convey this concern.[22]  It is undisputed, however,

that Ms. Oba never "conveyed" **anything** to JetStream, symbolically or otherwise,

**about its failure to accommodate her hijab** – much less any "concern" about this

being an unlawful practice.  *See Hinds,* 523 F.3d at 1202-03 ("to qualify as protected

opposition the employee must convey to the employer his or her concern that the

employer has engaged in a practice made unlawful by the [statute].")  As such, this

element of her *prima facie* claim for retaliation fails, and her retaliation claim will be

dismissed.

## 3.   MS. HAJI'S CLAIMS

It is undisputed that Ms. Haji was assigned three part-time shifts when she

initially began working for JetStream in December of 2008, but that, beginning with her

fourth shift, she began doing full-time work.  Although JetStream does not explicitly

argue that Ms. Haji's religious accommodation and disparate treatment claims should

be dismissed because she did not experience an adverse employment action, it **does**

make this argument with respect to her retaliation claim, in noting that "Haji's claim also

fails on the second *prima facie* element [for retaliation] because receipt of a part-time

schedule only resulted in Haji working three part-time shifts rather than three full-time

---

[22] For example, in *EEOC v. 704 HTL Operating, LLC*, 979 F. Supp. 2d 1220, 1223 (D.N.M. 2013), the plaintiff alleged that, despite being hired initially while wearing a hijab, she was told that she had to remove it; after she tearfully refused and attempted to explain why she could not remove it for religious reasons, she was escorted from the employer's premises.

shifts.  Such a *de minimis* difference is not a materially adverse action."  (Doc. # 83 at

15.)  As such, even though the requirements for material adversity differ slightly

between retaliation claims and religious accommodation and disparate treatment

claims, the EEOC was provided with an opportunity to argue that Ms. Haji, did, in fact,

experience an adverse action for purposes of her religious accommodation and

disparate treatment claims.  In this regard, the EEOC stated that:

> In asserting that there are no genuine fact issues, Defendant ignores
> testimony by Haji that she was told exactly why she was not hired full time
> – because all the full time positions had been filled by the time she
> acquiesced to remove her hijab and wear a company cap instead.  **Haji's
> testimony alone raises a genuine issue of material fact as to whether
> she was denied work for a month and then denied full time
> employment because she sought accommodation.**

(Doc. # 117 at 21.)  A close examination of Ms. Haji's deposition excerpts actually

submitted by the EEOC reveals that the excerpts **do** contain testimony about her

discussions with JetStream personnel about her desire to wear a hijab for religious

reasons.  What they do not contain, however, is any mention of an earlier start date (nor

do any of the other depositions submitted to the Court).  (*See* Doc. ## 84-54; 117-55).

As such, the deposition transcripts do not support the proposition that Ms. Haji was

supposed to begin work as of November 13, 2008.

In its statement of facts, the EEOC also asserts that **"[a]ccording to

Defendant's records**, Haji's first day of work was November 13, 2008, but she was not

allowed to work until December 15," citing to Exhibit 41 in support of its Motion for

Summary Judgment.  (Doc. # 117, ¶ 39) (emphasis added).  The first page of Exhibit 41

is entitled "Time Card," and appears to be a computer printout from a time-tracking

program, for the week of November 9, 2008 ("Haji, Milko" is selected as the relevant employee from a drop-down menu).  (Doc. # 117-41 at 1.)  The bottom of the "Time Card" contains a notation that "I certify that the above time card is correct."  (*Id.*)  The "Time Card" does not indicate that Ms. Haji's start date was November 13, 2008; rather, the column for November 13, 2008 contains a time entry of 7.5 "worked hours."  (*Id.*)  However, no other days that week reflect that there were "worked hours" (and it is undisputed that Ms. Haji did not actually work the 7.5 hours on November 13, 2008). (*Id.* at 1.)  The second page of Exhibit 41 is titled "Employee Monthly Schedule Report" and contains a calendar of the month of December 2008, but no notations about November. (*Id.* at 2.)  The EEOC also submitted an undated[23] "New Hire Processing Form" with information about Ms. Haji, including her address.  (Doc. # 117-5.)  The form has a blank space for a "hire date" (which is not filled in), and has several handwritten notations at the very bottom of the page – some are illegible, but the legible words read "Events 401K & Med" and a date (11/12/08), but does not have a place for (or otherwise indicate) a "start date."  (*Id.*)

To survive summary judgment, the party resisting the motion "may not rest upon the mere allegations" of her pleadings, including the arguments in the EEOC's Response.  *See Liberty Lobby, Inc.*, 477 U.S. at 248.  Rather, disputed issues of fact must be supported by evidence on which a jury could reasonable find in favor of the non-moving party; a "mere scintilla" of evidence will not do, and if the evidence is merely

---

[23] The Form has a fax date at the top margin – the month is not legible, but the date (10) and year (2008) are legible, and at the bottom has a notation "Received time Nov. 10 11:44 PM."  It appears, then, that this form was filled out in November of 2008 and faxed on November 10, 2008.  Of course, this date is in no way probative of Ms. Haji's start date.

colorable or is not significantly probative, summary judgment may be granted. *Id.* at 251; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 678 n.5 (10th Cir. 1998).  However, on the evidence before the Court (namely, the "Time Card" and "New Hire Processing" form), a jury would not be reasonably warranted in finding that Ms. Haji was supposed to start work on November 13, 2008.  The "Time Card" merely appears to be a mistaken entry for hours which Ms. Haji undisputedly did not work; it is not a prospective work schedule, but rather is backward-looking (it states that "I certify that the above time card is correct", and notes that she had 7.5 "hours worked" on November 13, 2008).  (Doc. # 117-41 at 1.)  Even assuming that it does represent a prospective work schedule, it has no entries for November 14th through 22nd – which would be expected given that Ms. Haji regularly worked five days a week.  (*Id.*)  Similarly, the mere fact that a date in November (11/12/08) is written on the bottom of Ms. Haji's "New Hire Processing" form – notably, this date is within one day of, but does not match, the alleged November start date – is simply not competent evidence that Ms. Haji was supposed to start that day. (Doc. # 117-5.)   At best, these documents represent a mere scintilla of evidence that Ms. Haji was supposed to start sooner than she did; they are certainly not probative, much less "significantly" probative, of the fact that she was supposed to start in November, and accordingly do not create a genuine issue of material fact sufficient to withstand summary judgment.  Because there is not sufficient evidence to create a disputed issue of fact as to Ms. Haji's earlier start date, the only purportedly adverse action before the Court is Ms. Haji's assignment to three part-time shifts prior to her reassignment to full-time status.

Although the Tenth Circuit "liberally interpret[s] the second prong of the *prima facie* case and take[s] a case-by-case approach, examining the 'unique factors relevant to the situation at hand,'" an employer's act must do more than *de minimis* harm to be "materially adverse." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004). Specifically, for a Title VII discrimination claim, "[c]onduct rises to the level of adverse employment action when it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a **significant change in benefits**." *Stinnett v. Safeway, Ins.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (emphasis added). For a Title VII retaliation claim, a Plaintiff must show that an employer took an action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Under either standard, the Court concludes that Ms. Haji's *de minimis* reduction in hours over the course of only three shifts does not qualify as an adverse action: her part-time status was temporary, and although she was paid less than she would have been had she worked full time over those three days, Ms. Haji was ultimately denied the equivalent of a single day's pay (seven and a half hours), because she worked five and a half hours, rather than eight, over the course of three shifts. *See Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012) (holding that an employee's loss of three shifts on holidays "simply does not rise to the level of an adverse employment action"); *Embry v. Callahan Eye Found. Hosp.*, 147 Fed. App'x. 819, 829 (11th Cir. 2005) (an employee's one-day suspension resulting in a loss of $88.73 was not an

adverse action because it did not constitute "a serious and material change in the terms, conditions, or privileges of employment"); *Shaver v. Rottinghaus Co., Inc.*, 09-1193-EFM, 2011 WL 3880893, at *18 (D. Kan. Sept. 2, 2011) (finding that employer's reduction of employee's hours by approximately 2 hours a week was *de minimis* harm and did not constitute an adverse employment action); *Roe v. Estee Lauder Companies, Inc.*, 3:04CV429, 2007 WL 1024120, at *11 (S.D. Ohio Feb. 7, 2007) (finding that a "temporary reduction of her work hours" and the resulting "*de minimis* reduction in pay" were not materially adverse employment action); *Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 449 (S.D.N.Y. 2002) (denial of opportunity to work one day's worth of overtime not an adverse employment action where plaintiff had other opportunities to earn overtime pay); *Rivers v. Potter*, No. 05–4868, 2007 WL 4440880, at *7 (D.N.J. 2007) (denial of a single instance of overtime work did not constitute an adverse employment action sufficiently impacting the terms, conditions, or privileges of employment).  Accordingly, Ms. Haji has failed to allege that she was subjected to a materially adverse action – a necessary element of a *prima facie* case for religious accommodation, discrimination, and retaliation claims – and her claims will be dismissed.

**4.   WHETHER MS. OBA FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES**

Section 706 of Title VII requires **individual claimants** to file a charge of employment discrimination with the EEOC.  *See* 42 U.S.C. § 2000e–5(e)(1).  However, Section 706 of Title VII also authorizes the EEOC to bring suit in its own name, on behalf of a "person or persons aggrieved" by the employer's unlawful employment

practice. 42 U.S.C. § 2000e–5(f)(1); *accord Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 324 (1980) ("Given the clear purpose of Title VII, the EEOC's jurisdiction over enforcement, and the remedies available, the EEOC need look no further than § 706 for its authority to bring suit in its own name for the purpose, among others, of securing relief for a group of aggrieved individuals."); *EEOC v. Original Honeybaked Ham Co. of Georgia*, 918 F. Supp. 2d 1171, 1177 (D. Colo. 2013) ("In an enforcement action, the EEOC brings a claim in its own capacity. If it prevails on its claim, then it can seek a variety of remedies, including a monetary award for those individuals who were 'aggrieved by the unlawful conduct.'") Specifically, "[t]he EEOC is not limited to the terms of the charge filed so far as the scope of a [section] 706 suit it brings upon that charge. Rather, it may sue to vindicate further acts or incidents of discrimination discovered in the process of investigation of the charge filed and reasonably related to that charge." *EEOC v. Cont'l Oil Co.*, 548 F.2d 884, 889 (10th Cir. 1977).

42 U.S.C. § 2000e–5(b) outlines the prerequisites when the EEOC brings an enforcement action in its own name, providing that the Commission must: (1) have received a formal charge of discrimination against the employer; (2) given notice of the charge to the employer; (3) investigated the charge; (4) made a determination that there was reasonable cause to believe that a violation of Title VII occurred and given notice of this same determination to the employer; and (5) made an effort to conciliate the charges. 42 U.S.C. § 2000e–5(b); *accord Original Honeybaked Ham Co. of Georgia*, 918 F. Supp. 2d at 1176 (outlining 5 steps)*; Cont'l Oil Co.*, 548 F.2d at 889 (noting that the EEOC may bring a private enforcement action to vindicate further acts or incidents

41

of discrimination discovered in the process of investigation, "so long as a finding of reasonable cause is made and conciliation is attempted as to the additional acts"); *EEOC v. Gen. Elec. Co.*, 532 F.2d 359, 366 (4th Cir. 1976) ("the original charge is sufficient to support action by the EEOC as well as a civil suit under the Act for any discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge, provided such discrimination was included in the reasonable cause determination of the EEOC and was followed by compliance with the conciliation procedures fixed in the Act.").

Defendant contends that Ms. Oba's claims must be dismissed because she did not file charges with the EEOC and thus "ha[s] not administratively exhausted [her] allegations." (Doc. # 83 at 16). Specifically, it asserts that

> Although the EEOC is allowed to pursue claims on behalf of non-charging individuals when there is a pattern or practice case [under Section 707] and the individuals are ascertained pursuant to a reasonable investigation, *see Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 445 U.S. 319, 331 (1980), the EEOC is not asserting pattern or practice claims in this case. As a result, the EEOC should be precluded from seeking relief on Haji's or Oba's behalf.

(Doc. # 83 at 16, n.2.) However, as the authority cited above indicates, Defendant is incorrect as a matter of law. The EEOC is permitted to pursue claims on behalf of non-charging parties in its enforcement capacity, regardless of whether it brings these claims under Section 706 (42 U.S.C. § 2000e–5) or Section 707 (42 U.S.C. § 2000e–6) of Title VII; indeed, *General Telephone Company of the Northwest* involved an EEOC enforcement action under Section 706. *See* 446 U.S. 318 (emphasis added) ("[T]he

EEOC **need look no further than § 706 for its authority to bring suit in its own name**.")

Defendant also contends that it was never given adequate notice "as to the nature of Oba's claims" before the EEOC filed suit, because the EEOC "did not conduct an investigation with regard to . . . Oba's claims, include [her] claims in its determination letters, or advise JetStream of [her] claims during conciliation."  (Doc. # 116 at 20.)

As for the EEOC's investigation, Defendant sole basis for objection is that the EEOC made a single request for information regarding Ms. Oba and "never requested that JetStream identify the basis for laying Oba off."  (Doc. # 116 at 21).  JetStream cites no legal authority for the notion that multiple requests for information are required for an investigation to be sufficient, and the extent of the investigation is the Commission's prerogative.  *See EEOC v. Keco Industries, Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984) (holding that district court erred in inquiring into the sufficiency of the Commission's investigation because "the nature and extent of an EEOC investigation into a discrimination claim is a matter within the discretion of that agency."); *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 832–33 (7th Cir. 2005) (holding "[n]o case actually holds that the scope of the EEOC's investigation is a justiciable issue in a suit by the EEOC"). Additionally, JetStream's assertion about the EEOC's failure to inquire about the basis for Oba's layoff is puzzling in light of the fact that on May 24, 2012, the EEOC undisputedly made a request for this information when it asked JetStream to "[d]escribe the details of the lay-off or reduction-in-force **which resulted in the termination of Amina Oba and others** in early 2009, including when it occurred, **the criteria for lay**

**off/reduction-in-force**, names of decision-makers, and how the lay off was implemented," and the fact that JetStream specifically provided the basis for Ms. Oba's layoff in its response to this request for information ("In February 2009, JetStream laid off twenty-one employees**, including Amina Oba**, because United Airlines reduced the number of flights serviced by JetStream's aircraft cleaners").  (Doc. # 116-6 at 29, 31) (emphasis added).

Additionally, the EEOC's Letter of Determination notified JetStream on August 29, 2012 that "there is reasonable cause to believe that there is a violation of Title VII in that the Respondent unreasonably refused to accommodate the Charging Party and a **class of female Muslim** applicants **and employees'** bona fide religious practice and/or because of sex."  (Doc. # 84-25) (emphasis added).  Notwithstanding Ms. Oba's status as a female Muslim employee, Defendant asserts that this reference to an "unidentified class" was not adequate notice of Ms. Oba's claim in that it failed to identify her specifically by name, and it cites *EEOC v. Outback Steakhouse of Fla., Inc.*, 520 F. Supp. 2d 1250, 1266 (D. Colo. 2007), as legal authority for the proposition that such identification was required.  (Doc. # 116 at 21.)  However, in *Outback Steakhouse,* this Court did not hold that employees must be specifically identified in determination letters; instead, it held that the EEOC's reasonable cause determination referencing a "class of females" did not provide an employer of proper notice of the **national scope** of the charges against it, because "neither the charges, the investigation, nor the determination affirmatively indicate that the discrimination alleged was in fact national in scope."  520 F. Supp. 2d 1250.  Instead, they referred to a three-state "regional" class of

44

female employees.  *Id.*  Unlike *Outback Steakhouse*, Defendant has no colorable

argument that Ms. Oba was not included in the "class of female Muslim . . . employees"

referenced by the EEOC's determination letter: her claims were **identical** to the

Intervenors' claims, and if there was any doubt about her inclusion, the EEOC

requested information about Ms. Oba in particular during the course of its investigation.

JetStream also argues that the EEOC's conciliation efforts on behalf of Ms. Oba

were insufficient, because "the EEOC provided **no information whatsoever** about the

nature of her claims."  (Doc. # 116 at 21) (emphasis added).  This assertion is also

contradicted by the record; as discussed above, JetStream already had notice, as of the

Commission's May 24, 2012 request for information, that the EEOC was interested in

Ms. Oba's layoff, and the EEOC's in-person conciliation meeting occurred on October

25, 2012.  (Doc. ## 116-6 at 29; 83-3 at 50.)  Additionally, the Proposed Conciliation

Agreement contained a specific provision entitled "OTHER AGGRIEVED

INDIVIDUALS," which would have provided that JetStream deposit money into a fund

for "additional aggrieved individuals" and noted that "The EEOC has provided mitigation

information for some of these individuals in Exhibit A."  (Doc. # 83-3 at 54.)  Exhibit A

specifically identified Ms. Oba and provided information about her mitigation efforts.  (*Id.*

at 59.)

In sum, because Ms. Oba was an "aggrieved individual" identified by the EEOC

in the course of its investigation;[24] the Commission may bring claims on her behalf

---

[24] Defendant also asserts, in response to Plaintiff's statement of facts, that "the EEOC did not
identify . . . Oba prior to conciliation."  (Doc. # 116 at 2.)  This assertion is plainly contradicted by
the record.  Ms. Oba was identified by the EEOC in May of 2012, in the EEOC's request for

without a formal charge because "a finding of reasonable cause [was] made and conciliation [was] attempted" as to her claims.  *See Cont'l Oil Co.*, 548 F.2d at 889. Accordingly, the EEOC has satisfied the administrative prerequisites for bringing suit on behalf of Ms. Oba against JetStream.[25]

## 5.    THE INTERVENOR'S DAMAGES

Generally speaking, a Title VII claimant's rejection of a defendant's job offer ends the defendant's ongoing responsibility for back pay.  *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1493 (10th Cir. 1989) (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 241 (1982)).  Such an offer, however, must be "unconditional" – and a rejected offer of reinstatement does not end ongoing backpay liability "if the claimant's rejection of the offer was reasonable given the form of the offer and the circumstances surrounding it." *Id.*; *see also Lemons v. ICM Mortgage Corp.*, 941 F.2d 1213 (10th Cir. 1991) (emphasis added) ("Only an **unreasonable** rejection of a reinstatement offer will toll a plaintiff's damages); *Giandonato v. Sybron Corp.*, 804 F.2d 120, 124 (10th Cir. 1986) ("an employee's refusal to accept reinstatement does not automatically preclude relief if he or she has valid reasons for refusal.")  "Generally, it is the duty of the trier of fact to weigh the evidence to determine whether a reasonable person would refuse the offer of

---

information; conciliation efforts began several months later, August 29, 2012.  ("On August 29, 2012, the EEOC issued class cause findings for the referenced causes.  The EEOC began efforts to conciliate on the same day.")  (Doc. # 116-6 at 48.)

[25] Defendant argues that Ms. Oba should not be permitted to "piggyback" off of any charges filed by the five Intervenors under the single filing rule, which allows "an individual who has not filed an administrative charge [to] opt-in to a suit filed by any similarly situated plaintiff under certain conditions." *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1110 (10th Cir. 2001). However, the single filing rule is irrelevant here, as it relates to an **individual's** ability to intervene in an **existing lawsuit** without first filing a charge with the EEOC.  It does not address the scope of the charges that may be brought by the EEOC in an enforcement action. *EEOC v. Unit Drilling Co.*, 4 F. Supp. 3d 1257, 1265 (N.D. Okla. 2013).

reinstatement." *Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 808 (8th Cir. 1982); *see also Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 830 (2d Cir. 1992) (same).

The EEOC argues that summary judgment is precluded on this issue, because whether JetStream's job offer was "unconditional" and whether it was reasonable for the Intervenors to reject it is a disputed issue of fact. Specifically, it notes that if the acceptance of the offers would have required the Intervenors to swallow their sincerely held religious belief and to wear pants, as well as to complete new applications and submit to drug testing.[26] (Doc. # 118 at 29-29.) *See Toledo*, 892 F.2d at 1493 (holding that an offer was not "unconditional" for purposes of Title VII because the offer "was conditioned on [the employee] dropping his claim, as well as his passing a polygraph test and physical examination.") The Court agrees, and notes that any assessment of whether the job offers were unconditional (or whether it was reasonable for the Intervenors to reject them) will turn, at least in part, on the jury's decisions about the Intervenor's and Ms. Oba's religious accommodation claims; specifically, as explained below, they will be tasked with deciding whether JetStream should have permitted employees to wear skirts or whether such an accommodation would have represented an undue hardship. If the jurors agree that such an accommodation was reasonable, they would also be entitled to conclude that JetStream's was not an "unconditional" offer and/or that it was reasonable for the Intervenors to reject it, as that same offer was premised on wearing pants. *Cf. Naylor v. Georgia-Pac. Corp.*, 875 F. Supp. 564, 582 (N.D. Iowa 1995) (holding that an employee established a material fact question as to

---

[26] It appears that all of JetStream's hires from AirServ were also required to fill out applications and submit to drug testing.

whether it was reasonable for him to refuse an offer of reinstatement "because of a fear of continued racial harassment"); *Wilcox v. Stratton Lumber, Inc.*, 921 F. Supp. 837, 843 (D. Me. 1996) ("Plaintiff feared continued harassment, and therefore, reasonably declined Defendant's offer of reinstatement.")  Accordingly, the Court DENIES summary judgment with respect to this issue.

**B.     PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiff's Cross-Motion for Summary Judgment requests that the Court grant summary judgment in its favor on several of Defendant's asserted defenses, including (1) the exhaustion of remedies and administrative prerequisites; (2) the statute of limitations, waiver, and estoppel; (3) laches; and (4) its defenses alleging that the religious accommodations at issue are an undue burden.  The Court addresses each of these defenses in the order stated above.

**1.     JETSTREAM'S EXHAUSTION DEFENSES**

The Court has already determined that the EEOC sufficiently engaged in conciliation efforts with respect to the Intervenors' claims, and also that the EEOC fulfilled the other necessary administrative prerequisites with respect to Ms. Oba's claims (including investigation, notification in a reasonable cause determination, and conciliation).  As such, summary judgment will be entered on Defendant's third, fourth and fifth defenses (that Plaintiff/Intervenors' claims are barred due to the failure to exhaust "administrative remedies" and "conditions precedent to filing suit," and because "they exceed the scope of the administrative charges, the scope of the administrative

investigation, or the scope of the administrative determinations," respectively).  (Doc. # 13 at 19.)

## 2.   <u>THE STATUTE OF LIMITATIONS, WAIVER, AND ESTOPPEL DEFENSES</u>

Defendant argues that it has viable statute of limitations, waiver, and estoppel defenses because the EEOC failed to exhaust its administrative requisites with respect to Ms. Oba's claims when it did not file charges within 300 days of any alleged discriminatory actions.[27]  As has already been discussed, the EEOC was not required to file charges on behalf of the aggrieved individuals.  Accordingly, summary judgment will be entered on Defendant's sixth and eighth defenses.

## 3.   <u>LACHES</u>

The EEOC is not required to conclude its conciliation efforts and bring an enforcement suit within any maximum period of time.  *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 360 (1977).  Nevertheless, laches may constitute an equitable defense to a Title VII action when the EEOC's "unexcused or unreasonable delay has prejudiced [its] adversary."  *Bratton v. Bethlehem Steel Corp.*, 649 F.2d 658, 667 (9th Cir.1980) (internal quotation marks and citation omitted).  The laches defense has two components: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."[28]  *Nat'l R.R. Passenger Corp. v.*

---

[27] JetStream also asserts that the EEOC should be estopped (and "quasi-estopped") from asserting that Haji and Oba are 'similarly situated' to the Intervenors for purposes of piggybacking." (Doc. # 116 at 22.)  As the Court explained in note 25, *supra*, this argument is irrelevant.

[28] Although *Morgan* observed that it was not entirely clear whether the laches defense may be asserted against the EEOC, it also noted that "there seem[s] to be general agreement that courts can provide relief to defendants against inordinate delay by the EEOC."  536 U.S. at 122

*Morgan*, 536 U.S. 101, 122 (2002); *see also Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002) (defendant must prove both unreasonable delay and that it was materially prejudiced by the delay).  Accordingly, to prevail on its Cross-Motion for Summary Judgment, the EEOC must establish, as a matter of undisputed fact, that it (1) did not unreasonably delay the proceedings, or (2) that JetStream has not been substantially prejudiced by any delay.  *Id.*  Conclusory allegations of prejudice, including allegations that witnesses have faded memories from the passage of time, are "insufficient to establish material prejudice" for the purposes of laches.  *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1208 (10th Cir. 2001); *see also EEOC v. Gard Corp.*, 795 F. Supp. 1066, 1070 (D. Kan. 1992) ("Generalized allegations of harm from the passage of time do not amount to a showing of prejudice sufficient to invoke the doctrine of laches.")  Moreover, JetStream must show that the prejudice is due to the EEOC's delay.  *See EEOC v. Scrub, Inc.*, No. 09-cv-4228, 2010 WL 3172855, at *4 (N.D. Ill. Aug. 10, 2010) (citing *EEOC v. Massey-Ferguson, Inc.*, 622 F.2d 271, 275 (7th Cir. 1980).

JetStream has failed to provide adequate evidence in response to Plaintiff's Cross Motion to create a factual dispute as to whether it was "substantially prejudiced" by such delay.  Defendant asserts that "due to the passage of time, many of JetStream's witnesses – and, most importantly, Norris – do not recall many of these events needed to respond to the Plaintiff's allegations," including whether Mr. Norris told

---

n. 14; *see also Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 373 (1977) (stating that federal courts have power to provide relief when a defendant is "significantly handicapped" due to "inordinate EEOC delay in filing the action after exhausting its conciliation efforts.")

them that they could not wear hijabs or skirts at work.  (Doc. # 116 at 26.)  Specifically,

Mr. Norris has submitted a declaration asserting that "due to the fact that it is has been

more than five years since the 2008 hiring process occurred, I do not remember many

details of those events needed to respond to the specific allegations made by the five

women in this lawsuit."  (Doc. # 116-4 at 48.)  The only specific examples of lapsed

memory he can provide, however, are (1) he cannot remember whether the Intervenors

offered to get him a letter from a mosque in support of their accommodation request,

and (2) he "cannot remember the identity of the AirServ employees that I spoke with

during the 2008 hiring process.  Based on reading the deposition testimony of one of

the women in this case, Amino Warsame, which indicated she had a dispute about her

pay rate, I recall a pay rate dispute, and so I might be remembering her, but I am not

certain whether the woman I spoke to was Ms. Warsame, or whether my recollection

involves someone else entirely."  (*Id.* at 48-49; Doc. # 116, ¶ 24.)  JetStream also

alleges that prejudice resulted from Mariela Feliciano's inability to remember "many

facts needed to respond to the allegations in this case," specifically, details about her

interviews and why JetStream provided the reasons it did in its March 2009 Position

statement provided to the CCRD.  (Doc. # 116, ¶¶ 25-28.)[29]

---

[29] JetStream contends that it also is prejudiced by virtue of the fact that "During the 2008 hiring process, JetStream managers Frank Austin and Gail Cardoniga met with at least one AirServ manager to review a list of AirServ employees and get recommendations on who to hire.  Austin and Cadorniga do not recall when the meeting occurred, who else was present, which AirServ employees were recommended, what else was discussed that the meeting, or what was said about the Intervenors."  It provides no argument or analysis, however, about how these facts make any difference whatsoever to its case.  Indeed, JetStream has repeatedly emphasized that AirServ's recommendations were essentially irrelevant insofar as JetStream failed to hire the Intervenors for reasons completely unrelated to their work for AirServ and because it only

However, the Intervenors' charges were filed almost immediately after the conversations occurred with Norris, and JetStream could have taken the testimony of Mr. Norris and/or other employees, or otherwise memorialized their side of the story in anticipation of litigation – particularly after JetStream learned that the matter was not likely to go away.  After all, it had notice that (1) the CCRD had made a reasonable cause finding; (2) the investigation had been transferred to the EEOC from the CCRD; and (3) the EEOC was expanding the investigation.  *See Howard v. Roadway Exp., Inc.*, 726 F.2d 1529, 1533 (11th Cir. 1984) (holding that an employer was not prejudiced by the EEOC's delay because it was "notified of [the employee's] charge well within a year of the alleged discriminatory act.  At that time, [the employer] could have maintained its records and taken the testimony of key employees in anticipation of the ensuing litigation."); *Occidental Life*, 432 U.S. at 372-73 (internal citations omitted) (noting that a Title VII defendant is not, as a general matter, subjected "to the surprise and prejudice that can result from the prosecution of stale claims," because unlike a litigant in a private action who may first learn of the cause against him or her upon service of the complaint, "the Title VII defendant is alerted to the possibility of an enforcement suit within 10 days after charge has been filed.  This prompt notice serves, as Congress intended, to give him an opportunity to gather and preserve evidence in anticipation of a court action.  Moreover, during the pendency of EEOC administrative proceedings, a potential defendant is kept informed of the progress of the action.")

---

planned to hire "about sixty (60) of the best applicants from Air Services and then to fill the remaining available positions through 'outside' hires."  (*See, e.g.,* Doc. # 84-6 at 2-3.)

Indeed, although Mr. Norris claims that he cannot remember "the identity of the AirServ employees that I spoke with during the 2008 hiring process" (Doc. #116-4 at 48-49), the record reveals that his memories about their identities are no worse now than they were when Mr. Norris was interviewed by the CCRD several months after the events in question – in August of 2009.  (Doc. # 132-7.)  Even at that time, Mr. Norris could not remember the names of the women he interviewed.  (*Id.*) ("Norris cannot remember any of the names of the people he interviewed, but he rememebers a group of girls.")  Similarly, Feliciano investigated and provided the reasons why Intervenors were not hired in February 2009, a point which was very close to the events in question, and these reasons were memorialized in JetStream's position statement.

As for the fact that JetStream will pay "much more" in back pay if found liable, JetStream has pointed to no authority which indicates that this factor alone suffices to show prejudice; regardless, because backpay is an equitable remedy and subject to mitigation, the Court has the discretion to take the EEOC's delay into account when fashioning a remedy.  *See* 42 U.S.C. § 2000e–5(g) (authorizing courts to order "such affirmative action as may be appropriate, which may include" back pay); *Occidental Life*, 432 at 373 (1977) (noting that the trial court may restrict or even deny backpay relief when the EEOC is the plaintiff if there is "unexcused" delay); *EEOC v. Great A. & P. Tea Co.*, 735 F.2d 69, 84-85 (3d Cir. 1984) (denying employer's laches defense and noting that "[t]he district court has ample authority to tailor the scope of [backpay] relief" to account for any delay.)

Because JetStream has failed to show that it was prejudiced by the EEOC's

delay, the Court enters summary judgment in the EEOC's favor on Defendant's Seventh

Defense.

**4.      JETSTREAM'S UNDUE HARDSHIP DEFENSES**

Title VII makes it unlawful for an employer to "discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's . . . religion."  42

U.S.C. § 2000e–2(a)(1).  "Religion" is defined to include only those "aspects of religious

observance and practice" that an employer is able to "reasonably accommodate . . .

without undue hardship on the conduct of the employer's business."  42 U.S.C. §

2000e(j).[30]  Accordingly, an employer violates Section 2000e–2(a)(1) when it does not

make reasonable accommodations, short of undue hardship, for the religious practice of

employees.  *Pinsker v. Joint Dist. No. 28J of Adams and Arapahoe Cnties.*, 735 F.2d

388, 390 (10th Cir.1984) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74,

(1977)).

Once a plaintiff has made out a *prima facie* case of religious discrimination or the

failure to accommodate, "the burden shifts to the employer to show that it was unable

reasonably to accommodate the plaintiff's religious needs without undue hardship."  *Lee

v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1022 (10th Cir. 1994).  The determination of

whether a particular accommodation constitutes an undue hardship "must be made by

---

[30]"The reasonable accommodation duty was incorporated into the statute, somewhat
awkwardly, in the definition of religion."  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n. 1
(1986).

considering 'the particular factual context of each case.'"  *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir. 1989) (quoting *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 134 (3d Cir. 1986)); *see also United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976) (explaining that, with respect to an undue hardship determination, "[e]ach case necessarily depends upon its own facts and circumstances, and in a sense every case boils down to a determination as to whether the employer has acted reasonably.")  An accommodation that requires an employer to bear more than a *de minimis* burden imposes an undue hardship.  *See Trans World Airlines,* 432 U.S. at 84.  "[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business.  Title VII does not require that safety be subordinated to the religious beliefs of an employee."  *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975); *see also Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 760 (E.D.N.Y. 1998) *aff'd*, 189 F.3d 461 (2d Cir. 1999) ("Even assuming that [plaintiff] is correct about the degree of risk, Title VII does not require employers to absorb the cost of all less than catastrophic physical injuries to their employees in order to accommodate religious practices.")  Any proffered hardship, however, must be **actual**; "[a]n employer . . . cannot rely merely on speculation."  *Toledo*, 892 F.2d at 1492 (internal citation omitted); *see also Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (collecting cases) (any asserted hardship "must be 'real' rather than 'speculative'" and cannot therefore be proven by assumptions or "opinions based on hypothetical facts").

JetStream contends that it would be an undue hardship for safety reasons to allow its employees to wear hijabs and skirts. (For ease of reference, the Court will refer to the proposed accommodation to allow employees to wear hijabs as "the hijab accommodation," and the proposed accommodation to allow employees to wear skirts as "the skirt accommodation").  As discussed in greater detail below, with respect to the hijab accommodation,[31] the EEOC argues that JetStream's safety concerns are purely "speculative," and the Court agrees.  JetStream has, however, presented sufficient evidence to create a disputed issue of fact as to whether it would pose an "undue hardship" for JetStream to implement the skirt accommodation.

As for hijabs, the EEOC notes that JetStream's management has admitted that as long as a head covering is not loose or flowing, such a garment poses **no** safety risks.  *See* Norris Depo. (Doc. # 84-47 at 11) ("I don't have an issue with the [head]scarf, we could make allowances for that, that would not be an issue.  . . . One of the girls said could she put a hat on top of her scarf and I said, 'Well, yeah, I guess but, you know, the scarf is fine, you don't have to do that . . . .'"); Alexander Depo. (Doc. # 84-46 at 4) (after being shown a picture of a headscarf and asked whether, "In your professional opinion, would that head scarf and the way it's worn tucked into the shirt, would that have posed a safety hazard working at DIA for JetStream for the cabin

---

[31] The Court notes that Defendant's ninth separate defense (as originally pled in its Answer) was limited to the skirt accommodation: "Plaintiff's claims are barred, in whole or in part, because Plaintiff cannot meet its burden of showing that it is reasonable to allow employees to wear full-length skirts on jetway stairs or near jet engines."  (Doc. # 13 at 12.)  Nevertheless, Defendant's tenth defense was worded in a more general fashion, and appears to apply to hijabs as much as to skirts.  (Doc. # 13 at 13) ("Plaintiff's claims are barred, in whole or in part, because any religious accommodation would have created undue hardship and imposed more than a de minimis burden on Defendant.")

cleaners?", Mr. Alexander answered, "As long as it was tucked into a shirt I would think

not.")  Indeed, in 2011, JetStream modified its uniform policy in response to this lawsuit;

its policy now provides that employees are permitted to wear hijabs:

> Scarves used as a headdress are permitted in solid navy blue, black or
> JGS [JetStream Ground Services] approved only.  In compliance with
> safety requirements, the scarf/head dress must be short as not to obscure
> the face (36" x 36" maximum dimensions) and must be attached securely
> to the employee's head.  The scarf/head dress must not hang below the
> shoulders or loose fitting to prevent injury.

(Doc. # 116-4 at 22.)[32]  JetStream's actual practice also makes its current claims of

undue hardship ring particularly hollow:  JetStream's reinstatement offers for the

Intervenors provided that they would be permitted to wear headscarves, and Ms. Oba

has been doing so on a daily basis since she was rehired.  (Doc. ## 83, ¶ 18; 83-2 at

43, 50.)

JetStream does not dispute these facts specifically; instead, it generally refers to

"safety risks" and "engine ingestion hazards" that exist on airport ramp areas from

"**loose** clothing – such **as loose** skirts **or hijabs**."  (Doc. # 116, ¶¶ 37, 41) (emphasis

added).  Similarly, it submits a declaration from a safety expert Matthew Lykins, but a

close reading of that declaration indicates that its conclusions about the safety of hijabs

are premised on the dangers posed from "loose," rather than secured, hijabs.  For

example, Mr. Lykins states that jet engines and aircraft maintenance hangars pose

known safety hazards for employees who wear "**loose headscarves** and long, loose

---

[32] The copy of the Uniform Policy submitted by Plaintiffs at Doc. # 84-33 did not contain this
second and third sentence (describing the requirement that the hijab be short and securely
attached to the head). However, Doc. # 84-33 does not appear to be a final policy. and both of
the parties' experts quoted a version of the policy with these additional provisions in their
reports.  (*See* Doc. # 116-4 at 22, 37.)

skirts." (Doc. # 116-4, ¶ 4.) His expert report also states that "Wearing loose clothing including **loose-fitting head coverings** and loose-fitting long dresses/skirts is a safety hazard and is prohibited by industry safety guidelines." (*Id.* at 16) (emphasis added). Because it is limited to safety hazards involving "loose" hijabs, JetStream's rebuttal evidence fails to create a genuine factual dispute as to whether an accommodation allowing cabin cleaners to wear hijabs if they are tucked in to a shirt and secured to the head – that is, its current hijab policy, which is being effectuated on a daily basis by Ms. Oba – constituted an "undue hardship." (Doc. # 116-4 at 22.) Accordingly, summary judgment will be entered in Plaintiff's favor with respect to the hijab accommodation.

However, Jetstream has presented sufficient evidence to create a disputed issue of fact as to whether it would pose an "undue hardship" for JetStream to permit its cabin cleaners to wear long skirts while working. JetStream is self-insured for worker's compensation, up to the limit of its "stop loss" policy (which is $250,000 per claim), such that an increase to its employee injury risk could represent a financial burden. (Doc. # 115, ¶ 71.) Additionally, JetStream has presented non-speculative – albeit weak – evidence that its employees could face additional safety risks if they wore skirts.

Unlike airline passengers, cabin cleaners do not enter the airplanes through the airport's gates; rather, they often move and work in and around the ramp area at DIA and are required to ascend and descend jetway stairs, such that they are at risk for tripping, slipping, or falling up or down those stairs and injuring themselves. (Doc. # 116, ¶ 34.) JetStream's expert, Dr. Nancy Gruble, conducted an experiment in which she asked 10 women who wore long skirts on a somewhat-regular basis to traverse a

set of jetway stairs for a total of 540 ascents and descents under varying conditions (including wearing pants, wearing a loose, long skirt, or gathering a long skirt; using the handrail and not using the handrail; and carrying zero, one, or two objects).  (Doc. # 84-3 at 3, 12.)  The EEOC points to the fact that the experiment showed no statistically significant difference between the number of slips, trips, stumbles, or losses of balance by participants who wore skirts and those who wore pants, and that none of the participants actually injured themselves in the experiment.  (Doc. # 84, ¶ 38.)  Defendant counters, however, that Dr. Gruble still concluded that "[s]tair users are more at risk of a safety incident during stair use while wearing a long loose skirt," because such safety incidents include not only slipping, tripping, stumbling, or falling, but also so-called "task interference" – i.e., an interruption to the employee's stair-climbing "task" "due to the presence of the clothing or [the] interaction with clothing while climbing the stairs that takes the user's attention off the stair climbing task (e.g., distraction caused by clothing, stepping on clothing.)"  (Doc. # 116-3 at 54, 55.)  Participants stepped on the skirt in 40 out of 180 trials, and nine of the ten participants stepped on the skirt at least once.  (*Id.* at 43.)  Additionally, when task interference was considered by Dr. Gruble, the wearing of skirts resulted in far more safety incidents – specifically, 2.2% of the safety incidents occurred with pants, 3.8% with a gathered skirt, and 23% with a skirt hanging loose.  (*Id.*)  The EEOC attempts to rebut this evidence by asserting that "task interference" is essentially irrelevant to safety, in that "Dr. Grugle established no correlation between slips, trips, stumbles, or balance loss – the precursors to falling – and stepping on a skirt."  (Doc. # 132 at 17.)  Nevertheless, because stepping on a skirt

can lead to a fall, Dr. Gruble's experiment constitutes sufficient (albeit thin) evidence for

the jury to decide that such an accommodation would be an undue hardship.

Additionally, JetStream submitted a declaration from safety expert Matthew

Lykins, who personally observed JetStream's cabin cleaners walking and working in the

ramp area and concluded that "Allowing cabin cleaners to wear [loose] clothing is

contrary to industry safety standards and creates a foreseeable safety risk," due to the

fact that the cleaners are within close proximity to belt loaders, power tools, and jet

engines.  (Doc. # 116-4 at 2-4.)  The EEOC presents evidence about other company's

practices in providing religious accommodations for employees to wear skirts; for

instance, it points to the fact that JetStream previously offered an accommodation to

allow the Intervenors to wear skirts, and that a representative for United Airlines testified

that United has no objection to cabin cleaners servicing its airplanes while wearing

skirts.  Although this lends very strong support to the argument that such an

accommodation would not be an undue hardship for JetStream, it does not establish, as

a matter of undisputed fact, that it is not an undue hardship.  Accordingly, the EEOC's

Motion is denied with respect to the undue hardship defense as it pertains to the skirt

accommodation.

## C.   THE EEOC'S MOTION TO STRIKE

On June 8, 2015, this Court ordered the parties to submit simultaneous,

supplemental briefing on the effect of Supreme Court's interim decision in *EEOC v.*

*Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015) on the pending summary

judgment motions.  (Doc. # 157.)  The EEOC filed a Motion to Strike two portions of

Defendant's supplemental brief, arguing that they raised new arguments that should

have been made in Defendant's Motion for Summary Judgment.  (Doc. # 170.)

Specifically, the EEOC argues that the court should strike (1) Defendant's arguments

about the impact of the *Abercrombie & Fitch* decision on the *prima facie* case for failure-

to-accommodate claims and (2) Defendant's arguments about Plaintiff's retaliation

claims.

       As for the impact of *Abercrombie & Fitch* on the *prima facie* case, the EEOC

asserts that this portion of Defendant's brief should be struck because the EEOC "could

not have anticipated that Defendant would propose a new construction of the *prima*

*facie* framework for analyzing EEOC's failure-to-accommodate claims."  (Doc. # 170 at

9.)  The Court disagrees.  As discussed in pages 25-26, *supra*, the *Abercrombie & Fitch*

decision at least implicitly reformulated the second element of the *prima facie* case.

The second element had been previously articulated by the Tenth Circuit as requiring a

showing that the employee "**informed** his or her employer" that he or she had a bona

fide religious belief that conflicted with an employment requirement, but the Supreme

Court held that an employer still violates Title VII if the employer "acts with the motive of

avoiding accommodation," even if it has "no more than an unsubstantiated suspicion

that accommodation would be needed."  *See Abercrombie & Fitch Stores, Inc.*, 731

F.3d at 1122, *rev'd*, 135 S. Ct. 2028 (2015).  As such, Defendant was merely attempting

to **apply** *Abercrombie & Fitch* to the case at bar, and the EEOC certainly could have

anticipated that Defendant would discuss the impact of the decision's holding on the

second element of the *prima facie* case – particularly because all three elements were

at least implicitly affected by the Supreme court's holding – and also expect that it might offer a "new" version of the *prima facie* elements.  Regardless, as discussed in page 25, *supra*, the Court did not adopt JetStream's reformulation of the *prima facie* case in the instant matter.

JetStream's retaliation arguments present a closer call.  Defendant's own supplemental brief concedes that *Abercrombie & Fitch* involved a failure to accommodate claim, not a retaliation claim, such that "prior precedent regarding retaliation claims continues to apply."  (Doc. # 165 at 11-12.)  Nevertheless, Defendant still proceeded to discuss how Ms. Oba did not engage in protected activity by wearing her hijab at work while off duty, as "[s]uch conduct cannot be construed as opposition to lawful discrimination," and made further arguments about the lack of a causal connection between protected activity and the lack of sufficient evidence about pretext. (*Id.* at 12-13.)  In support of these propositions, it cited to a handful of cases, including *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) – but not to *Abercrombie & Fitch.*  (*Id.*)  Defendant asserts that it included these arguments because it wished to explain that

> despite the Supreme Court's *Abercrombie* decision, the failure of Haji and Oba to request an accommodation is still relevant to the EEOC's retaliation claims; and the EEOC still cannot prevail of such claims, even in light of the *Abercrombie* decision. . . . Jetstream, therefore, argued in its Supplemental Brief that *Abercrombie* has not changed the retaliation analysis set forth in JetStream's summary judgment motion.

(Doc. # 174 at 5.)  However, a close reading of its supplemental brief reveals that JetStream goes much further than merely stating that the failure to request an accommodation is "still relevant" despite *Abercrombie* – and thus goes beyond the

permissible scope of the supplemental briefing – in arguing why, for example, there is no casual connection or insufficient evidence of pretext. Nevertheless, this portion of the brief need not be struck because it was not actually a new argument. As the Court explained in pages 31-32, *supra*, Defendant cited *Hinds* and made the argument that Ms. Oba had not engaged in sufficient protected activity for a retaliation claim. *See* (Doc. # 84 at 15) ("the EEOC cannot establish the first element of its *prima facie* case, as neither Oba nor Haji engaged in any protected activity. . . . [Additionally,] the EEOC must show that those who decided to take any alleged adverse action had knowledge of Oba and Haji's protected activity. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).") Accordingly, the EEOC already had an opportunity to respond to this argument, and it did so. (Doc. # 117 at 23) (explaining that Ms. Oba "opposed Defendant's practices by continuing to wear her hijab openly at work during non-work times.") Accordingly, this portion of the Motion to Strike is denied as moot.

## IV. **CONCLUSION**

Accordingly, the Court ORDERS that Defendant's Motion for Summary Judgment (Doc. # 83) is GRANTED IN PART, insofar as Ms. Oba's retaliation claim and Ms. Haji's disparate treatment, religious accommodation, and retaliation claims are hereby DISMISSED. It is DENIED in all other respects.

Plaintiffs' Motion for Partial Summary Judgment (Doc. # 84) is GRANTED IN PART, insofar as summary judgment is entered in Plaintiff's favor as to Defendant's third, fourth and fifth defenses (the exhaustion of administrative remedies and conditions precedent to filing suit (including conciliation)); sixth, seventh, and eighth

defenses (the statute of limitations, laches, and waiver and/or estoppel).  As for the

ninth and tenth defenses, summary judgment is entered in Plaintiff's favor with respect

to the hijab accommodation, but DENIED with respect to the skirt accommodation.  It is

FURTHER ORDERED that Plaintiffs' Motion to Strike (Doc. # 170) is DENIED.

DATED:  September 29, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge