IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02340-CMA-KMT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

and

SAFIA ALI ABDULLE, et al.,

Plaintiff Intervenors,

v.

JETSTREAM GROUND SERVICES, INC.

Defendant.

**EEOC's Rule 702 Motion to Strike Opinions of JetStream's Expert Matthew Lykins**

Defendant seeks to introduce an unprepared, unreliable, and unqualified expert to present expert testimony about the possibility of injuries due to loose clothing, even though discovery in this case has established there is no reasonable likeliness of such injuries occurring. Mr. Matthew Lykins' ("Lykins") opinions should be disallowed because (a) he is unqualified to opine on the safety hazards faced by cabin cleaners; (b) his opinions are based on factual assumptions which are false or incorrect; and, (c) his opinions mischaracterize and misapply industry definitions and federal regulations.

This Court has already ruled as a matter of law that allowing Muslim women to wear hijabs while they work is not an undue burden. [Doc. 184, at 56, 58]. Hence all of

1

Lykins' opinions with respect to the danger of wearing headscarves should be excluded. But Lykins' opinions about the wearing of long skirts are similarly speculative. There is no evidence that wearing a long skirt will increase a cabin-cleaners' chance of suffering an accident with jet engines, belt-loaders, mechanical power tools, or other airport equipment because the cabin cleaners do not come in contact with such equipment. Under Fed.R.Evid. 403 and 702 Lykins' opinions on long loose clothing should be precluded as they play no part other than to confuse the jury and waste time. The EEOC respectfully requests an evidentiary hearing to further elaborate on this matter.

### I.   Factual Background

### a.  Lykins' Expert Report.

Defendant retained Lykins in 2014 to investigate whether employees wearing loose clothing, including long skirts and long head scarves, would pose a safety risk to cabin cleaners while they performed their job duties at Denver International Airport ("DIA"). [*See* Ex. 1, p. 1]. Importantly, in spite of Lykins' 20 years of airport experience, he does not recall any injuries to cabin cleaners because of their clothing [Lykins dep. 43:17-18; 163:23-164:2] Nevertheless, Lykins opines as follows:

> 7.1 Wearing loose clothing including long skirts and long headscarves by ramp employees including aircraft cabin cleaners, while working on airport ramps and maintenance facilities is a known safety hazard.
>
> 7.2 JetStream's uniform policy prohibiting its aircraft cabin cleaners from wearing loose clothing including long skirts and long headscarves while working on airport ramps and maintenance facilities is consistent with federal safety regulations and accepted industry guidelines.
>
> 7.3 Accommodating ramp employees including aircraft cabin cleaners by allowing them to wear loose clothing while working on airport ramps and

> maintenance facilities violates industry safety standards and federal safety regulations and denies those employees the protection afforded by those regulations.

Ex. 1, at 18. The safety hazards Lykins discusses are: (1) jet engine ingestion, (2) jet blast (injuries caused from being behind the engine), (3) injuries caused by belt loaders, and, (4) injuries caused by machine power tools in maintenance shops. [*Id.* at 6-13]. Lykins *did not* investigate hazards related to tripping, slipping, falling, or climbing jetway stairs, [Lykins dep. 168:25-169:3] even though these were the hazards Defendant's managers identified for not allowing Muslim women to wear skirts.

Lykins' opinions rest on essentially three arguments. First, cabin cleaners are "ramp personnel." [Ex. 1 at 1, 6-13 (regularly including cabin cleaners as ramp employees); Lykins dep. 36:8-15]. This assumption is not only made clear in Lykins' stated opinions, *supra*, but is embodied in the very outset of Lykins report, where he states, "JetStream's uniform policy requires ramp and utility employees, including aircraft cabin cleaners, to wear pants…" [Ex. 1. at 1] But Defendant's own witnesses agree cabin cleaners are not ramp employees. [Feliciano 30(b)(6) dep. 54:7-22; Devi dep. 75: 8-10; Desnoyers dep. 122:11-17].

Second Lykins argues that cabin cleaners work with or in proximity to aircraft belt loaders, ground power cables and duct, aircraft fueling equipment, service vehicles, and aircraft jet engines. [Ex. 1 at 6-13]. With regards to belt loaders Lykins refers to one JetStream employee in Ohio who was injured because his clothing was caught on a belt loader while he was leaning on it. [*Id.* at 8]. But Lykins later states that during his DIA inspection he only saw JetStream cabin cleaners walk by a belt loader once and the

3

closest they came to the belt loader was around 20 to 25 feet. [Lykins dep. 139:20-140:6; 143:7-13; 144:6-18].

Lykins relies on OSHA standard (OSHA 3080 Hand and Power Tools 2002) to opine that wearing long skirts is a hazard because these items of clothing may get caught in the power tools found in hangars. [Ex. 1 at 12] But Lykins testified that he was unable to recall ever hearing of a cabin cleaner being injured by a power tool. [Lykins dep. 154:2-9]. During his inspection at DIA Lykins did not observe any cabin cleaners boarding or exiting a plane in the maintenance bay or hangar, but instead speculated that because they have access to the hangar in which the power tools are stored, there is a potential for them to come into contact with the tools, and so a hazard exists. [*Id.*120:8-15; 126:7-22; 137:4-8; 138:19-25; 139:13-19; 154:10-155:10].

Lykins also refers to the dangers posed by jet engines, specifically jet blast and engine ingestion, [Ex. 1 at 8], and mentions placards that are placed on aircrafts to direct employees to stay away from engines. [*Id.*] In his report Lykins used a picture to illustrate a "hazard zone" around an aircraft engine. [*Id.* at 11] The picture depicts the line which an employee may not cross in order to remain safe from injury, i.e., the hazard zone. [*Id.*] Lykins also refers to jet blast injuries and references one incident at a JetStream facility in which an employee was injured by a jet blast. [*Id.*] But Lykins admitted that the poster in his report does not indicate whether the engine is idle or operating, and rather the figure is a general depiction indicating that the closer a person comes to an engine the higher the danger of ingestion. [Lykins dep. 147:3-17] During his inspection at DIA Lykins never saw any cabin cleaners cross the hazard zone as

4

depicted in figure 5 of his report. [*Id.* 149:14-21]. Nor did he see any employee, including cabin cleaners, approach, stand, or work by an operating jet engine. [*Id.* 145:9-13, 152:2-4]. Even when the engines were off, Lykins estimates that the closest distance between any cabin cleaner he observed and the back of an aircraft engine was 75 to 100 feet. [*Id.* 145:14-21]. Lykins admits that a jet blast danger exists regardless of an employee's clothing. [*Id.* 152:5-153:16].

Third Lykins implies that federal OSHA regulations and industry safety guidelines restrict the types of clothing that cabin cleaners may wear. [Ex. 1 at 7-9, 12-13, 15]. Specifically, he states, "[t]he state of Colorado leaves the enforcement of employee safety matters to federal OSHA. Colorado employers including JetStream are required to comply with government regulations including safety regulations promulgated by OSHA." [*Id.* at 13]. Lykins cites to a few OSHA regulations for ramp employees who work with belt-loaders and machine tools [*Id.* at 7-8, 12-13], but admits he is unaware of any OSHA regulations related to clothing, other than those requiring personal protective equipment, ("PPE"). [Lykins dep. 99:24-100:8, 20-101:1]. Lykins agrees that "OSHA 3170 Safeguarding Equipment and Protecting Workers from Amputations 2001," cited in his report, (explaining how to protect employees from amputations when operating equipment-none used by cabin cleaners) is not a legal standard or regulation but an optional supplement. [Lykins dep. 99:7-23]. He further relies on industry standards for ramp employees to buttress his case. For example, Lykins argues that:

> Well-known safety guidelines for ramp personnel including aircraft cabin cleaners working near aircraft jet engines is to secure any loose items on their person or remove them. Wearing loose clothing including loose-fitting

>head coverings and loose-fitting long dresses / skirts is a safety hazard and is prohibited by industry safety guidelines.
>…
>
>In their Ground Accident Prevention Program (GAP) section 2.3 of their Ramp Operational Safety Procedures, A Template for Ramp Supervisors clearly establishes that appropriate clothing for ramp personnel should fit snugly to prevent injury.

[Ex. 1 at 9]. It is on these bases, that Lykins concludes that long loose clothing should not be worn by cabin cleaners and creates a safety hazard.

### b. Lykins' Qualifications and Preparation for His Report.

Lykins has taught FAA curriculum regarding airframe and power plant certification processes, which in his own words, "essentially talks and discusses and teaches… aircraft maintenance." [Lykins dep. 8:2-12] He also served as a consultant to airports seeking to develop emergency and security plans. [*Id.* 10:6-11:4; 13:1-14:12]. The emergency plans were geared to reducing risk to aircraft technicians and ramp personnel, and to minimizing damage to aircraft and ground equipment. [*Id.* 16:13-25; 17:3-14; 18:22-19:1; 24:17-25:18; 28:14-22; 30:11-17; 31:11-32:10]. Lykins has never supervised cabin cleaners, and has never been involved in developing safety policies for them. [*Id.* 170:10-18]. Nor is he aware of DIA's safety standards for cabin cleaners. [*Id.* 61:3-62: 6]. When asked about them at his deposition, he stated that he could only speculate. [*Id.*]

To prepare his report, Lykins visited DIA on May 1, 2014, and inspected JetStream's operations for approximately two hours. [*Id.* 112:14-18; 117:15-18; *see also* Ex. 1, at 5]. Before formulating his opinions, Lykins did not speak with anyone from

JetStream about the job duties of cabin cleaning employees. [*Id.* 115:22-116:10, 19-117:14]. He did not review the testimony of JetStream's safety coordinator that cabin cleaners do not work with or operate belt loaders. [Cadorniga 30(b)(6) dep. 49:18-23]. Nor did Lykins review DIA's policies and procedures. [*Id.* 64:12-20]. Finally, although airport ground operations may be governed by local agencies and requirements unique to that location, Lykins did not look into whether that was true for DIA. [*Id.* 64:21-65:17].

### c.  The job duties and work environment of cabin cleaners.

According to Defendant's witnesses, cabin cleaners are not ramp employees and do not work with or around conveyer belts, or with power equipment such as ground power cables and duct, aircraft fueling equipment, or other service vehicles. [*See* Devi dep. 25:24-26:7; 74:7-21; 75:8-10, 11-13; 76:6-9; 93:7, 15-18; 94:2-11; 95:18-23; Desnoyers dep. 122: 11-17; 123:1-3, 12-16]. In fact belt loaders are usually on the opposite side of the plane and not in the vicinity of cabin cleaners. [Devi dep. 74:13-21]. Defendant's witnesses also testified that cabin cleaners are prohibited from approaching jet engines, or crossing the lines around an engine when the engine is on, and are prohibited from approaching closer than 25 feet when the engines are off. [Devi dep. 43:21-24; 45:5-13; 18-47:7; Cadorniga dep. 99:2-7, 14-22; Austin dep. 79:9-15; 108:6-8; 111:22-112:5; Blacksher dep. 172:13-19]. Cabin cleaners must wait in their van until the aircraft engine comes to a complete stop before they are allowed to exit the van and approach the aircraft. [Blacksher dep. 41:16-24; 42:2-12; Cadorniga dep. 99:14-22]. The hazards cabin cleaners typically face on the job include aggressive crew members,

contamination, and cleaning up human waste and fluids, including blood. [Devi dep. 53:14-55:23].

## II.   Legal Argument

District courts have the unique task of acting as gatekeepers with regards to the admissibility of expert testimony. *Daubert v. Merrell DowPharmaceuticals*, Inc., 509 U.S. 579, 591 (1993), *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). This articulation of the district court's role was codified into Federal Rules of Evidence 702. In order to fulfill that role, the district court must determine whether the expert testimony introduced in the case is adequately tied to the facts that it will help the jury resolve a factual dispute. *Daubert*, 509 U.S. at 591.The gatekeeper inquiry must focus on an expert's methodology and principles, rather than on the conclusions, *Id.* at 595, and must make certain that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

A court may refuse to admit expert testimony if "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Even a witness qualified as an expert may only offer opinions that (1) are based on sufficient facts or data, (2) are the product of reliable principles and methods, and (3) reasonably apply those principles to the facts at issue. *Kumho Tire*, 526 U.S. at 152-53. Since 2011, under Rule 702, an expert's qualifications, alone, are no longer sufficient foundation to admit his testimony. *Pritchett v. I-Flow Corp.*, 2012 U.S. Dist. LEXIS 53505 *6 (D. Colo. Apr. 7, 2012). Rather, the party putting the expert forward must show

not only that the expert is qualified but also that the process by which the expert arrived at his opinion is reliable. *Id.* The court must ensure that an expert does not present speculative or unreliable opinions. *Tom v. S.B. Inc.*, 2013 U.S. Dist. LEXIS 90277 *11 (D. N.M. Mar. 22, 2013). The party producing the expert must show that the expert's method in reaching his opinion is sound and based on facts which satisfy Rule 702's reliability requirements. *Pritchett* at *7. The court has broad discretion to decide the expert's reliability. *Tom v. S.B. Inc.*, 2013 U.S. Dist. LEXIS 90277 *4 (D. N.M. Mar. 22, 2013).

In the Tenth Circuit, Rule 702 determinations are a two-step process. *Pritchett v. I-Flow* at *9. The Court will determine whether the expert is qualified and if so, whether the opinion itself is reliable. *Id.*; *Tom v. S.B.* at *3. The burden is on the proponent of the expert and is shown through a preponderance of the evidence. *Pritchett* at *8. The proponent is not required to show that the expert's opinion is objectively correct, rather only that the expert has sufficient expertise to apply a methodology, the methodology was reliable, that sufficient facts and data were used, and that the methodology was reliably applied. *Id.* Any inadequacy in the proof of the elements may render the expert's opinion inadmissible. *Id.*

### a. Lykins' Opinions Are Not Based on Proper Knowledge or Experience.

To determine admissibility of expert testimony, the courts first must determine whether an expert is qualified by knowledge, skill, experience, training, or education to opine on the subject. *Rutstein v. Cindy's Trucking of Ill. Inc.*, 2012 U.S. Dist. LEXIS

9

188963 *9 (D. Wyo. Aug. 8, 2012). *See also Pritchett v. I-Flow Corp.*, 2012 U.S. Dist. LEXIS 53505 (D. Colo. Apr. 7, 20112) (expert held unqualified on some subjects).

Here, Lykins is not qualified to testify about the job duties of cabin cleaners or their safety protocols. Although Lykins is versed in FAA regulations, his expertise is focused on maintenance workers, such as mechanics or technicians. [Lykins dep. at 25:18; 28:14-22; 30:11-17; 31:11-32:10] Lykins has never supervised cabin cleaners, and has never been involved in developing safety policies for cabin cleaners. [*Id.* 170:10-18]. Nor did Lykins make any effort to inform himself as to the safety standards that apply to cabin cleaners at DIA. When he toured DIA, he did not ask anyone at JetStream about cabin cleaner's duties, not even his JetStream escort. [*Id.* at 112:14-18; 115:22-116:10, 19-117:18]. Lykins has no actual knowledge about whether DIA has any oversight about cabin cleaner's safety and admitted that he could only guess. [*Id.* at 61:3-62: 6]. Lykins did not review DIA's procedures and policies governing JetStream, or research whether there are any local agencies or requirements that impact DIA. [*Id.* 64:12-20; 65:5-17]. Lykins' knowledge of FAA regulatory requirements for mechanics does not establish the requisite knowledge, training, or experience to opine as to safety precautions for cabin cleaners at DIA, particularly where Lykins took no time to inform himself about the cabin cleaners' duties and safety protocols. Lykins' opinions about alleged hazards posed by cabin cleaners wearing long skirts should be disallowed based on his lack of qualifications and preparation.

    **b. Lykins Did Not Base His Opinion on Sufficient Facts or Data.**

        **i. Possible Engine Ingestion and Jet Blast**

Lykins discusses the hazards of jet engine inlets and the threat that an employee may be sucked into an operating engine. [Ex. 1 at 8]. But as Lykins conceded, the danger of being sucked into a into a jet engine exists regardless of an employee's clothing and is related more to where an employee is standing. An employee has to cross the hazard zone while an engine is on, which is strictly forbidden by JetStream rules. And there is not a bit of evidence in this case of any cabin cleaner ever crossing the hazard zone while an engine is running. And even assuming an employee actually approached an operating jet engine, violating this critical safety rule, there is not a whit of evidence that the violating employee is more likely to be sucked into the engine if she is wearing a skirt, than if she is wearing pants. Lykins' opinion that employees wearing skirts are more likely to get sucked into a jet engine is pure speculation based on no actual facts in evidence in this case. It appears to be a stereotype drawn from the likes of the Flying Nun – complete fiction. Moreover in his report Lykins suggests jet blast hazard is another risk from cabin cleaners wearing skirts. [Ex. 1 at 11]. But again, Lykins concedes that jet blast has to do with getting too close to the back of the engine; it has nothing to do with an employee's clothing. [Lykins dep. 152:5-153:16].

Simply put, there is no basis for Lykins opinion that loose clothing worn by JetStream employees may cause either engine ingestion or jet blast injury because these opinions are not based on any facts or evidence in this case. Moreover his opinions will not aid the jury in resolving a factual dispute because no factual dispute exists. Regardless of clothing, these hazards are present but accounted for by JetStream's safety policies – prohibiting employees from the "zone of danger", requiring

cabin cleaners to remain in their van until an aircraft's engine has been completely turned off, and safety placards on the aircraft warning of hazards. None of the actual facts of this case support Lykins opinion that women wearing skirts are at greater risk, and in fact his "opinions" do more to confuse a jury.

### ii. Maintenance shops, power tools and equipment

The hazards posed in maintenance shops and airport hangars are from employees who use power tools or machine tools in the shops or hangars. [*Id.* at 12]. Lykins' opinion that women's skirt are likely to get caught in power tools completely ignores that cabin cleaners are not close to where the power tools are operating. Indeed, when Lykins toured DIA, he never saw the cabin cleaners in a hangar or maintenance bay, and with all his years in the industry, still cannot recall *ever* hearing of a cabin cleaner being injured by a power tool. [Lykins dep. 154:2-9]. His opinion is based on mere "surmise", as he admitted. [*Id.*120:8-15; 138:19-25; 139:13-19; 154:10-155:10]. Lykins opinion is based on conjecture, not facts. It is inadmissible.

### iii. Belt Loader Conveyors

Similarly, although Lykins opines about the clothing-related risks of belt-loaders, he ignores his own observations during his site visit that cabin cleaners never got within 20 feet of a belt loader. [Lykins dep. 139:20-140:6; 143:7-13; 144:6-18]. Lykins also ignores testimony of one of Defendant's own witnesses Koffi Devi, who explained that the belt loaders are usually operated on the opposite side of the plane from where the cabin cleaners approach an aircraft. [Devi dep. 74:15-21].

### c. The Opinions are Not the Product of Reliable Principles and Methods and Have Not Been Reliably Applied to the Facts.

If an expert is deemed qualified, he must then show that his opinion is reliable, i.e. that it is based on sufficient facts or data, or is the product of reliable principles and methods and that the expert has dependably applied these principles and methods to the facts of the case. *Heer v. Costco Wholesale Corp.*, 589 Fed. Appx. 854 *861 (10th Cir. 2014) **(**court excluded opinion of expert who concluded product was defective without testing his theory, discussing industry standards, or discussing any theory that supported his opinion). A district court will exclude an expert's opinion when the opinion testimony or evidence is only connected to the facts by the "ipse dixit" of the expert – a statement made only on the authority of the expert – resulting in a great analytical gap between the data, or facts of the case, and the opinion offered by the expert. *Id.* An expert's opinion must be tied to the specific facts at issue in a case and cannot rely *just* on the expert's experience to validate his opinion. *Gianfrancisco v. Excelsior Youth Ctrs. Inc.*, 2012 U.S. Dist. LEXIS 98040 *14-16 (D. Colo. July 16, 2012) (excluding opinions because the expert relied on speculation and conjecture and was unable to show how she applied her experience to the facts of the case or identify the information reviewed).

Here, Lykins' opinions are based on his own *ipse dixit,* and are not supported either by the facts or by industry standards. A fundamental error in Lykins' analysis is based on his lack of experience with cabin cleaners. Specifically, Lykins assumes incorrectly that cabin cleaners are "ramp employees" subject to the same regulations as the technical and mechanic jobs encompassed by his experience. If he had experience

with cabin cleaners, or bothered to learn about their jobs and safety protocols, he would know that cabin cleaners are not "ramp employees." This misperception, drawn from his lack of qualifications and preparation, is the basic foundation on which his opinions are laid and thus his opinions must crumble due to their weak basis.

An expert's testimony must be tied to the facts so that it can aid a jury to solve a factual dispute*. Daubert v. Merrell DowPharmaceuticals*, Inc., 509 U.S. 579, 591 (1993). It is significant that Lykins' opines about hazards like jet blast, belt loaders, and power tools, which are not real risks for cabin cleaners, and fails to address the risks identified by JetStream as the reasons for its decisions in this case – slip-trip-and-fall injuries. [Lykins dep. 168:25-169:3; *See* Exhibit 2, p. 3-5]. This focus on non-existent risks, rather than the potential injuries actually at issue in the case, only further shows that his opinion is not anchored in the facts of this case and will not aid the jury in resolving the factual dispute at issue in this matter. Indeed, of all the potential hazards Lykins discusses, engine ingestion is the only risk JetStream identified as a reason for not allowing cabin cleaners to wear skirts as a religious accommodation. But as discussed above, the fears about engine ingestion are without any factual basis.

Thus, Lykins' opinions are based on his own *ipse dixit*. Specifically, although he never saw any cabin cleaners work in the hangar or maintenance bay Lykins speculates there will be a hazard because the cabin cleaners have access to the hangar where the power tools are stored and used, creating some potential for cabin cleaners to somehow come into contact with those tools. This is pure conjecture by Lykins, based

on his own experience with technical and mechanic employees, and his complete lack of experience and knowledge about cabin cleaners.

### III.  CONCLUSION

Defendant has presented an expert who has no experience in the cabin cleaning field or aircraft appearance. And lacking any experience or knowledge about cabin cleaning, the expert failed to adequately research or otherwise prepare himself to be able to render qualified and reliable opinions about cabin cleaners. Defendant's expert has applied his expertise from technical and mechanic employees – experience not applicable to this case – to his own incorrect assumptions about the facts and reached conclusions based on his own *ipse dixit* rationale. Even if, *arguendo*, Lykins was qualified or properly prepared, his opinions should be excluded because his opinions are not properly anchored in the facts of this case, and do not account for JetStream's own safety rules and procedures that are, in fact, applicable to cabin cleaners. There is no evidence that JetStream's safety procedures are not followed by the cabin cleaners, as Lykins' opinions seem to assume. Lykins opinions are formulated in a vacuum and will not aid the jury in understanding if injuries may be tied to cabin cleaner's clothing and in fact he may unnecessarily confuse the jury by introducing hazards that do not exist for cabin cleaners. Nor can Defendant show that he is qualified and reliable. Lykins should be excluded as an expert.

Dated: January 21, 2016

Respectfully submitted,

*/s/ Wasan A Awad*

15

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 21, 2016 a true and correct copy of the foregoing was served upon the following through the District of Colorado ECF System:

Mathew M. Morrison
Andrew W. Volin
Sherman & Howard, LLC
633 17th Street, Suite 3000
Denver, CO 80202
Telephone: 303-299-8086
Facsimile: 303-298-0940
avolin@@shermanhoward.com
mmorrison@shermanhoward.com

Attorneys for Defendant


Diane S. King
Hunter A. Swain
1670 York Street
Denver, CO 80206
(303) 298-9878 telephone
(303) 298-9879 facsimile
king@kinggreisen.com
swain@kinggreisen.com

Attorneys for Plaintiff/Intervenors

                                               *s/ Wasan Awad*
                                               Wasan Awad
                                               Trial Attorney