# EXHIBIT 2

# Sherman & Howard L.L.C.

ATTORNEYS & COUNSELORS AT LAW
633 SEVENTEENTH STREET, SUITE 3000
DENVER, COLORADO 80202
TELEPHONE: (303) 297-2900
FAX: (303) 298-0940
WWW.SHERMANHOWARD.COM

Raymond M. Deeny
Direct Dial Number: (719) 448-4016
E-mail: rdeeny@shermanhoward.com

William A. Wright
Direct Dial Number: (303) 299-8086
E-mail: wwright@shermanhoward.com

Matthew M. Morrison
Direct Dial Number: (303) 299-8431
E-mail: mmorrison@shermanhoward.com

August 8, 2012

**VIA E-MAIL AND HAND DELIVERY**

Mr. Glenn Parker
Investigator
U.S. E.E.O.C.
303 East 17th Ave., Suite 510
Denver, CO 80203

      Re:    Warsame *et al.* v. JetStream Ground Services, Inc.
                 EEOC Charge Nos.: 32A-2009-00239, 32A-2009-00240,
                 32A-2009-00241, 32A-2009-00242, 32A-2009-00243

Dear Mr. Parker:

      We have received your pre-determination letter dated August 1, 2012. We were surprised by the letter because you had conferred by telephone with Bill Wright just hours before and indicated that you were waiting to receive information about JetStream's safety training that was described during your recent interviews of JetStream employees. Those materials are attached here. We believe the included training video – showing, for example, how a service worker may be "ingested" into a jet engine after a moment of inattention – would have been useful to you in reaching your conclusions. You have had this investigation pending since March 2010; it is hard to see why you could not wait a week for our response.

      Your letter summarizes the evidence that will be the basis for your recommendation to EEOC management. You suggest that JetStream should have hired the Charging Parties as cabin cleaners because, having performed the same job for Air Services, they were qualified for

# Sherman & Howard L.L.C.

Mr. Glenn Parker, Investigator
U.S. E.E.O.C.
August 8, 2012
Page 2

the position. You also suggest that, although JetStream does not permit employees to wear loose-fitting clothing for safety reasons, JetStream's safety concerns are overblown and that JetStream should have permitted the Charging Parties to wear long skirts and loose clothing while working. As explained below, the evidence does not support a reasonable cause determination, and there is no evidence to support your allegation of "class implications."

**A.     JetStream's Hiring Process.**

You suggest that JetStream should have hired the Charging Parties as cabin cleaners because, having successfully performed the job for Air Services, they were qualified for the position. Your letter does not address the complete facts, nor the legitimate, non-discriminatory reasons that explain why JetStream did not hire the Charging Parties.

JetStream began operations at Denver International Airport ("DIA") in November 2008 after United Airlines ("United") awarded JetStream a cabin cleaning service contract. JetStream replaced Air Services as United's cabin cleaning contractor at DIA. Air Services lost its contract with United because it was not meeting United's cleaning standards. See JetStream's Position Statement, dated March 29, 2009, at 7; United Cleanliness Ratings, provided to the Colorado Civil Rights Division ("CCRD") on July 23, 2009. When JetStream began providing cabin cleaning services, it set out to overhaul and improve upon the level of service previously provided to United. See Position Statement at 4. Thus, although JetStream needed to fill approximately one hundred and ninety (190) full time and part time positions, it decided not to hire every cabin cleaner employed by Air Services; it decided, instead, to hire only about sixty (60) of the best applicants from Air Services and then to fill the remaining available positions through "outside" hires. Id.

JetStream evaluated applicants based on how well they conducted themselves during their interviews, whether they had relevant cleaning experience, whether they could provide their own transportation to DIA, whether they expressed a willingness to change their work schedules and rate of pay, and whether they would accept JetStream's work standards, including its religiously neutral and gender neutral uniform requirements. See Position Statement at 3–4. Applicants were also required to pass a drug test and an airport security screening before being hired. See Supplemental Position Statement, dated June 3, 2009, at 2.

Like all of the applicants, the Charging Parties were evaluated based on these factors. Sadiyo Jama and Hana Bokku were not hired because they had scheduling conflicts that JetStream could not accommodate, and they both showed little enthusiasm or interest in working for JetStream during their interview. Id. at 4–5. Amino Warsame was not hired because a dispute arose during her interview regarding the rate of pay that she would accept and whether she had adequate experience as a cabin cleaner. Id. at 5. Safia Ali was not hired

EEOC001240

# Sherman & Howard L.L.C.

Mr. Glenn Parker, Investigator
U.S. E.E.O.C.
August 8, 2012
Page 3

because she refused to abide by JetStream's uniform policy. Id. Sahra Abdirahman demanded during her interview that JetStream pay for her RTD bus pass, a benefit that JetStream was not prepared to provide, and she failed to complete a required drug test. See Supplemental Position Statement at 2.

As the above facts demonstrate, even if the Charging Parties were technically qualified to perform the work of a cabin cleaner, JetStream had legitimate non-discriminatory reasons for deciding not to hire them. Further, you are aware from your interviews that JetStream did hire women, Muslims, and Muslim women who had worked previously with Air Services. You also know from your interviews that JetStream's interviewers did not ask people about their religion, but only about their experience, work history, wage history and willingness to abide by work standards. When you interviewed Milko Haji, she told you how JetStream hired her even though she wore a long headscarf to the interview.

**B.  JetStream Was Not Required to Accommodate the Charging Parties' Request to Wear Loose-Fitting Clothes Because It Would Create a Safety Hazard.**

According to the Charging Parties, JetStream's Vice President David Norris questioned them about the way they dressed during the hiring process and told them that they would not be allowed to wear skirts and head scarves while working. Your pre-determination letter suggests that JetStream should have accommodated the Charging Parties' need to wear long skirts and loose fitting clothing, and that JetStream's failure to do so was discriminatory. Your assessment of the case is not consistent with the facts or the law.

1.  An Employer Is Not Required to Accommodate a Secular Preference.

Under Title VII, an employer is not required to accommodate an employee's secular preferences. See Tiano v. Dillard Dept. Stores, 139 F.3d 679 (9th Cir. 1998) (holding that discharge of employee who went on a religious pilgrimage during employer's busy season did not violate Title VII because timing of pilgrimage was a secular preference and not a religious requirement). Notably, Kathleen Moore, Ph.D., who has been retained by the EEOC as an expert on Islam in other cases involving Muslim women, has stated that "[m]odesty practiced through a particular style of dress is not considered a requirement of Islamic law." See Dr. Moore's Expert Report in EEOC v. Abercrombie & Fitch Stores, Inc., Case No. 10-cv-03911-EJD (December 16, 2011) (N.D. Cal. 2011), enclosed as Exhibit A, at 10. Even the letter the Charging Parties provided the CCRD from the Denver Islamic Society does not support their position. The Denver Islamic Society only asserted that women are not allowed to wear pants showing their bodies and have to cover their hair.

# Sherman & Howard L.L.C.

Mr. Glenn Parker, Investigator
U.S. E.E.O.C.
August 8, 2012
Page 4

    2.    <u>JetStream Took Steps to Determine an Appropriate Accommodation</u>.

Even assuming that long skirts and head scarves are religious practices rather than secular preferences within a range of modest clothing options, Milko Haji described to you during her interview the efforts JetStream took to accommodate her need to cover her hair. JetStream suggested hats that were within the uniform guidelines. Ms. Haji found that the hats were either not large enough to adequately cover her hair or could not be made to fit. JetStream obtained different hats that Ms. Haji tried on. During this process, lasting several weeks, Ms. Haji wore her head scarf. Ultimately, when no hat within the uniform guidelines would serve, JetStream allowed Ms. Haji to wear the head scarf indefinitely. Ms. Haji never had to work a single day without her hair being covered.

    3.    <u>Long Skirts and Loose-Fitting Clothing Create a Safety Hazard.</u>

JetStream's uniform policy does not permit cabin cleaners to wear long skirts. <u>See</u> Uniform Policy, provided to the CCRD on July 17, 2009. According to the policy, all of JetStream's cabin cleaners are required to wear pants while at work, regardless of their religion or sex. <u>Id</u>. As JetStream has previously explained to the EEOC, allowing cabin cleaners to wear long skirts would create a serious safety hazard. <u>See</u> Response to EEOC's Request for Information, dated October 15, 2010, at 3.

Cabin cleaners access an aircraft by walking onto the airport ramp and climbing the jetway stairs, which lead to the elevated jetway that provides access to the aircraft cabin. <u>Id</u>. The jetway stairs are steeper than normal stairs. <u>Id</u>. They are made of metal and become slippery when covered in rain, ice, or snow. <u>Id</u>. When climbing up and down the stairs, cabin cleaners must carry vacuums, cleaning supplies, or other material in their hands; as a result, cabin cleaners are unable to hold on to the stairs' handrails with both hands. <u>Id</u>. at 3–4.

Thus, even when cabin cleaners wear pants, the jetway stairs are dangerous, and serious injuries have occurred on the stairs as a result of slips, trips, or falls. For example, in 2008, three JetStream employees working at facilities in Florida and North Carolina tripped or fell while using the jetway stairs, resulting in serious injuries. <u>See</u> Response to EEOC's Request for Information, dated October 15, 2010, at 4. Additionally, in 2009, a JetStream employee working in West Palm Beach, Florida filed a workers compensation claim after she fell on the jetway stairs and seriously injured her knee. <u>Id</u>. Permitting cabin cleaners to wear long skirts would only increase the likelihood of a serious injury occurring on the jetway stairs, as employees would be more apt to trip over a long skirt or catch loose clothing on protuberances while moving up and down the stairway throwing them off balance. Milko Haji confirmed this from her own experience during her interview. She explained to you that even while working

# Sherman & Howard L.L.C.

Mr. Glenn Parker, Investigator
U.S. E.E.O.C.
August 8, 2012
Page 5

for Air Services, she had found that a long skirt was not functional on the job because of the physical demands.

JetStream also prohibits cabin cleaners from wearing long skirts because employees working in the vicinity of aircraft engines cannot be allowed to wear loose fitting clothing. As you know, cabin cleaners must walk within a few feet of the aircraft's engine when boarding and leaving an aircraft. See Response to EEOC's Request for Information, dated October 15, 2010, at 4, and Exhibits 4–7, attached thereto. When the engine is in operation and the turbine blades are rotating, the resulting airflow can pull nearby persons (or their loose fitting clothing) into the engine, causing serious personal injuries. See id.

JetStream specifically trains its employees on the dangers of working near aircraft engines. During JetStream's new hire orientation, cabin cleaners are shown a United Airlines' safety video that warns them to keep clear of running engines. See, e.g., "FOD/Jet Blast" safety video, included on the enclosed CD-ROM as Exhibit B. As the video notes, the airflow created by a running jet engine can draw people into the rotating turbine blades and cause serious injury or death. Id. The attached photographs provide additional grim evidence of the danger. See photographs, enclosed as Exhibit C.

JetStream also provides newly-hired cabin cleaners with training material relating to ramp safety, which specifically warns employees that "[a] running aircraft engine has enough suction to pull you *and your belongings* into it." See "Aircraft Appearance Training: Ramp Safety," enclosed as Exhibit D, at p. 2-2-2 (emphasis added). Accordingly, JetStream prohibits employees who must work in the vicinity of aircraft engines, including cabin cleaners, from wearing loose fitting clothes. The most effective means of enforcing such a requirement is to have employees wear a uniform.

JetStream does permit employees to wear a head scarf so long as certain conditions are met. See Response to EEOC's Request for Information, dated October 15, 2010, at 3. Airport security procedures require that all employees wear an airport photo identification badge that displays the employee's full face, and therefore JetStream requires that a head scarf not obscure the employee's face. Id. JetStream also requires that the head scarf be short (*i.e.*, not so long that it flows over the employee's shoulders, chest, or back); this ensures that an employee's head scarf does not become caught on aircraft equipment, portions of the jetway (a.k.a. the passenger bridge), or the jetway stairs, resulting in injury. Id. In addition, JetStream requires that a head scarf be secured to the employee's head, either by a hat or by some other means. Id. The requirement that a head scarf be short and secured to an employee's head prevents a head scarf from being drawn into the rotating blades of an aircraft engine while the engine is in operation, which could result in serious damage to the aircraft. Head scarves must also be dark blue or black, so as to be consistent with the JetStream uniform. If these conditions are met,

# Sherman & Howard L.L.C.

Mr. Glenn Parker, Investigator
U.S. E.E.O.C.
August 8, 2012
Page 6

cabin cleaners are permitted to wear a head scarf. Id. As you are aware, JetStream has several female Muslim cabin cleaners at DIA – including Milko Haji and Nurida Boriyo – who wear head scarves in accordance with these guidelines. Id.

    4.  <u>JetStream Is Not Required to Create a Safety Hazard.</u>

  Your pre-determination letter suggests that JetStream's safety concerns are overblown and that permitting cabin cleaners to wear skirts and loose fitting clothing would not pose a safety hazard. According to your letter, the "[e]vidence indicates that female cabin cleaners had worn head coverings and/or long skirts at DIA without incident prior to [JetStream] taking over the cabin cleaning contract [from AirServices]." You also assert that the "[e]vidence indicates that aircraft engines at DIA are turned off prior to cabin cleaners boarding the planes and the engines remain off until after the cabin cleaners have de-planed and cleared the aircraft." You appear to have ignored relevant evidence as well as the fact that JetStream is not required to experiment with employee safety.

  An employer need not accommodate a religious belief or practice that would create an undue hardship. <u>EEOC v. The Geo Group, Inc.</u>, 616 F.3d 265, 271 (3d. Cir. 2010). As courts have recognized, "[a] religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship." Id. at 273. Contrary to your assertion, permitting cabin cleaners to wear skirts or other loose fitting clothing would create an undue hardship because, as noted above, it would create a safety hazard. In similar cases, courts have reached the same conclusion.

  In <u>The Geo Group</u>, the EEOC filed a complaint on behalf of a class of female Muslim employees at a correctional facility. Id. at 267. The EEOC alleged that the employer violated Title VII when it failed to accommodate female Muslim employees who had requested that they be permitted to wear a headcovering called a khimar while at work. Id. The EEOC argued that the employer should have exempted the women from its uniform policy, which prohibited employees from wearing hats or caps that were not part of the official uniform. Id. The employer moved for summary judgment, arguing that any accommodation that permitted employees to wear khimars would create an undue hardship. Specifically, the employer argued that khimars constituted a safety hazard because they could be used to smuggle contraband into the prison and they could be used as a strangulation weapon by an inmate if an altercation occurred. Id. at 273. The Third Circuit Court of Appeals affirmed an order granting the employer's motion for summary judgment. Id. at 277.

  According to the court, the employer established its undue hardship defense even though employees had previously been permitted to wear khimars at the prison. Id. at 267. The court also expressly rejected the EEOC's argument that an undue hardship defense could not be

EEOC001244

# Sherman & Howard L.L.C.

Mr. Glenn Parker, Investigator
U.S. E.E.O.C.
August 8, 2012
Page 7

established because there was no evidence that khimars had, in fact, been used in the past as a strangulation weapon or as a method for smuggling contraband. Id. at 274. The court held that the employer "should not have to wait for a khimar to actually be used in an unsafe or risky manner . . . before the foreseeable risk is considered when determining undue hardship." Id. Other courts have rejected similar religious discrimination claims in the face of an employer's undue hardship defense. See EEOC v. Oak-Rite Mfg. Corp., 2001 U.S. Dist. LEXIS 15621, *1-2 (S.D. Ind. 2001) (holding that metal-working factory with a pants-only safety policy did not violate Title VII when it refused to accommodate plaintiff's religious practice of wearing a long dress since such an accommodation "would impose an undue hardship on [the employer] by requiring it to experiment with employee safety"); EEOC v. Kelly Services, Inc., 598 F.3d 1022, 1031-32 (8th Cir. 2010) (holding that employment agency did not violate Title VII by refusing to refer female Muslim plaintiff to a commercial printing company that had a neutral, safety-driven dress policy prohibiting all employees from wearing loose fitting clothing or headwear near machinery, where plaintiff refused to remove long, loose fitting head scarf).

The same principles apply here. The purported lack of workplace injuries at Air Services, which you reference in your letter, is irrelevant; the wearing of long skirts and loose clothing by cabin cleaners creates a foreseeable safety hazard, and JetStream cannot be required to adopt an accommodation that requires it to place employee safety at risk. See Geo Group, 616 F.3d at 274 (holding that Muslim head covering created an undue hardship despite fact that safety problems had not occurred when employees were previously permitted to wear head coverings).

Despite the purported lack of injuries at Air Services, the risk posed by long skirts and loose fitting clothing is clearly foreseeable. As noted above, JetStream employees in other states have been seriously injured while climbing or descending the jetway stairs, and individuals (although not JetStream employees) have been injured or killed when they were drawn into a running aircraft engine. See Response to EEOC's Request for Information, dated October 15, 2010, at 4; "FOD/Jet Blast" safety video, included on the enclosed CD-ROM.

You assert that the "aircraft engines at DIA are turned off prior to cabin cleaners boarding the planes and the engines remain off until after the cabin cleaners have de-planed and cleared the aircraft." This assertion seems to be based on the interviews you conducted at DIA on July 10, 2012. However, Milko Haji told you that, despite rules specifying that no one is to exit the transport van while the engines are running, from time to time, because of tight gate times, workers do get out onto the ramp while the engines are running. You asked her how often this happened and she agreed that it might be as often as once a month.

EEOC001245

# Sherman & Howard L.L.C.

Mr. Glenn Parker, Investigator
U.S. E.E.O.C.
August 8, 2012
Page 8

**C.     There Is No Evidence Supporting Your Assertion that "Class Implications Exist."**

No evidence supports the suggestion that "class implications exist." As you recall, none of the former Air Services employees you interviewed on July 10 described many Air Services employees who wore head scarves or long skirts. All of them described several current JetStream employees who wear head scarves. The number of persons to be included in your proposed class cannot be so numerous that joinder is impracticable. In any case, you have never identified any additional aggrieved individuals.

In addition, JetStream's uniform policy is generally applicable, and is job-related and consistent with business necessity. JetStream does not apply the same uniform policy to its customer service agents as to its ramp employees. Only employees who have to navigate narrow, steep stairs and who work near jet engines must avoid long, loose fitting clothes.

For all the foregoing reasons, and in light of the facts and the applicable law, the EEOC should not issue a reasonable cause determination. JetStream had legitimate, non-discriminatory reasons for deciding not to hire each of the Charging Parties. Even if JetStream had decided not to hire the Charging Parties because it could not accommodate their long skirts and loose fitting clothes, JetStream would not have violated the law. As explained above, JetStream is not required to grant an accommodation that poses an undue hardship, and the foreseeable safety hazards that would have arisen if JetStream had allowed its ramp employees to wear long skirts and loose fitting clothing constitute an undue hardship.

Sincerely,

*[signature]*
Matthew M. Morrison

MMM:cdw
Enclosures
cc:     Ms. Mariela Feliciano  (w/enclosures)