**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-02340-CMA-KMT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

    Plaintiff,

SAFIA ABDULLE ALI,
SAHRA BASHI ABDIRAHMAN,
HANA BOKKU,
SADIYO HASSAN JAMA, and
SAIDA WARSAME, a/k/a AMINO WARSAME,

    Applicants for Intervention,

v.

JETSTREAM GROUND SERVICES, INC.,

    Defendant.

---

## ORDER DENYING MOTION FOR RECONSIDERATION

---

This matter is before the Court on Plaintiff Equal Employment Opportunity Commission's (EEOC's) Motion for Reconsideration. (Doc. # 185.) Because the EEOC has not shown clear error or manifest injustice warranting reconsideration, and because EEOC's arguments could have been raised in its summary judgment briefing, the instant Motion is denied.

## I. BACKGROUND

On September 29, 2015, the Court granted, in part, Defendant JetStream Ground Services, Inc.'s (JetStream's) Motion for Summary Judgment (the Summary Judgment Order). (Doc. # 184.) Among other things, the Summary Judgment Order dismissed Milko Haji's individual claims pursuant to Fed. R. Civ. P. 56(a). (*Id.* at 63.) The EEOC now seeks reconsideration of that portion of the Court's decision. (Doc. # 185.)

The pertinent facts and background of this case are set forth in detail in the Summary Judgment Order, and will be reiterated below only to the extent necessary to resolve the instant Motion. (*See* Doc. # 184.)

## II. DISCUSSION

### A. Legal Standard

The Federal Rules of Civil Procedure do not explicitly authorize a motion for reconsideration. Accordingly, where, as here, a party's motion seeks reconsideration of a non-final order, such relief falls within the Court's discretionary power to revisit and amend its interlocutory orders as justice requires. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 n. 2 (10th Cir. 2008) ("The District Court's partial summary judgment ruling was not a final judgment. Thus, [plaintiff's] motion for reconsideration is considered an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment."); *see also* Fed. R. Civ. P. 54(b).

There are three major grounds justifying reconsideration of an interlocutory order: "(1) an intervening change in the controlling law, (2) new evidence [that was] previously

unavailable, [or] (3) the need to correct **clear error** or prevent **manifest injustice**." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (emphasis added). Concomitantly, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law, but such motions are "inappropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion." *Id.* (citing *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991)). To that end, "[a]bsent **extraordinary circumstances** . . . the basis for the second motion must not have been available at the time the first motion was filed." *Id.*; *see also Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F. Supp. 2d 1250, 1256 (D. Colo. 2000) ("Notwithstanding the district court's broad discretion to alter its interlocutory orders, the motion to reconsider is not at the disposal of parties who want to rehash old arguments. . . . [a] motion to reconsider should be denied unless it clearly demonstrates manifest error of law or fact or presents newly discovered evidence.") (internal quotation marks and citation omitted).

### B. Application

In the instant case, Plaintiff's arguments for reconsideration are premised on the need to correct clear error and to prevent manifest injustice. (*See* Doc. # 185.) Specifically, the EEOC argues that the Court erred when it determined that Ms. Haji's claim for religious discrimination failed as a matter of law, contending that Ms. Haji was not required to show that she was subjected to an adverse action by JetStream. (Doc. # 185 at 5-10.) This argument easily could have been made in the EEOC's summary

3

judgment briefing; unfortunately, it was not. To the contrary, the EEOC's response to Defendant's Motion for Summary Judgment explicitly stated that the requirements for a religious accommodation claim **include** a showing of an adverse action:

> A *prima facie* religious accommodation claim requires the plaintiff to prove (1) he or she has a bona fide religious belief that conflicts with an employment requirement, (2) he or she informed the employer of this belief, and (3) **he or she [suffered an adverse employment action]** for failure to comply with the conflicting employment requirement."

(Doc. # 117 at 14) (brackets in original, emphasis added). It was only once this Court determined that the Haji did not suffer an adverse employment action and thus had no actionable claims under Title VII that the EEOC reversed course and argued – for the first time in the instant Motion – that an additional adverse action is unnecessary to establish a *prima facie* religious accommodation claim. (*See* Doc. # 185 at 2 n. 2.)[1]

Although the EEOC expressly admits that it did not provide the Court with the arguments it currently advances, it asserts that because these new arguments are purely "legal," the Court nevertheless should exercise its discretion and grant the instant Motion. (Doc. # 185 at 2 n.2.) This would be contrary to Tenth Circuit precedent. Although a motion for reconsideration may be appropriate "where the court has

---

[1] Defendant alleges that, because of this discrepancy, the instant Motion cannot succeed based on the so-called Invited Error Doctrine. (Doc. # 186 at 7-8.) "[T]he Invited Error Doctrine . . . prevents a party who induces an erroneous ruling from being able to have it set aside on appeal." *United States v. Burson*, 952 F.2d 1196, 1203 (10th Cir. 1991). The EEOC counters that Invited Error constitutes more than mere omission or negligence, but rather an affirmative intentional relinquishment of a known right. *United States v. McGehee*, 672 F.3d 860, 873 (10th Cir. 2012). Accordingly, the Invited Error Doctrine only applies in situations where, for example, a person invokes her right against self-incrimination at trial and then claims she did not have the opportunity to defend herself. *See, e.g., United States v. Oldbear*, 568 F.3d 814 (10th Cir. 2009). The Court agrees that, although not wholly applicable here, at least the **spirit** of the Invited Error Doctrine reinforces the notion that the EEOC's new arguments are an attempt at a second "bite" at the proverbial apple after an unfavorable decision.

4

**misapprehended** . . . **the controlling law**," such a motion does not constitute license to advance arguments, legal or otherwise, "that could have been raised in prior briefing." *Servants of Paraclete*, 204 F.3d at 1012 (emphasis added).  Additionally, the arguments put forth by the EEOC now are not purely "legal" arguments insofar as they do not ask the Court to reconsider its prior **application** of the law, but actually advance **new legal theories** entirely.

Regardless, even assuming, *arguendo*, that the EEOC raised these arguments previously, a movant must show there is a need to correct **clear** error or to prevent **manifest** injustice for the Court to grant a motion to reconsider.  *See id.*  As discussed in greater detail below, neither showing can be made here, as there is an utter lack of controlling law indicating a result contrary to the Court's holding; accordingly, the Court, by definition, did not "misapprehend" the controlling law.

The EEOC first asserts that an employer has an affirmative duty to accommodate an employee's religious practice, such that an employer's mere failure to make a religious accommodation – **without more** – constitutes a distinct, "freestanding" cause of action under Title VII of the Civil Rights Act of 1964 (the Act).[2]  (Doc. #185 at 5-10.) In support of this proposition, the EEOC points to the Act's definition of "religion," which is defined as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate

---

[2] Of course, this argument assumes that the employer cannot show that the proposed accommodation constituted an undue hardship.  *See* 42 U.S.C. § 2000e(j) (emphasis added) (defining "religion" to include "all aspects of religious observance and practice, as well as belief, **unless an employer demonstrates that he is unable to reasonably accommodate** . . . **without undue hardship on the conduct of the employer's business.**")

to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Although this language **could** support an employer's purported affirmative duty to accommodate "all aspects of [an employee's] religious observance and practice," so long as those aspects do not pose an undue hardship, it does not necessarily follow that the statute's **definition** of "religion" creates an independent, separate **cause of action** for an employer's failure to accommodate.[3]  In fact, the Congressional record indicates that the Act's somewhat-awkward definition of "religion" was added in 1972, as an amendment proposed by Senator Jennings Randolph.  Senator Randolph, a Baptist who observed the Saturday Sabbath, explained that the amendment was needed to protect Saturday Sabbatarians like himself from discrimination from employers that "refused to **hire** or **to continue in employment** employees whose religious practices rigidly require them to abstain from work . . . on particular days." 118 Cong. Rec. 705, 705 (1972) (emphasis added); *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 73–74 (1977) (describing the amendment and Senator Randolph's religious background).  Thus, it appears that the legislative intent behind the addition of this definition was to ensure that employees were **protected from adverse actions** (i.e., the failure to hire or retain), not to create a separate, stand-alone cause of action for the mere failure to accommodate.

---

[3] The EEOC also points to the Court's statement in the Summary Judgment Order that "an employer violates section 2000e-2(a)(1) when it does not make reasonable accommodations short of undue hardship, for the religious practice of employees." (Doc. # 185 at 5) (quoting Doc. # 184 at 54.)  However, the Court's general, high-level statement was not specifically addressing a situation in which an employee who was denied an accommodation was allowed to remain on the job and was not subjected to an adverse action.

The EEOC also contends that the United States Supreme Court's recent decision in *EEOC v. Abercrombie & Fitch Stores, Inc.,* 135 S.Ct. 2028 (2015), supports its argument that an employer's refusal to accommodate a religious practice is a stand-alone violation of the Act.  Specifically, the EEOC asserts that the following statement from *Abercrombie* – made in a footnote that was discussing an argument made by the concurrence – supports its position:

> The concurrence mysteriously concludes that it is not the plaintiff's burden to prove failure to accommodate.  But of course that is the plaintiff's burden, if failure to hire 'because of' the plaintiff's 'religious practice' is the gravamen of the complaint.  Failing to hire for that reason is synonymous with refusing to accommodate the religious practice.  To accuse the employer of the one is to accuse him of the other.  **If he is willing to "accommodate" – which means nothing more than allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary – adverse action "because of" the religious practice is not shown**.

(*See* Doc. # 185 at 6) (quoting *Abercrombie*, 135 S.Ct. at 2032 n. 2).  Specifically, the EEOC argues that, if the Supreme Court said it is true that "If [an employer] is willing to 'accommodate' . . . [then] [an] adverse action 'because of' the religious practice is not shown," it must also be true that "where the employer is **not** willing to accommodate, an adverse action **is** shown."  (Doc. # 185 at 6) (emphasis in original).  Reduced to a simpler, syllogistic form, the EEOC's argument is, essentially, as follows:

**[Hypothesis]: If P, then Q.**      If accommodation, then no adverse action.

**Not P.**      No accommodation was made.

**[Conclusion]: Therefore, no Q.**      Therefore, there was an adverse action.

Although this argument appears clever at first blush, it is actually premised on a logical fallacy called the "fallacy of the inverse" or "denying the antecedent."  *See NLRB v. Noel*

7

*Canning*, 134 S. Ct. 2550, 2603, 189 L. Ed. 2d 538 (2014) (explaining that the fallacy of the inverse, otherwise known as denying the antecedent, involves "the incorrect assumption that if P implies Q, then not-P implies not-Q."). The flawed nature of such reasoning becomes readily apparent with a simple example of this fallacy, provided by the court in *Garcia v. United States*, No. 08 CIV 4733 (HB), 2010 WL 1640224, at *5 (S.D.N.Y. Apr. 21, 2010): "If there is drug residue, then there must have been drugs. There is no residue. Therefore, there were no drugs." In contrast, the **true** inverse of the Supreme Court's statement – i.e., the **logically correct** rendering – requires reversal and negation of both parts of the statement, resulting in the following: "if an adverse action **is** shown, then there is no accommodation." Such a statement – which, of course, assumes the existence of an adverse action – plainly offers no support for the EEOC's arguments in the instant case.

The EEOC also points to certain "union dues" cases involving plaintiffs whose unions refused to accommodate their religious objections to the payment of union dues, in order to argue that a failure to accommodate claim does not require some kind of additional adverse action. (Doc. # 185 at 7–8.) However, three of the five cases it cites are plainly inapposite; in one, the plaintiff was terminated, and in two others, the plaintiff was explicitly threatened with discharge or was on the verge of being discharged. *See Nottleston v. Smith Steel Workers D.A.L.U. 19806, et. al.*, 643 F.2d 445, 448 (7th Cir. 1981) (employee was discharged); *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 405 (9th Cir. 1978) (employee sued in anticipation of his threatened discharge); *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1241 (9th Cir. 1981) ("The district court enjoined the

union and the company from attempting to discharge the plaintiffs."). In the instant case, Plaintiffs have never alleged that Ms. Haji was threatened with discharge. The remaining cases cited by the EEOC lend no support to its position because both stated that a *prima facie* failure to accommodate claim in fact requires an adverse action (i.e., termination, failure to hire, or discipline). *See Cooper v. Gen. Dynamics, Convair Aerospace Div., Ft. Worth Operation*, 533 F.2d 163, 167 (5th Cir. 1976) ("[b]ecause of the particularly sensitive nature of **discharging or refusing to hire** an employee or applicant on account of his religious beliefs, the employer has the burden of proving . . . undue hardship"); *EEOC v. Alliant Techsystems, Inc.*, 1998 WL 777015, at *5 (W.D. Va. Sept. 18, 1998) ("[i]n order to establish a *prima facie* case of failure to accommodate under Title VII, the employee must demonstrate that . . . **she was disciplined** for failure to comply with the conflicting employment requirement"). In sum, then, the EEOC does not cite to any cases from the Tenth Circuit, or elsewhere – and the Court was not able to find any – in which a plaintiff brought a successful Title VII religious discrimination claim without a showing of **some** type of adverse action, **even a threatened adverse action**.

Additionally, the EEOC urges the Court to look to analogous failure-to-accommodate claims under the Americans with Disabilities Act (ADA). Notably, however, the failure to accommodate is a "freestanding," distinct cause of action under the ADA. *See EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014) ("A failure-to-accommodate claim [brought under the ADA] provides a mechanism to combat workplace discrimination even when the employee in question has not suffered

9

adverse employment action."). The ADA defines "discrimin[ation] against a qualified individual on the basis of disability" to include not only an employer's disparate (i.e., discriminatory) treatment ("limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee **because of the disability** of such applicant or employee"), but also an employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(1), (5)(A).  Although Title VII's definition of religion is similar to 42 U.S.C. § 12112(b)(5)(A), in mentioning accommodations and providing for an employer's "undue hardship" defense, Title VII contains no such stand-alone, failure-to-accommodate claim; it merely defines an "unlawful employment practice" as either disparate treatment ("fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, **because of such individual's . . . religion**, . . . ."), or disparate impact ("limit[ing], segregate[ing], or classify[ing] . . . employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion, . . . .").  42 U.S.C. § 2000e-2(a)(1), (2).[4]

---

[4] It also bears mention that the ADA's implementing regulations, unlike those of Title VII, contain

Moreover, although the EEOC notes that both the ADA and Title VII are similar insofar as they are "prophylactic" in nature, the two statutes cannot be so easily or superficially equated with one another, given the divergent policy considerations behind the ADA's freestanding failure-to-accommodate claim on the one hand, and those animating Title VII's religious discrimination claim on the other.  Specifically, to establish a disparate treatment claim under Title VII, a plaintiff must show that an employer discriminated against her "**because of**" her religion, which includes her religious practices; i.e., she must demonstrate that her employer acted on the basis of an unlawful (i.e., discriminatory) **motive**, for example, in deciding to fire her in order to deny her accommodation.  As the United States Supreme Court noted in *Abercrombie*, "[a]n employer who has actual knowledge of the need for a[] [religious] accommodation does not violate Title VII by refusing to hire an applicant if avoiding that accommodation is not his motive.  Conversely, an employer who acts with the motive of avoiding accommodation may violate Title VII even if he has no more than an unsubstantiated suspicion that accommodation would be needed."  *Id.*, 135 S. Ct. at 2033.  In contrast, an employer's motive is simply not an issue in failure-to-accommodate claims under the ADA.  Instead, the gravaman of a failure-to-accommodate claim is the employer's failure to provide a reasonable accommodation, notwithstanding its motive for such a failure;

---

a specific provision describing the "interactive process" by which the employer and employee determine whether they can arrive at an agreement as to a "reasonable accommodation," including the employer's duty to make a "reasonable effort" in this process.  *See* 29 C.F.R. app. § 1630.9 ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.  The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability.").

indeed, the Eighth Circuit has explained that this difference in focus is the reason for that the *McDonnell Douglass* test is not applied in reasonable accommodation cases under the ADA:

> Reasonable accommodation claims are not evaluated under the *McDonnell Douglas* burden-shifting analysis. Rather, "a modified burden-shifting analysis" is applied. . . . This is so because **a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive**. **The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this "'elusive factual question of intentional discrimination.'"** In a reasonable accommodation case, the "discrimination" is framed in terms of the failure to fulfill an affirmative duty – the failure to reasonably accommodate the disabled individual's limitations. The [ADA] compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts. . . . The concern is compelling behavior, not policing an employer's actions that, when accompanied by an invidious discriminatory intent, are unlawful. **As such, it is not the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.**

*Peebles v. Potter*, 354 F.3d 761, 766-67 (8th Cir. 2004) (emphasis added, internal citations omitted). In light of these differences, the Court cannot simply equate the two statutes because both involve accommodations, and effectively import a claim from the ADA "into" Title VII.

Finally, Plaintiff argues that the Court should not have applied the *McDonnell Douglas* burden-shifting framework at all in this case. (Doc. # 185 at 10-12.) Specifically, the EEOC maintains that because there was "direct" evidence of discrimination, the burden-shifting framework (including the usual *prima facie* case) was

inapplicable.  *See Ramsey v. City & Cty. of Denver*, 907 F.2d 1004, 1007 (10th Cir. 1990) (noting that *McDonnell Douglas* burden shifting does not apply in cases involving direct evidence of discrimination).

However, the evidence implicated here was **not,** in fact, direct evidence for purposes of Title VII.  Specifically, the Tenth Circuit defines "direct" evidence as "proof of an existing **policy which itself constitutes discrimination** or oral or written statements on the part of a defendant showing a discriminatory motivation."  *Cuenca v. Univ. of Kan.*, 101 Fed. App'x. 782, 788 (10th Cir. 2004) (unpublished) (internal citations and quotations omitted, emphasis added).  To put it slightly differently, direct evidence is "evidence, which if believed, proves the existence of a fact in issue **without inference or presumption**."  *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 854–55 (10th Cir. 2007); *see also Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (internal quotation omitted, emphasis added) ("Direct evidence is 'evidence from which the trier of fact may conclude, **without inference**, that the employment action was undertaken because of the employee's protected status.'"); *Ramsey,* 907 F.2d at 1008 (to be "direct evidence" of discrimination, "the evidence would need to show that [an employer] acted on [its] discriminatory beliefs.").

However, the evidence implicated here is not "direct."  Both the instant Motion and the EEOC's Response to Defendant's Motion for Summary Judgment argued that the "direct evidence" of discrimination against Ms. Haji includes the fact that "since 2008, and continuing through the present, [JetStream] maintains a uniform policy that prohibits employees from wearing skirts, and that no religious exception is allowed."

13

(Doc. # 117 at 14.)[5]  However, an employer's policy only constitutes "direct" evidence of discrimination if it is discriminatory **on its face**.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (finding that a plaintiff presented direct evidence of age discrimination in his employer's transfer policy, whereby the policy provided that workers over 60, unlike their younger counterparts, were not permitted to "bump" less senior flight engineers, thus discriminating against older employees "on its face"); *cf. Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702, (1978) (employer's policy requiring female employees to make larger contribution to pension fund than male employees was discriminatory on its face).  In contrast to the employer's policy in *Trans World Airlines,* JetStream's uniform policy here is not discriminatory "on its face" – indeed, the policy states only that employees must wear pants, and in no way explicitly references or disallows religious dress.  (See Doc. # 84-33 at 8) ("Pants – must be solid navy blue or black.  Hem should be one (1) inch from floor at the heal and touch the top of the she and must be worn with a uniform belt in navy or black.")  Jetstream's uniform policy can be considered discriminatory only **when it is applied** to Plaintiffs' particular circumstances, as Plaintiffs wish to wear skirts, rather than pants,

---

[5] The Court does not consider the EEOC's other arguments pertaining to other pieces of purportedly direct evidence – (1) that Ms. Haji testified that she asked to wear a hijab at work and JetStream refused to allow her to do so, and (2) that "a factual dispute remains as to whether Defendant enforced a policy of refusing to let Muslim women wear hijabs prior to 2011" (Doc. # 185 at 14) – because these arguments were never raised in the EEOC's Response to Defendant's Motion for Summary Judgment.  (See Doc. # 117 at 13–14.)  The instant Motion cannot be granted on the basis of new arguments which could have been raised at an earlier juncture.  *See Servants of the Paraclete*, 204 F.3d at 1012 (a motion for reconsideration is an "inappropriate vehicle[ ] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion"); *United States v. Rodriguez-Martinez*, 2009 WL 2372850, *1–2 (D. Colo. 2009) (where motion for reconsideration raised arguments that could have been raised in an earlier pleading, the motion was "properly denied on that basis" alone).

for religious reasons.  *See Tuffa v. Flight Servs. & Sys. Inc.*, 78 F. Supp. 3d 1351, 1357 (D. Colo. 2015) (an employee did not show that his employer's policy, which required employees to pass written tests in English, was not direct evidence of discrimination because such a policy "does not discriminate on its face.").  As the EEOC offers no evidence of "an existing policy **which itself** constitutes discrimination," *Ramsey,* 907 F.2d at 1008 (emphasis added), the Court correctly applied the burden-shifting framework provided by *McDonnell-Douglas* to Ms. Haji's claim.  As such, it properly dismissed that claim in the Summary Judgment Order.

### III.  CONCLUSION

Ultimately, Plaintiff's arguments, if they are to be considered at all, do not meet the requisite standard of clear error or manifest injustice warranting relief.  Accordingly, based on the foregoing, the Court ORDERS that Plaintiff's Motion for Reconsideration (Doc. # 185) is hereby DENIED.

DATED: March 8, 2016

BY THE COURT:

*[signature: Christine M. Arguello]*

CHRISTINE M. ARGUELLO
United States District Judge