**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 13-cv-02340-CMA-KMT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

SAFIA ABDULLE ALI,
SAHRA BASHI ABDIRAHMAN,
HANA BOKKU,
SADIYO HASSAN JAMA, and
SAIDA WARSAME, a/k/a AMINO WARSAME,

      Plaintiff Intervenors,

v.

JETSTREAM GROUND SERVICES, INC.,

      Defendant.

---

## ORDER DENYING PLAINTIFFS' MOTION FOR NEW TRIAL

---

This matter is before the Court on Plaintiffs' Motion for a New Trial. (Doc. # 299.) For the reasons outlined below, the Court denies the motion.

## I.  BACKGROUND

Plaintiffs,[1] five Muslim females who had previously worked as cabin cleaners for Airserv, a United Airlines subcontractor, applied for, and were denied, cabin cleaning positions with Defendant JetStream Ground Services, Inc. (JetStream), when JetStream

---

[1] The Court will refer to Plaintiff Intervenors as "Plaintiffs" throughout this Order.

assumed Airserv's subcontract for United Airlines.  (*Id.* at 4.)  Plaintiffs brought this Title VII suit, alleging that JetStream refused to hire them for discriminatory reasons after they requested to cover their heads with a hijab[2] and wear long skirts for religious purposes.  (Doc. # 1.)  Plaintiffs also alleged that JetStream retaliated against employees who wore hijabs and against applicants for engaging in protected activity in seeking a religious accommodation for their clothing and/or for complaining about discrimination.  (*Id.*)

On summary judgment, the Court ruled that Plaintiffs had met their burden to show that hijabs that were tucked into a shirt and secured to an employee's head presented no safety problems; accordingly, as a matter of law, it held that accommodating such hijabs posed no "undue hardship" for Jetstream.  (Doc. # 184 at 54–58.)  However, the Court also found that Jetstream had presented sufficient evidence to create a disputed issue of fact as to whether it would pose an "undue hardship" for JetStream to permit its cabin cleaners to wear long skirts while working. (*Id.*)

On January 21 and 22, 2016, Plaintiffs filed two motions (Doc. ## 192 and 193) to exclude under Fed. R. Civ. P. 702 the expert opinions of Matthew Lykins and Dr. Nancy Grugle, both of whom were retained by Defendants to opine about the dangers of wearing loose clothing, including "long, loose" skirts while working as cabin cleaners

---

[2] "A leading scholar of Islam . . . has defined a 'hijab' as the 'veil or head covering worn by Muslim women in public.'" *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1111, n.1 (10th Cir. 2013) rev'd and remanded, 135 S. Ct. 2028 (2015) (citing John L. Esposito, *Islam: The Straight Path* 310 (4th ed. 2011)).

and the reasonableness of JetStream's conduct in restricting such clothing.  On

February 26, 2016, prior to any response being filed by Defendants to these motions,

the parties submitted a Joint Motion for Leave to File Proposed Amended Final Pretrial

Order and Withdraw EEOC's Fed.R.Evid. 702 Motions to Excluded the Opinions of Two

of Defendant's Experts [Dkt. Nos. 192 & 193].  In this joint motion, Plaintiffs indicated

that they were withdrawing their skirt accommodation claims and sex-plus-religion

discrimination claims, leaving only their hijab accommodation claims for trial.  (Doc. #

206 at 3.)  The parties also agreed to not call those experts who were going to testify

regarding the safety of wearing skirts (rather than pants) when walking up and down

jetway stairs and in performing cabin cleaning work.  (*Id.*)

On April 29, 2016, after a fourteen-day jury trial, in accordance with the verdict of

the jury, this Court entered final judgment in favor of JetStream and against Plaintiff

EEOC and Intervenor Plaintiffs.  (Doc. # 287.)

Plaintiffs bring the instant motion under Rules 59 and 60 of the Federal Rules of

Civil Procedure, the Court's inherent powers, and the plain error doctrine.  (Doc. # 299

at 1.)  They assert that a new trial is justified for a host of reasons, including:

    **a)**  that evidence regarding safety hazards was confusing and distracting to the

        jury, and was designed to incite juror's fear and prejudice of Muslims;

    **b)**  new evidence was disclosed at trial;

    **c)**  defense counsel committed misconduct throughout the trial;

    **d)**  the Court erred in denying sanctions for the destruction of evidence;

**e)** the jury was tainted by anti-Muslim bias and the Court erred in deciding not to allow the Plaintiffs to use a juror questionnaire prior to trial and in denying Plaintiffs' motion to strike two jurors for cause.

## II.  ANALYSIS

**A.   LEGAL STANDARD**

**1.   Rule 59**

Under Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure, the Court may, "on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." The decision to grant a motion for a new trial pursuant to Rule 59 is committed to the trial court's sound discretion. *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998). Nevertheless, a motion for new trial "is not regarded with favor and should only be granted with great caution." *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991); *see also* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (hereinafter "FPP") § 2805 (quoting Fed. R. Civ. P. 61) (emphasis added) ("The importance of Rule 61 in its application to motions for a new trial cannot be overlooked. It provides specifically that 'unless justice requires otherwise,' no error 'is ground[s] for granting a new trial' . . . It further admonishes the courts to 'disregard all errors and defects that do not affect any party's substantial rights.' **Thus, it is only those errors that have caused substantial harm to the losing party that justify a new trial.** Those errors that are not prejudicial do not call for relief under Rule 59.")

A motion under Rule 59(a) can be premised upon the argument that the verdict is against the weight of the evidence.  *See Anaeme v. Diagnostek, Inc* ., 164 F.3d 1275, 1284 (10th Cir.1999).  A motion for a new trial based on this ground presents a question of fact.  *Patton v. TIC United Corp.,* 77 F.3d 1235, 1242 (10th Cir. 1996).  Although the decision to grant such a motion is within the court's discretion, "[u]nder the Seventh Amendment, the court may not substitute its judgment of the facts for that of the jury." *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1443 (10th Cir. 1988); see also *Minshall v. McGraw Hill Broadcasting Co.,* 323 F.3d 1273, 1279 (10th Cir. 2003) (citation and internal quotation marks omitted) (noting that, in reviewing such a motion, the Court may "not weigh the evidence, pass on the credibility of the witnesses, or substitute [its] conclusions for that of the jury"); *see also Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1213 (10th Cir. 1997) ("It is the province of the jury, . . . and not that of th[e] court, to resolve conflicting evidence and to appraise credibility. The jury has the power to accept or reject any particular evidence presented.  Thus, the mere existence of contrary evidence does not itself undermine the jury's findings as long as sufficient other evidence supports the findings.").  Additionally, "[w]here a new trial motion asserts that the jury verdict is not supported by the evidence, **the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence.**"  *Anaeme,* 164 F.3d at1284 (emphasis added) (internal quotation marks and citations omitted); *see also Skinner*, 859 F.2d at 1443; FPP § 2806 (noting that, in considering a motion for a new trial based on the weight of the evidence, "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in

our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of the judge's own doubts in the matter"). The burden of proof is on the moving party, *see Domann v. Vigil*, 261 F.3d 980, 983 (10th Cir. 2001), and the Court considers the record evidence in the light most favorable to the nonmoving party, *see Anaeme*, 164 F.3d at 1284.

Additionally, in order to secure a new trial based on allegedly improper evidentiary rulings, a moving party must show that the evidentiary rulings were both clearly erroneous and so prejudicial that "it can be reasonably concluded that with or without such evidence, there would have been a contrary result." *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993); *see also Tanberg v. Sholtis*, 401 F.3d 1151, 1162 (10th Cir. 2005) ("Remand for a new trial is a blunt instrument with which to address the many and multifarious evidentiary rulings made during any trial; a deferential standard of review coupled with the distinction between harmless and reversible error ensures that that instrument will be wielded only as necessary to protect litigants' rights to a fundamentally fair adjudication of their disputes.")

### 2.    Rule 60

Rule 60(b) of the Federal Rules of Civil Procedure provides that

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1)    mistake, inadvertence, surprise, or excusable neglect;
(2)    newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4)    the judgment is void;

(5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b). "Relief under Rule 60(b) is extraordinary and may only be granted in exceptional circumstances." *Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co., Inc.*, 909 F.2d 1437, 1440 (10th Cir. 1990).  The decision whether to grant relief pursuant to Rule 60(b) lies within the sound discretion of the trial court. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1181 (10th Cir. 1981).

## B.    APPLICATION

### 1.    The Introduction of Safety-Related Evidence at Trial

Plaintiffs moved *in limine* to exclude evidence of safety hazards and safety issues at the airport, "subject to a narrow exception for the testimony from JetStream co-owner David Norris factually describing his personal interactions with Plaintiff-Intervenors and his mental impressions at that time, as described in his deposition testimony on those matters."

Specifically, Plaintiffs argued that

> This Court previously held as a matter of law that a hijab accommodation would not create an 'undue hardship' for Defendant. **Because Plaintiffs are not pursuing their skirt accommodation claim at trial,** [3] **evidence regarding the aggrieved individuals' religious practice of wearing skirts, and evidence of clothing-related injuries (including any**

---

[3] The Court cannot speculate regarding the reasons Plaintiffs' counsel decided to withdraw the skirt claim, but the fact of the matter is that withdrawal of that claim significantly weakened their case.  Plaintiffs' presumption that, by withdrawing the claim, it was going to be able to preclude all testimony about safety concerns was both naïve and incorrect.  JetStream had always taken the position that it was concerned that the wearing of loose clothing, including long, flowing skirts, made it more likely that women would trip, slip, or fall while entering or exiting planes and that such injuries could lead to workers' compensation claims.  Because this was a factor in Defendants' hiring decisions, testimony as to safety concerns remained relevant.

> **perceived safety risks associated with skirts), is no longer of any consequence in determining any part of this action**, and therefore is neither relevant nor admissible under Fed. R. Evid. 401 and 402.

(*Id.* at 2) (emphasis added).    Defendant opposed the motion, and based on

Defendant's representations that Mr. Norris would testify that he had safety concerns

about the women's skirts, the Court deferred decision on Plaintiffs' motion until trial.

(*Id.*)

> During defense counsel's opening statement, he stated:

> MR. DEENEY:  . . . And I just want to express something that should be obvious and that is that nobody in JetStream's position was concerned about head dress.  **The issue has always been, and you will hear it from Mr. Dave Norris, all of the way through the ranks. . . The question was, from the inception, the free flowing skirts**.  **And that is not an issue before you, because the EEOC and Ms. King, after many years of litigation about this, withdraw those** . . .

> MS. HALPERN:  Your Honor, we object. Sorry, that skirt case has been withdrawn.

> THE COURT:  If he will have a witness that testifies that is what it is, then that is what it is.

> MR. DEENY:  That is exactly what I was saying, Your Honor.

> THE COURT:  All right.  Overruled.

(Doc. # 299-16 at 1:16-25, 2:1-7) (emphasis added).  At trial, Mr. Norris testified

that he **did** have safety concerns about the Plaintiffs' skirts when he met with

them, but no such concerns regarding their hijabs:

> Q.    And you claim that your response to [the Plaintiff-applicants] was that you absolutely had no problem with the scarf, that you could make allowances for that, and maybe even put a JetStream logo on it, is that correct?

A.    **That is what I said. I said we have no issue with your headscarf whatsoever, but the long skirts, we do.  As a safety hazard.**

Q.    And then you said as to your skirt, I don't know, we will have to see; correct?

A.    Yeah, I said we might have an issue with that, but I didn't make the determination right then and there.  I said we will probably have an issue with that. I said we will have to see.  Wait and see.  HR department everybody else would get involved and make the ruling

(Doc. # 314-22 at 44:16-25, 45:1-4.)

Subsequently, Mr. Norris testified regarding his decision to place Plaintiffs' applications in the so-called "B" pile, rather than the "A" pile (the latter, he claimed, would have received a job offer/interview):

Q.    One more question, Mr. Norris. It is your position that the clothing of the women who gave you their applications in the AirServe break room had nothing to do with the pile that you actually put their application in; is that correct?

A.    That is correct.

                                        ***

Q.    I want to clarify something in your testimony with regard to the women in the AirServe break room that you spoke to. Now, you indicated that you said you didn't have a problem with their headscarves but you did have a problem with their skirts; correct?

A.    Correct.

Q.    But then you indicated that your decision to put them in the B pile had nothing to do with their clothing, correct?

A.    That's correct.

(Doc. # 299-15 at 44:7-12; 139:16-25.)

Plaintiffs also point to testimony from JetStream's Director of Station Operations, Frank Austin, who was asked general questions about his background in "aviation safety," and also stated as follows:

Q:     You mentioned your background in safety.  Is [sic] there any safety related aspects to uniforms?

A:     Loose clothing around airplanes is a huge issue.  Safety concern. Anything loose, because of loading, unloading bags, that could fall into the conveyer belt.  Going up and down the stairs and the jetway, in and out of a motorized equipment.  So if you have loose fitting clothing, it just increases the risk of some type of injury or accident.

(Doc. # 299-11 at 116:21-25, 117:1-4.)  Plaintiffs' counsel did not object to this line of questioning.  Mr. Austin also testified about safety dangers occurring on jetway stairs, without objection from Plaintiffs' counsel:[4]

Q.     And we heard testimony earlier today that [the cabin cleaning employees] may be going up and down the stairs, was it 30 or 60 times a day?  Does that sound right for you?

A.     At least twice per aircraft. If they work 10 airplanes 12 airplanes a day, 35, 30 times possibly.

Q.     So employees are going up and down the stairs carrying supplies 20 or 30 times a shift?

A.     Yes, sir.

***

Q.     Are there any safety rules or procedures associated with using the jetway stairs themselves?

---

[4] Plaintiffs' counsel objected **before** this testimony occurred to the admission of Exhibit 101, a diagram of an airport ramp, on the grounds of relevance.  (Doc. # 320-11 at 1-25.)  The Court overruled the objection, because "it would be helpful to the jury to see what they are talking about."  (*Id.* at 121:2-5.)

> A.   Yeah, you have to hold the railing, because depending on the weather, and you know, particularly the weather, the steps are slick.  The jetway stairs, they are slick.  So you definitely have to hold the -- we have had injuries where people slip and hurt their ankle and shins and what have you.  You have to hold the railing.

(Doc. # 320-11 at 124:21-25, 125:1-3, 126:18-25.)

Plaintiffs also point to testimony from Mariela Feliciano, JetStream's HR Manager, regarding the email signature block of Frank Austin, the JetStream's Director of Station Operations, which stated that "the right way is the safe way."  Specifically, Ms. Feliciano testified that "My understanding [of what the signature block means] is that I guess it is obviously related to the way we perform the cleaning at the airport and we need to do it the right way and the safe way in order to be safe."  (Doc. # 320-10 at 97:19-23.)  Again, Plaintiffs' counsel did not object to this line of questioning.

On the ninth day of trial, the Court ruled that it would "not allow any **further** testimony" regarding safety-related concerns, explaining, "I have given a lot of thought to the safety issues. . . . I allowed the aircraft [evidence] to come in, the steps to come in.  I allowed Mr. Norris to testify.  But I think we are getting sidetracked . . . . [So] I will not allow further testimony on that."  (Doc. # 314-6 at 7:15-16, 8:3-6.)

In his closing argument, defense counsel stated as follows:

MR VOLIN:  And, of course, we know about security issues and the bading.  So being in a uniform helps with security.  And that is important, as well.  And then there are also safety concerns.  We'll see in the uniform policy that a lot of the requirements get traced back to safety.

Another problem that AirServ had was their workers were not using the jetway stairs.  Instead, they were using the passenger bridge. Picture this, you are coming off an aircraft, trying to get to your connection or trying to get to baggage claim, and you see people coming at you that may not be

in uniform, and they are carrying things, and doesn't that leave a little -- create a little bit of insecurity about what is going on?

***

So we know from the beginning that there is a communication issue. And what [Norris] says -- what happens is, I want to wear headscarves. And he is like, okay. And they say we want to wear a skirt, and he is like, I have a safety concern with that. And you can see the way he testified that he gestures. And you can see that they said, well, I will put a hat over the headscarf. And he is going no, no, no. He says, no, no, no, you don't have to do that. And what they hear is no, I won't allow it. What he says is, you don't have to do that. We will figure out a way to get a logoed headscarf for you, because we do know that Mr. Norris likes uniforms, because United likes uniforms and likes logos, because that is what Dixie Blaylock told him. So he says, let's figure out a logo. But they don't hear that. What they hear is "no," right. And they talk about the skirt. And he has a safety concern for the skirt. And you heard him explain why. And it is the jetway stairs; the treacherous jetway stairs. And there is no dispute that they are treacherous. . . . So his concern was legitimate, but it is focused on the skirt, not the headscarf, because in his mind, the headscarf is not a problem. And they don't even have to wear a baseball hat over their headscarf. He is thinking logos.

***

And [the new uniform policy] had something about scarves and headscarves. So the headscarves are fine. So now it is very expressed, and it just says please keep them safe, securely to the head. Don't let it hang below the shoulders. Don't have it loose fitting, to prevent injuries. And is not just headscarf, but neckscarves. Because, remember, we see people that wear neckscarves, and those can hang down. So it says, try to wear it around the collar. Don't allow it to hang, to interfere with safety, because safety is a big issue.

And why is that important? Well, it is important for the workers, themselves, obviously, but also important for the co-workers. Because if somebody falls, they could fall into another person. And, of course, for United Airlines, it was important for them. We saw from Mr. Austin's testimony at the end, was to send United JetStream's safety plan. And, of course, we heard from Ms. Georgianne that it was important to JetStream's bottom line to be safe, because who pays when a worker gets hurt? JetStream pays. So everyone has an incentive to reduce injuries. And it is not discrimination to want people to be safe. And it is not asking someone to choose between their religion and their job to ask them to be safe. Safety is non-discriminatory. And you would not put the employer in

12

a place between choosing to let people do whatever they want if they claim it is for religion, regardless of the safety impact on them and on other people.

(Doc. # 299-10 at 143:19-25, 144:1; 155:14-25, 156:1-15; 160:15-25, 161:1-17.)

Notably, Plaintiffs' counsel did not object to any of these portions of Defendant's closing argument.

Plaintiffs argue that a new trial is justified under Rule 60(b)(3), under which the Court may set aside any final judgment if it was procured by attorney misconduct or fraud upon the Court, because they were exceptionally prejudiced by this safety-related evidence.

With regard to Defendant's opening and closing statements, the Court specifically instructed the jury both before and after opening statement and closing argument, as well as in the jury instructions, that such statements and arguments by the lawyers did not constitute evidence in the case. (Doc. # 283 at 10). Accordingly, the only **evidence** before the jury regarding safety was (1) the testimony of Mr. Norris, who stated that he had safety concerns about the skirts, (2) the testimony of Frank Austin, who spoke about the dangers of loose clothing around airplanes and the slipperiness of jetway bridges; and (3) the very brief testimony of Mariela Feliciano, who essentially reiterated Mr. Austin's email signature block ("the right way was the safe way.") Plaintiffs argue that they were "exceptionally prejudiced" by this safety-related evidence and that its admission constituted both fraud on the court and misconduct by the attorneys. However, such an argument is premised on Plaintiffs' assumption that merely because Plaintiffs made the decision to withdraw their skirt accommodation

claim, **any mention whatsoever** of safety concerns at the airport constituted fraud on the Court or attorney misconduct.  To the contrary, Plaintiffs' counsel had long been on notice that JetStream was claiming that safety-related issues were in play in this case. Plaintiffs' **strategic decision** to withdraw the skirt accommodation claim did not suddenly render any and all safety-related evidence completely irrelevant and unduly prejudicial, such that it constituted **attorney misconduct or fraud on the court** for defense counsel to elicit testimony from its witnesses regarding safety concerns.  Fraud on the court is "fraud which is directed to the **judicial machinery itself** and is not fraud between the parties," and relief is not dependent on the filing of a motion by a party to the original judgment; the court may assert this power *sua sponte*.  *United States v. Buck*, 281 F.3d 1336, 1341–42 (10th Cir. 2002) (emphasis added).  Nevertheless,

> Generally speaking, **only the most egregious conduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated will constitute a fraud on the court.**  Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before [the Court], will not ordinarily rise to the level of fraud on the court.

*Weese v. Schukman*, 98 F.3d 542, 552–53 (10th Cir. 1996) (internal quotation omitted). Additionally, showing the intent to defraud is an "absolute prerequisite" to a finding of fraud on the court.  *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1291 (10th Cir. 2005).  Plaintiffs can do so only by showing that JetStream acted with "an intent to deceive or defraud the court," by means of a "deliberately planned and carefully executed scheme."  *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1267 (10th Cir. 1995) (quotation omitted) (noting that "[w]hen there is no intent to deceive, the fact that

misrepresentations were made to a court is not of itself a sufficient basis for setting aside a judgment under the guise of 'fraud on the court.'"); *see also United States v. Buck*, 281 F.3d 1336, 1343 (10th Cir. 2002) ("relief based on fraud upon the court must be founded on intentional misconduct.")

With respect to attorney misconduct, a party alleging such misconduct must "clearly substantiate" the claim of fraud, misconduct or misrepresentation, by way of "clear and convincing proof." *Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 952 (10th Cir. 1990) (internal quotation omitted). Moreover, "the challenged behavior **must substantially have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial**." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (internal quotation omitted) (emphasis added); *see also Ryder v. City of Topeka*, 814 F.2d 1412, 1425 (10th Cir. 1987) (emphasis added) (noting that although the misconduct of counsel or a party can justify a new trial, "**[a] showing of prejudice, however, is essential.**  A new trial is not to be granted simply as a punitive measure to punish the misconduct of counsel.")

Finally, "[t]he admission or exclusion of evidence lies within the sound discretion of the district court and will not be reversed absent an abuse of discretion." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1227 (10th Cir. 2000). Even if error is found in the admission of evidence, the Court "will set aside a jury verdict only if the error prejudicially affect[ed] a substantial right of a party." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998); *see also Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1518 (10th Cir. 1995) (same, and noting that "the burden of demonstrating that

substantial rights were affected rests with the party asserting error."). Specifically, "[e]vidence admitted in error can only be prejudicial if it can be reasonably concluded that with or without such evidence, there would have been a contrary result." *Sanjuan,* 160 F.3d at 1296 (quotation omitted).

Plaintiffs also argue that this evidence was "extremely prejudicial" because it was "**distracting and confusing to the jury**, **leading to the false conclusion** Defendant expressly urged in closing – **that Defendant's hiring decision was reasonably based on safety concerns**." (Doc. # 299 at 5.)  The Court rejects this assertion.  First, Plaintiffs did not object to many of the statements they now reference.  This failure weighs heavily against granting them relief.  "A party who waits until the jury returns an unfavorable verdict to complain about improper comments during opening statement and closing argument is bound by that risky decision and should not be granted relief." *Glenn v. Cessna Aircraft Co.*, 32 F.3d 1462, 1465 (10th Cir. 1994); *see also Gonzalez v. Volvo of Am. Corp.*, 752 F.2d 295, 298 (7th Cir.1985).  While some fundamental errors "may mandate new trials despite the lack of contemporaneous objection", *id.*, the Court declines to find such fundamental error here.

Second, defense counsel did not "expressly urge" that Defendant's hiring decision was based on safety concerns.  Defense counsel referenced Norris's safety concerns but did not state that they drove his hiring decision.  Third, even if defense counsel implied a connection between Norris's safety concerns and his hiring decision, the jury was aware that the closing argument was not evidence and that the evidence presented at trial suggested otherwise.  As the Court noted on the ninth morning of trial,

16

Norris's testimony was limited to his "concern[] about the safety of the skirts[;] . . . there [was] no testimony, and the evidence shows, that [his safety concern] was never a reason used by the defendants in response to inquiries from the CCRD of the EEOC and that safety was never an issue." (Doc. # 314-6 at 7.)  And, as Plaintiffs concede, "none of Defendant's witnesses claimed the decision was safety related, and Norris expressly disavowed safety as a motivation. (Doc. # 299 at 5).  Much of the safety evidence was instead in the way of background information about the nature of the jobs to which the women had applied.  It is within the jury's prerogative to weigh and evaluate that evidence.  *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1279 (10th Cir. 2003).

Plaintiffs also argue that this safety evidence was prejudicial because such evidence "tapped directly into fear and prejudice against Muslims resulting from air-related terrorist attacks." (Doc. # 299 at 5.)  In support of this proposition, Plaintiffs point to one comment made by defense counsel in opening: "historically these [employees] have to be uniformed . . . That is an important issue for airport security that people can be identified as associated with a business that is lawfully on the premises." (Doc. # 299-16 at 11:7-12.)  They also point to three sentences of the lengthy defense closing:

> Another problem that AirServ had was their workers were
> not using the jetway stairs.  Instead, they were using the
> passenger bridge.  Picture this, you are coming off an
> aircraft, trying to get to your connection or trying to get to
> baggage claim, and you see people coming at you that may
> not be in uniform, and they are carrying things, and doesn't
> that leave a little -- create a little bit of insecurity about what
> is going on?

(Doc. # 299-10 at 143:19-25, 144:1). Plaintiffs allege that these comments "rais[ed] the specter of security and passenger safety at a time when the public has a heightened fear of air-industry attacks by extremist Muslims," and that, as such, the comments were "blatant misconduct intended to incite fear and prejudice against Muslims." (Doc. # 299 at 6.)

As previously stated, the jury was instructed that opening and closing statements did not constitute evidence in the case. Plaintiffs did not object to these statements or request a curative instruction, thereby waiving any arguments they may have had about them. *See Glenn*, 32 F.3d at 1465 (10th Cir. 1994); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 238–39 (1940) ("[C]ounsel ... cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial."). Moreover, the Court is not persuaded by the inference that **any** discussion of airport safety **generally** would be so automatically equated in a juror's mind with the "specter" of extreme Islamic terrorism. Although Mr. Volin's comment about "people coming at you that may not be in uniform" gets relatively close to the line, it was a single sentence in a lengthy closing, is ambiguous, and in no way directly raises the "specter" of Islamic terrorism at airports. *See Stouffer v. Trammell*, 738 F.3d 1205, 1225 (10th Cir. 2013) (declining to find prejudice in part because the challenged comments were brief).

In sum, Plaintiffs have not shown that defense counsel's eliciting testimony regarding safety concerns or his statements in opening or closing constituted misconduct or fraud on the Court warranting a new trial.

**2.      The Production of New Evidence at Trial**

Plaintiffs next argue that a new trial is warranted because Plaintiffs were

surprised by new evidence at trial.  Specifically, Plaintiffs contend they were surprised

by defense witness Arnie Knoke's testimony that he had "sent multiple emails to

Jetstream officials containing his recommendations about AirServ employees."  (Doc. #

299 at 8–9.)

Under Rule 60(b), the Court may order relief from a judgment based on "mistake,

inadvertence, surprise, or excusable neglect . . . [or] . . . [because of] fraud (whether

previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing

party."  Fed. R. Civ. P. 60(b)(1), and (3).  To satisfy Rule 60(b)(1) on the basis of

surprise, a moving party must show (1) surprise, (2) prejudice, and (3) an effort to cure

the prejudice.  *Hynes v. Energy W., Inc.*, 211 F.3d 1193, 1203 (10th Cir. 2000)

(quotation omitted).

Based on this standard, Plaintiffs argue for a new trial because:

- Plaintiffs were surprised that Knoke and the Defendant had exchanged emails
  regarding the first and second list of names.  Plaintiffs believed all
  communication had been in person and limited to the first list.

- The new information prejudiced Plaintiffs because it denied them the
  opportunity to conduct discovery with respect to, or question witnesses who
  preceded Knoke about, the emails.

- They attempted to cure the prejudice by cross examining Knoke, but it only served to bolster the Defendant's story and add to the prejudicial nature of this information.

Even assuming this evidence surprised Plaintiffs, it is not entirely clear to this Court how it was so unfairly prejudicial as to merit a new trial. Knoke testified that he could not remember which names he sent to the Defendant, when he sent them, or even which Defendant employees were communicating with him. Knoke's brief testimony on this matter was confusing and inconsistent at best. The fact that Knoke testified that he communicated with the Defendant by email, rather than solely in person, is insufficient, standing alone, to support a finding of prejudice here. More importantly, Plaintiffs failed to adequately attempt to cure any purported prejudice at a time when meaningful steps could have been taken by the Court. Upon hearing about emails that were never disclosed, Plaintiffs could have immediately objected and raised the issue with the Court. Plaintiffs did not. Nor did Plaintiffs request that the Court strike the testimony, sanction the Defendant for failure to disclose, or allow Plaintiffs to offer any rebuttal testimony. Plaintiffs' argument — that their singular attempt to cross examine Knoke was a sufficient attempt to cure — is without merit.

Accordingly, the Court concludes that Plaintiffs have not sufficiently demonstrated prejudice and an effort to cure, and a new trial on the basis of surprise under Rule 60(b)(1) is not warranted.

### 3.    Various Other Forms of Attorney Misconduct

Plaintiffs argue that they should be granted a new trial on the grounds of six instances of attorney misconduct at trial.

Granting a new trial on the basis of such misconduct is permitted only if the moving party can "clearly substantiate" the claim of fraud, misconduct or misrepresentation, by way of "clear and convincing proof." *Anderson*, 907 F.2d at 952 (internal quotation omitted).  Moreover, "the challenged behavior **must substantially have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial**." *Woodworker's Supply, Inc.*, 170 F.3d at 993; *see also Ryder*, 814 F.2d at 1425 (emphasis added) (noting that although the misconduct of counsel or a party can justify a new trial, "**[a] showing of prejudice, however, is essential.**  A new trial is not to be granted simply as a punitive measure to punish the misconduct of counsel.")   Finally, counsel cannot remain silent during trial, interpose no objections, and expect the Court to rule in its favor after the jury verdict has been returned. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940).  Instead, as previously stated, "a party who waits until the jury returns an unfavorable verdict to complain about improper comments . . .  is bound by that risky decision and should not be granted relief." *Glenn*, 32 F.3d at 1465.

First, Plaintiffs point to defense counsel's effort to discredit Plaintiffs' first witness, Diana Martinez, regarding her performance issues at JetStream, by waving an large file in the air and stating as follows:

> Q. In fact, do you recognize what I am holding in my hand as a personnel file?

> **THE COURT: Mr. Volin that is inappropriate. It hasn't been admitted. You can't use it that way.**
>
> MS. KING: Your Honor I am also going to object because Ms. Martinez wanted to testify about checking personnel file and what was and wasn't in there and she was precluded doing that by the defense.

(Doc. # 299-11 at 128:18-25) (emphasis added).  The Court unambiguously admonished defense counsel as to the problematic nature of this behavior, and Plaintiffs have not provided a single argument as to why this isolated incident prejudiced them in any fashion.  In fact, given that the Court sternly called such behavior "inappropriate," such a display could have won Plaintiffs sympathy from the jury.

Second, Plaintiffs argue that defense counsel improperly relied on the experiences or actions of witnesses who were not disclosed in JetStream's Rule 26 disclosures, including Winsome Powell, who Ms. Feliciano testified posted the "first round" drug test list, as well as five JetStream employees, who Defendant claimed wore head coverings (likely for religious reasons).  (Doc. # 299 at 12.)  Plaintiff argues that these individuals were first disclosed at trial, and thus, "Plaintiffs did not have time to find these witnesses and question them about Defendant's assertions."  However, Defendant notes, these individuals were identified in discovery documents produced by the Defendant, including job applications which Plaintiffs used as exhibits at trial, and Plaintiffs do not even attempt to identify what prejudice resulted from the fact that they did not interview such witnesses.

Third, Plaintiffs argue that defense counsel disregarded a host of the Court's evidentiary rulings.  (Doc. # 299 at 12-13.)  However, the Court has painstakingly reviewed the transcripts cited by Plaintiffs, and the Court sustained each and every

objection made by Plaintiffs, and even went so far as to *sua sponte* admonish defense counsel without an objection from Plaintiffs' counsel.  (*See, e.g.*, Doc. ## 299-7 at 69:6-25 (court striking evidence from the record), 70:1-14; 299-14 at 51:13-18 ("THE COURT [*sua sponte*]: We are not going to go there Mr. Volin.  I have already ruled on this. We are not taking the time to go through a thousand photos."))  Our judicial system "presumes that jurors will conscientiously observe the instructions and admonitions of the court."  *United States v. Battles*, 745 F.3d 436, 453 (10th Cir. 2014).  With regard to defense counsel's single reference to so-called "memory conformity" in closing, not only did Plaintiffs fail to object to this statement, they specifically mentioned it in closing argument, as an example of pretext and stating, "Ask yourself if that is believable, if that makes sense, if that has anything to do with the evidence in this case.  We heard for the first time something called memory conformity, implying that all of the women in this case got together and lied.  There is no evidence of that, absolutely none."  (4/26/2016 Bridge Transcript.)  Additionally, Plaintiffs make no attempt to show how they were prejudiced by this conduct, much less how this conduct "substantially . . . interfered with [their] ability [to] fully and fairly to prepare for and proceed at trial." *Woodworker's Supply, Inc.*, 170 F.3d at 993 (emphasis added).

Fourth, Plaintiffs contend that defense counsel violated the Colorado Rules of Professional Conduct 1.7 and 1.8.  Plaintiffs note that in closing, defense counsel stated, with respect to Terri Gasch's deposition, that "the deposition happened a couple days after she quit abruptly after an argument with Ms. Feliciano, to quit a job she held for 6 or 7 years.  So she was kind of mad at Ms. Feliciano when that deposition took

place." (Doc. # 299-10 at 200:25-201:1-7.) Plaintiffs state that counsel had "earlier entered into an agreement with Gasch to 'represent her' at her deposition (if not also after). Evidently, Gasch was not informed of the **potential conflict of interest**, nor that her own attorney would later accuse her of perjury. Counsel thus violated Colorado Rules of Professional Conduct 1.7 and 1.8." (Doc. # 299 at 14) (emphasis added). Even if such a conflict of interest **did** exist, Plaintiffs failed to object at trial and provide no reason for their delay in raising the alleged conflict until now. In any case, the only prejudice Plaintiffs identify is that "Plaintiffs were restricted from contacting Gasch because she was ostensibly represented by defense counsel." (Doc. # 320 at 11.) Plaintiffs do not, however, attempt to explain how or why their inability to contact Gasch "substantially . . . interfered with [their] ability [to] fully and fairly to prepare for and proceed at trial." *Woodworker's Supply, Inc.*, 170 F.3d at 993 (emphasis added).

Fifth, Plaintiffs argue that defense counsel "intentionally exploited the jury's potential stereotypes about ignorant immigrants," during opening and closing arguments.[5] Specifically, they argue that

> Counsel also repeatedly implied that Intervenors, just because they are immigrants, were unable to understand events happening to them or basic conversations in English. There is no basis for this argument. **Defendant's witnesses have no first-hand knowledge of what Intervenors understood, and Intervenors have been unambiguous and consistently testified that they understood.** Instead, counsel relied on generic stereotypes about immigrants to insinuate that Intervenors were too unsophisticated to understand.

---

[5] The Court has already discussed defense counsel's comment regarding seeing people "using the passenger bridge . . . coming at you that may not be in uniform, and they are carrying things, and doesn't that leave a little – create a little bit of insecurity about what is going on?" *See supra* at 11-17.

(Doc. # 299 at 14-15) (emphasis added).  In support of this argument, Plaintiffs

point to the following comments made by defense counsel in opening

statements:

> So, the other complications [sic] is frankly what I refer to as the Tower of
> Babel, a very serious communication problem. This was 2008, a lot of
> these individuals here before you today, their language skills have
> improved probably since that time, but they still have struggles.  They will
> be using interpreters through this case.  Our people in doing the interviews
> are not interpreters.  But you can see when we talk about the Tower of
> Babel, the reference to Genesis.  It is confusing.

(Doc. # 299-16 at 7:21-25, 8:1-5.)  They also point to the following statements

made in JetStream's closing argument:

> And [Mr. Norris] says, "what job are you here for?"  And when they tell him cabin
> cleaners, he is trying to communicate.  It is obvious there is a language
> problem.  And that is why the third women joins him, Ms. Warsame.
> So we know from the beginning that there is a communication issue. And what
> he says -- what happens is, I want to wear headscarves. And he is like, okay.
> And they say we want to wear a skirt, and he is like, I have a safety concern with
> that.  And you can see the way he testified that he gestures. And you can see
> that they said, well, I will put a hat over the headscarf.  And he is going no, no,
> no. He says, no, no, no, you don't have to do that.  And what they hear is no, I
> won't allow it.

(299-10 at 155:9-22.)

As the Court has repeatedly noted, the Court specifically told the jury before

openings and closings that the statements did not constitute evidence, and the jurors

were given the same instruction in the jury instructions.  Additionally, Plaintiffs made no

objections to these statements and are accordingly bound by their silence.  *See*

*Gonzalez v. Volvo of Am. Corp.*, 725 F.2d 295, 298 (7th Cir.) (*citing Socony-Vacuum Oil*

*Co.*, 310 U.S. at 238-89.

In addition, Plaintiffs **argue** that they were "**unambiguous** and consistently testified that they understood [English]," yet defense counsel improperly asked every single Plaintiff about her English skills, and repeatedly attempted to make the point in cross examination that the Plaintiffs' English skills had improved since 2008, when the Plaintiffs applied for positions with JetStream and had critical conversations with Mr. Norris.  For the most part, the Plaintiffs testified without the aid of an interpreter; however, there were times that they had to have the question translated for them by the interpreter.  Moreover, at times their spoken English was very difficult for the Court to understand. The Court assumes that the jury may have had the same difficulty.  Under these circumstances, the Court sees nothing wrong with this type of cross examination in a case in which Defendant is asserting that there were communication-related issues between Plaintiffs and Mr. Norris.

Plaintiffs also argue that defense counsel "exploited stereotypes that immigrants are lazy by implying that Intervenors did not work for JetStream because it was just too much work," pointing to the following statements from the defense's closing argument:

> This is the job description for the cabin cleaners. . .  And look at the job duties there.  I have highlighted them for you.  And look how difficult this is.
>
> They have to stand, bend and stoop for periods of time.  They have to be able to lift 50 pounds.  They have to be walking up and down the jetway bridges.  And, remember, there are different angles depending on size of the aircraft.  They have to work under pressure.  They have to work in a fast-paced environment, under tight time constraints.  And they have to interact directly with customers, airline personnel, and fellow team members.  This is very hard work.  And we have to picture that as we identify what happened in this case.

(Doc. # 299 at 15) (citing Doc. # 299-10 at 141:16-25, 142:1-7.)  The Court is not

persuaded that defense counsel was exploiting a stereotype that immigrants are

"lazy"; if anything, the stereotype can run the other direction – i.e., immigrants are

hardworking.  Regardless, Plaintiffs did not object to these statements and fail to

present any argument regarding how Plaintiffs were prejudiced by them.  *See*

*Gonzalez*, 725 F.2d at 298 (affirming the district court's denial of a party's

request for a new trial based on misconduct in closing argument in part because

the party failed to contemporaneously object at trial and citing *Socony-Vacuum*

*Oil Co.*, 310 U.S. at 238-89).

     Sixth, Plaintiffs argue that defense counsel engaged in "personal attacks" and

"maligned" Plaintiffs' attorneys, in arguing that Plaintiffs would have been working for

JetStream but that their attorneys prevented this from happening.  Specifically, in

closing, defense counsel stated as follows: "So what was holding us up for 6 years?

Because Ms. King and Ms. Halpern demanded that [Plaintiffs] wear [sic] allowed to wear

skirts despite the safety hazard.  Then they dropped it, a month before the trial."  (Doc.

# 299-10 at 202:11-14.)  Plaintiffs did not object to this comment.  Plaintiffs also point to

an alleged gesture made by defense counsel in closing – i.e., the "evil pinky move that

Dr. Evil made [in the *Austin Powers* movie] when he ransomed the world for one million

dollars" – when discussing how Plaintiffs' experts were

> [J]ust jacking the rates [of damages.]  Why are they jacking the rates?
> The reason, ladies and gentlemen, and it is very clear, is because of this
> number down here.  They wanted to get to $1 million; right?  That is what
> they wanted to do, to get a big number in front of you, and so they did.

(*Id*. at 206:19-24.)  The Court did not see the gesture but it takes Plaintiffs at their word that such a gesture occurred.  Nonetheless, it is not reflected in the record because, again, Plaintiffs did not object.  In any case, the Court is not persuaded that these two, isolated comments, made in closing argument, fundamentally affected the fairness or the integrity of the trial.

### 4.  The Court's Denial of Sanctions for Defendant's Spoliation of Evidence

Before trial, Plaintiffs sought two kinds of sanctions for Defendant's conduct in destroying a hard-copy list of recommendations made by AirServ.  First, they sought an adverse inference instruction; second, they sought to preclude Defendant's witnesses from discussing the AirServ list.  (Doc. # 207.)  The Court denied the motion on the grounds that Plaintiffs had failed to make the requisite showing that the list was destroyed in bad faith.  (Doc. # 314-7 at 19:25, 20:1-2.)  In the instant motion, Plaintiffs again argue that such a showing is not necessary, pointing to Defendant's obligations to preserve records under 29 C.F.R. § 1602.14.  That regulation provides in relevant part that

> Any personnel or employment record made or kept by an employer (including but not necessarily limited to . . . application forms submitted by applicants and other records having to do with hiring . . . ) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved.

29 C.F.R. § 1602.14.  Plaintiffs cite to *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987), in which the Tenth Circuit held that a plaintiff-employee was entitled to the "benefit of a presumption that . . . destroyed documents would have bolstered her case," after her employer destroyed records it was required to preserve under 29 C.F.R.

§ 1602.14.  *Id.* at 1419.  In *Hicks*, the records at issue were destroyed "pursuant to its routine business practices," and in a footnote, the Tenth Circuit stated that "the record does not support the assertion that [the employer] acted in bad faith in destroying the documents."  *Id.* at 1419, n. 5.  Plaintiffs correctly note that *Hicks* has been cited in other cases and has not been not explicitly overruled by the Tenth Circuit.

Nevertheless, subsequent cases have at least implicitly overruled its holding, and have been very clear that "if [an] aggrieved party seeks an adverse inference to remedy . . . spoliation, it must also prove bad faith. . . . Without a showing of bad faith, a district court may only impose lesser sanctions."  *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009).  In *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997), the Tenth Circuit – despite *Hicks* – noted that there was a complete lack of Tenth Circuit precedent on the evidentiary doctrine of spoliation,[6] and stated as follows:

> [T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction.  **The adverse inference must be predicated on the bad faith of the party destroying the records.  Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case.**

*Id.* at 1407 (emphasis added).  Plaintiffs argue that *Aramburu* is distinguishable because it "did not involve destruction of records in violation of federal record-keeping requirements."  (Doc. # 299 at 16.)  However, although the Tenth Circuit did not **specifically mention** 29 C.F.R. § 1602.14, *Aramburu,* like the instant case, was a Title VII employment discrimination action, and did, in fact, involve employment records –

---

[6] "[T]he parties have not directed us to precedent from this circuit on the evidentiary doctrine of spoliation and we cannot locate any such precedent."  *Aramburu,* 112 F.3d at 1407.

specifically, the destruction of the plaintiff's attendance records.  112 F.3d at 1402.

Indeed, the plaintiff's excessive absenteeism was the legitimate, nondiscriminatory

reason proffered by the employer for the plaintiff's termination – just as here, the

destroyed records were ostensibly the basis of Defendant's failure to hire Plaintiffs.  *Id.*;

*see also* 29 C.F.R. § 1602.14 ("Any personnel or employment record made or kept by

an employer (including but not necessarily limited to . . . other records having to do with

. . . termination . . .) shall be preserved by the employer for a period of one year from

the date of the making of the record or the personnel action involved.").

Although the Plaintiffs make a public policy argument, that "absent the specter of

sanctions, 29 C.F.R. § 1602.14 is meaningless" – the Court cannot disregard the

holdings of *Turner* and *Aramburu*.  Moreover, Plaintiffs' motion provides no evidence of

bad faith destruction; indeed, Mr. Knoke, who purportedly destroyed this list before the

Plaintiffs found out that they were not selected for hire, would have no reason to believe

that litigation was imminent.

Plaintiffs also argue that "the disadvantage to Plaintiffs was further exacerbated

by the Court's rulings that prevented Plaintiffs from reading designated portions of

Defendant's Rule 30(b)(6) deposition testimony to admit Defendant's position

statements, as adopted by the designee."  (Doc. # 299 at 20.)  Plaintiffs, however, fail to

adequately demonstrate resulting prejudice.  Indeed, Plaintiffs were given a full

opportunity to impeach the 30(b)(6) witnesses, and the Tenth Circuit has specifically

held that using a deposition for impeachment purposes only is "at least [as] equally

effective" a method as permitting the deposition to be read into evidence.  *King & King*

*Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1165 (10th Cir. 1981).

Accordingly, this evidentiary ruling does not constitute a basis for a new trial.

### 5.    Plaintiffs' Jury-Related Arguments

Explaining that anti-Muslim bias has become increasingly pervasive in American

society, Plaintiffs argue that the Court erred in (1) denying their motion for a juror

questionnaire; (2) failing to provide adequate *voir dire* procedures to "ferret out

pervasive and deeply rooted bias"; and (3) failing to strike for cause two potential jurors.

The Court addresses and rejects each argument below.

Rule 47 of the Federal Rules of Civil Procedure and case law vest the Court with

broad discretion in fashioning *voir dire* procedures: "The court may permit the parties or

their attorneys to examine prospective jurors **or** may itself do so.  If the court examines

the jurors, it must permit the parties or their attorneys to make any further inquiry it

considers proper, **or** must itself ask any of their additional questions it considers

proper."  Fed. R. Civ. P. 47(a) (emphasis added); *accord United States v. Morris*, 623

F.2d 145, 151 (10th Cir. 1980) (citations omitted) ("[D]istrict courts have broad discretion

in fashioning . . . the jury selection procedure in general"); *United States v. Whitt*, 718

F.2d 1494, 1497 (10th Cir. 1983) ("*voir dire* is within the sound discretion of the trial

court, and the court's exercise of that discretion will not be disturbed, absent a clear

showing of abuse"); *United States v. Gibbons*, 607 F.2d 1320, 1330 (10th Cir. 1979)

("The trial court has broad discretion in conducting the *voir dire* examination"); *Mu'Min v.*

*Virginia*, 500 U.S. 415, 424 (1991) (a trial court has "great latitude in deciding what

questions should be asked on *voir dire*"); *Rosales–Lopez v. United States*, 451 U.S.

31

182, 189 (1981) ("Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he [or she] must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*.").  Accordingly, as long as the Court fulfills its role to "test the qualifications and competency of the prospective jurors," and "the tests employed **reasonably assure** that prejudice, if present, would have been discovered," *United States v. Bedonie*, 913 F.2d 782, 795 (10th Cir. 1990) (emphasis added), it is within the court's discretion to decline submission of a juror questionnaire that the court finds unduly invasive or simply unnecessary.

The Court first addresses the denial of Plaintiffs' motion for a juror questionnaire. Plaintiffs' proposed questionnaire was eleven pages long, and included some of the following questions:

> Do you agree or disagree with the statement that an employer is right to tell an employee not to engage in a religious practice at work if it makes it more difficult for the employer to enforce rules uniformly for all workers? (Yes, No, "Please tell us more")

> Do you agree or disagree with the statement that employees who want to work in this country should have to obey the workplace rules of an employer regardless of their religion? (Agree, Disagree, "Please tell us more")

> Do you think employers should not have to accommodate an employee's religious beliefs? (Yes, No, "Please tell us more")

> Do you know anyone who is Muslim? (Yes, NO, "If YES, please describe how you know the person(s) and your relationship")

> What do you know about the religion of Islam? (Open ended)

> Do you have any negative feelings about Muslims? (Yes, No, "Please tell us more")

Do you think the Muslim religion can be excessive? (Yes, No, "Please tell us more")

Do you think the United States should not allow any refugees from Muslim countries into the United States? (Yes, No, "Please tell us more")

Do you think Muslim immigrants should be restricted from working on or near airplanes? (Yes, No, "Please tell us more")

How do you feel about immigrants who wear religious or ethnic clothing instead of American clothing? (Yes, No, [sic] "Please tell us more")

Do you believe that immigrants are hurting America's economy? (Yes, No, "Please tell us more")

Do you agree or disagree with the statement that immigrants fortunate enough to come to this country and work here should adopt American values and conform with American culture? (Yes, No, "Please tell us more")

Do you believe immigrants are having a negative impact on America's values or traditions? (Yes, No, "Please tell us more")

Do you believe that immigrants to this country should be required to speak English fluently? (Yes, No, "Please tell us more")

Do you know anyone who is an immigrant from an African country? (Yes, No, "If YES, please describe how you know the person(s) and your relationship")

Do you have any negative feelings about immigrants from African countries where terrorist organizations may also operate? (Yes, No, "Please tell us more")

(Doc. # 205-1 at 5–9.)

In its Order denying the Plaintiffs' motion, the Court acknowledged the importance of finding an impartial jury in light of the real issue of anti-Muslim bias; nevertheless, it denied Plaintiffs' motion because the questionnaire would not have been particularly helpful in determining whether a juror should be removed for cause, as

questions like "What do you know about the religion of Islam?," "Do you have any negative feelings about Muslims?," or "Do you think the Muslim religion can be excessive?," were unlikely to be answered in a comprehensive enough fashion for the parties to have a basis to strike a juror for cause based on the questionnaire alone. However, the Court modified the Court's customary *voir dire* procedures: it expanded its own examination of potential jurors and included questions submitted by counsel.  It also expanded from fifteen minutes to forty-five minutes the time that each side could supplement the Court's *voir dire* examination and agreed to make "every reasonable effort to create an environment which encourages and enables prospective jurors to speak openly, including by instructing jurors that they should feel free to discuss any potentially embarrassing or sensitive topics at the bench."  (Doc. # 218 at 7.)  The Court also allowed the attorneys to request to speak at the bench with a prospective juror who they believed would be more candid in a private setting.  (Doc. # 218 at 7-8.)  The Court's discretionary decision to deny Plaintiffs' proposed juror questionnaire was not erroneous.

The Court next addresses the adequacy of *voir dire* procedures.  Plaintiffs claim that the Court "allowed twenty minutes of questioning for each party [and] that time was insufficient to ferret out pervasive and deeply rooted bias."  However, the Court allowed each party forty-five minutes to question prospective jurors, and this questioning occurred after extensive questioning by the Court.  This procedure was more than sufficient to "test the qualifications and competency of the prospective jurors," and "the tests employed **reasonably assure** that prejudice, if present, would have been

discovered," *United States v. Bedonie*, 913 F.2d 782, 795 (10th Cir. 1990) (emphasis added).

Finally, the Court addresses Plaintiffs' contention that two jurors who "openly expressed concerns and/or negative feelings about Islam and Muslims" should have been struck for cause.  (Doc. # 299 at 23.)  "The district court is in the best position to observe the juror and to make a first-hand evaluation of his [or her] ability to be fair." *Getter v. Wal–Mart Stores, Inc.*, 66 F.3d 1119, 1122 (10th Cir. 1995).  Accordingly, appellate courts afford great deference to a district court's judgment in evaluating a juror's actual bias, as that judgment must be "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *United States v. Powell*, 226 F.3d 1181, 1188 (10th Cir. 2000).  The district court must grant a challenge for cause, however, if a prospective juror shows actual prejudice or bias. *Getter*, 66 F.3d at 1122.  Actual bias can be shown either by the juror's own admission of bias or "by proof of specific facts which show the juror has such a close connection to the facts at trial that bias is presumed." *Id*.

The exchange between the juror number two and Plaintiffs' counsel occurred as follows:

> MS. KING:  Let me go back.  I want to go back to just the religious issue with you one more time, and ask you if you have any other concerns, other than watching the news and being concerned about the fact that it appears to be some people that feel strongly about their religion because they are the ones actually blowing themselves up.  Have you had any other experiences with the religion or with Muslims that make you uneasy?
>
> CHAIR NO. 2:  No, no. I always -- not necessarily Muslims or Islam, but I always wonder how people come to believe the way they do.  Why do they

do things different than me? Why do Catholics do certain things?  Why do Muslims do certain things? That, I don't understand, so –

MS. KING:  I promise, I am not trying to pick on you, but I want to ask you one more question.  Is there something -- do you wonder if there is really something wrong in this religion that people feel that strongly to engage in those acts?

CHAIR NO. 2:  Is there something wrong with their religion?

MS. KING:  Uh-huh.

CHAIR NO. 2:  Well, in my opinion, sure.

MS. KING:  Based on what you have seen?

CHAIR NO. 2:  Based on what I know. Based on what I read.  Based on my experiences.  I don't believe that way. I am sure a lot of other people don't believe that way.  So you have to wonder why do they believe that way?  Why would -- back to what I said before.  **Why would they believe so strongly that they would blow themselves up?**

MS. KING: So there is something going on with a **small group of Muslims that have some really strong feelings** that concern you?

CHAIR NO. 2: Say that again?

MS. KING:  I am sorry, maybe I will say it differently.  But it sounds like there is something, at least about **those people that engage in those activities**, **that you wonder why does their religion have them think it is okay to commit these acts.**  Is that a fair statement?

CHAIR NO. 2: That is fair.

(Voir Dire transcript at 87:12-25, 88:1-25, 89:1-2.)

Plaintiffs assert that this juror's responses "reflected a deep-seeded bias about the Muslim faith which warranted striking" him for cause.  (Doc. # 299 at 24.)  However, it is clear that juror number two was simply relating his disagreement with the tactics of a **small subgroup of extremist Muslims** – i.e., those Muslims that "would blow

themselves up" in the name of their religion.  Additionally, the juror expressed

skepticism about religious beliefs in general -- "**not necessarily Muslims or Islam,** but

I always wonder how people come to believe the way they do.  Why do they do things

different than me?  **Why do Catholics do certain things?**"  The Court disagrees that

juror number two's statements about his concerns regarding extremist Muslim terrorists

or religious diversity were indicative of bias against **all** Muslims.  Indeed, juror number

two specifically agreed when the Court asked him whether he could be "fair and

impartial, separating out what some terrorists are doing from people who are law

abiding citizens."  (Voir Dire transcript at 26:15-25, 27:1-2.)

Plaintiffs also argue that juror number fourteen should have been stricken for

cause based on the following exchange with the Court:

> THE COURT:  Do any of you feel that recent terrorist attacks or information in the news have affected your feelings about Muslims or the religion of Islam?

> CHAIR NO. 11: If I was seeing Christians, Jews, other religious groups carrying out acts of terrorism, then I wouldn't have an issue with Islamic terrorists. But, the fact is, most of that is done in the name of Islam, period.

> THE COURT: All right. Let's go ahead and go down to Ms. C.

> CHAIR NO. 14: I feel the same, but it is anybody in general, terrorist attacks.  But I guess it has made me a little more leery.

> THE COURT:  Of Muslims?  Does that feeling that you have, would that cause you not to be able to be fair and impartial to these five Muslim women in this case?

> CHAIR NO. 14:  I really hope not.

> THE COURT:  But you don't know?

> CHAIR NO. 14:  I don't want it to.

(*Id*. at 25:8-25, 26:1-3.)  They also reference the following exchange with Plaintiffs'

counsel:

> MS. KING: Anybody else have feelings about those kind of issues that you are comfortable sharing with us?  Anybody watch the news and start to wonder a little bit about what is going on here with this religion?  Why is it we are hearing so much about people who are Islamic committing pretty atrocious acts?  Ms. C., you said you had an issue or some concerns about people who are Muslim.  Can you share those with us?
>
> CHAIR NO. 14:  Just kind of the same stuff.  Just everything you see on TV, all of the terrorist attacks and everything.
>
> MS. KING:  Has that changed your behavior in any way?
>
> CHAIR NO. 14:  No, I don't think so.
>
> MS. KING:  Okay. Has it caused you, when you see Muslim people, does that cause you to think about that particular issue?
>
> CHAIR NO. 14:  Sometimes.
>
> MS. KING:  Pardon me?
>
> CHAIR NO. 14:  Sometimes.
>
> MS. KING:  Can you tell us more about that?
>
> CHAIR NO. 14:  I mean, I guess I am aware of it, I guess, more than anyone else.  I have -- I feel horrible saying that.
>
> MS. KING:  We want you to be honest, so please, please, you don't have to feel horrible.  Tell us how you feel.  So that is something you notice?
>
> CHAIR NO. 14:  Uh-huh.
>
> MS. KING: That makes you nervous potentially when you see somebody that is Muslim?
>
> CHAIR NO. 14:  Sometimes. Not always.

(*Id.* at 80:17-25, 81:1-23.)

When deciding whether the Court should strike juror fourteen for cause, the Court specifically stated, "I don't think she rises to the level of a strike for cause. . . . she never indicated she could not be fair and impartial." (*Id.* at 115:11-14.)  The Court's ruling was properly based on the entire exchange between the Court and the venire and the venire and the attorneys.  Indeed, after telling the venire that Plaintiffs were Muslim women who wore hijabs and that the case involved religious discrimination claims, the Court asked, "Do any of you feel that because of the subject matter of this case, the people involved, or similar experiences you or your family or friends may have had to those in this case, you may not be able to be fair and impartial to both sides?" and no juror, including juror fourteen, answered affirmatively.  (*Id.* at 20:6-10.)

Plaintiffs nonetheless seize on the fact that after defense counsel argued that Plaintiffs' motion to strike the juror numbers two and fourteen was because of those jurors' religion, the Court stated, "I don't think that is why they are striking them.  They are striking them because **they believe** they could not be fair and impartial."  (Id. at 113:24-25, 112:1-2) (emphasis added).  Plaintiffs assert that "the Court's acknowledgment that 'they could not be fair and impartial' . . . explains why the jurors should have been stricken for cause."  (Doc. # 299 at 25.)  However, the Court was clearly discussing **Plaintiffs' counsel's beliefs** ("they believe") about the jurors, **not its own**.

Regardless, even assuming that the Court erred in failing to strike one or both jurors, because Plaintiffs exercised preemptory challenges to successfully remove them, any purported error here is harmless and cannot serve as the basis for a new

trial.  *See Getter*, 66 F.3d at 1123 (holding that the trial court's error in failing to strike a juror for cause was harmless, because the plaintiff used a peremptory challenge to remove him, and "Plaintiff does not allege that the jury as seated was biased.  Thus, the district court's refusal to remove [the juror] for cause did not have a 'substantial influence on the outcome' of the trial, nor does it leave us 'in grave doubt as to whether it had such effect.'")  Plaintiffs argue that they were prejudiced because they "were forced to use two of their three peremptory challenges on jurors who should have been stricken for cause, leaving the Plaintiffs at a disadvantage to Defendant who raised no challenges for cause and thus was not forced to use peremptory challenges to strike any juror who had an openly-expressed bias adverse to Defendant."  (Doc. # 299 at 24.)  However, as in *Getter*, Plaintiffs do not allege that the jury as seated was biased, except in pointing to juror number seven, who made the following "concerning" statements:

> MS. KING:  Let me ask you -- I know, Mr. H., you said your brother was in the military in Afghanistan.

> CHAIR NO. 7: Brother-in-law.

> MS. KING: Did he share any feelings with you about how he was treated there that might influence one way or another your ability to sit in this case?

> CHAIR NO. 7: That is a good question. I mean, he certainly went through some pretty significant experiences; like he had friends that lost the lower part of the bodies in explosions. So, yeah, I do feel a bit of that experience he had. When I was in California and he got back, he had some pretty tough experiences.

(*Id.* at 90:22-25, 91:1-9.)  Nevertheless, because Plaintiffs did not attempt to remove juror number seven for cause (*see id.* at 108:12-13), this isolated statement that was, at

best, very tangentially related to Juror number seven's feelings about Muslims, does not warrant a new trial.

### III.  **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a New Trial (Doc. # 299) is HEREBY DENIED.

DATED:  November 3, 2016                    BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge